# 22-3237

## United States Court of Appeals for the Second Circuit

MICHAEL SPENCER, HIS TABERNACLE FAMILY CHURCH, INC.,

*Plaintiffs-Appellees,*

v.

STEVEN A. NIGRELLI, Acting Superintendent of the New York State Police, in his official and individual capacities,

*Defendant-Appellant,*

WEEDEN A. WETMORE, District Attorney for the County of Chemung, New York, in his official and individual capacities, MATTHEW VAN HOUTEN, District Attorney for the County of Tompkins, New York, in his official and individual capacities, EVERYTOWN FOR GUN SAFETY,

*Defendants.*

On Appeal from the United States District Court for the Western District of New York

## BRIEF FOR APPELLANT

BARBARA D. UNDERWOOD
 *Solicitor General*
ESTER MURDUKHAYEVA
 *Deputy Solicitor General*
JONATHAN D. HITSOUS
 *Assistant Solicitor General*
  *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellant
The Capitol
Albany, New York 12224
(518) 776-2044

Dated: February 7, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES....................................................................iii

PRELIMINARY STATEMENT.................................................................1

JURISDICTIONAL STATEMENT ...........................................................3

ISSUES PRESENTED .............................................................................4

STATEMENT OF THE CASE .................................................................4

    A.   Legal Background ........................................................................4

        1.   The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen* ..........................4

        2.   New York's prohibition on firearms in places of worship....6

    B.   Procedural Background .................................................................7

    C.   The District Court's Preliminary-Injunction Ruling..............10

STANDARD OF REVIEW.....................................................................14

SUMMARY OF ARGUMENT .................................................................15

ARGUMENT .........................................................................................18

POINT I

PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR FIRST AMENDMENT CHALLENGES TO THE PLACE-OF-WORSHIP PROVISION.........................................................18

    A.   The Place-of-Worship Provision Does Not Violate the Free Exercise Clause. ............................................................19

        1.   The place-of-worship provision does not burden plaintiffs' religious beliefs or practices............................19

**Page**

2. The place-of-worship provision is a neutral and generally applicable law. .................................. 23

3. Alternatively, the place-of-worship provision survives strict scrutiny. .................................. 31

B. The Place-of-Worship Provision Does Not Violate the Establishment Clause. ........................................... 36

POINT II

PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR SECOND AMENDMENT CHALLENGE TO THE PLACE-OF-WORSHIP PROVISION ........................................... 41

A. The Place-of-Worship Provision Is Presumptively Lawful ...... 42

B. The Place-of-Worship Provision Is a Sensitive-Place Restriction That Is Consistent with the Historical Tradition of Firearms Regulation .......................................... 45

1. Places of worship have long been regarded as sensitive places. .................................. 47

2. Places of worship are sufficiently analogous to other sensitive locations. .......................................... 54

POINT III

THE DISTRICT COURT ERRED IN APPLYING THE REMAINING PRELIMINARY-INJUNCTION FACTORS ...................................... 61

A. Plaintiffs Have Not Demonstrated Irreparable Harm Absent a Preliminary Injunction. .......................................... 61

B. The Preliminary Injunction Harms the Public Interest. ....... 64

CONCLUSION ........................................... 67

ii

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Andrews v. State*,
  50 Tenn. 165 (1871) ........................................................49-50

*Bonidy v. United States Postal Serv.*,
  790 F.3d 1121 (10th Cir. 2015) .......................................... 44

*Brody v. Village of Port Chester*,
  261 F.3d 288 (2d Cir. 2001) ............................................... 65

*Brooks v. Giuliani*,
  84 F.3d 1454 (2d Cir. 1996) ............................................... 22

*Burg v. Gosselin*,
  591 F.3d 95 (2d Cir. 2010) ................................................ 43

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940) ......................................................... 18

*Caswell v. Calderon*,
  363 F.3d 832 (9th Cir. 2004) ............................................. 43

*Central Rabbinical Cong. of the U.S. & Can. v. New York City
  Dep't of Health & Mental Hygiene*,
  763 F.3d 183 (2d Cir. 2014) ........................................ 23, 30

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) .................................... 23-24, 26, 29-30

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985) ............................................... 62

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ........................................................... 66

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .............................. 16, 43-44, 52, 59, 65

| Cases | Page(s) |
|---|---|

*Drevlow v. Lutheran Church, Mo. Synod,*
  991 F.2d 468 (8th Cir. 1993) ............................................................. 37

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,*
  884 F.3d 560 (6th Cir. 2018) ...................................................... 33, 35

*Employment Div., Dep't of Hum. Res. of Or. v. Smith,*
  494 U.S. 872 (1990) .................................................. 19, 26-27, 30-31

*English v. State,*
  35 Tex. 473 (1871) ...................................................................... 49, 58

*Everson v. Board of Ed. of Ewing,*
  330 U.S. 1 (1947) .............................................................................. 18

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
  559 F.3d 110 (2d Cir. 2009) ............................................................. 63

*Fields v. City of Tulsa,*
  753 F.3d 1000 (10th Cir. 2014) ........................................................ 42

*Fulton v. City of Philadelphia,*
  141 S. Ct. 1868 (2021) ................................................................ 24, 32

*Goff v. Harper,*
  60 F.3d 518 (8th Cir. 1995) .............................................................. 64

*Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.,*
  764 F.3d 210 (2d Cir. 2014) ............................................................. 14

*Grace United Methodist Church v. City of Cheyenne,*
  451 F.3d 643 (10th Cir. 2006) .......................................................... 26

*Green Haven Prison Preparative Meeting of the Religious Soc'y of
  Friends v. New York State Dep't of Corr. & Cmty. Supervision,*
  16 F.4th 67 (2d Cir. 2021) ............................................................... 22

*Hardaway v. Nigrelli,*
  No. 22-cv-771, 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ....... 12, 58

iv

**Cases**                                                              **Page(s)**

*Hill v. State,*
    53 Ga. 472 (1874) ................................................................. 49

*In re Subpoena 2018R00776,*
    947 F.3d 148 (3d Cir. 2020) ............................................... 34

*Kane v. De Blasio,*
    19 F.4th 152 (2d Cir. 2021)................................... 28-29, 32

*Kansas v. Hendricks,*
    521 U.S. 346 (1997)............................................................ 43

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.,*
    344 U.S. 94 (1952) ............................................................. 36

*Kennedy v. Bremerton Sch. Dist.,*
    142 S. Ct. 2407 (2022)................................ 19, 24, 32, 36, 40

*Kwong v. Bloomberg,*
    723 F.3d 160 (2d Cir. 2013) ............................................. 32

*Leebaert v. Harrington,*
    332 F.3d 134 (2d Cir. 2003) ............................................. 32

*Listecki v. Official Comm. of Unsecured Creditors,*
    780 F.3d 731 (7th Cir. 2015)............................................. 37

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy,*
    141 S. Ct. 2038 (2021)....................................................... 53

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)...................................................... 43, 53

*McRaney v. North American Mission Bd. of the S. Baptist
    Convention, Inc.,*
    966 F.3d 346 (5th Cir. 2020).............................................. 37

*NAACP, Inc. v. Town of E. Haven,*
    70 F.3d 219 (2d Cir. 1995) ............................................... 61

v

**Cases**                                                                                    **Page(s)**

*New York Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) ......................................................... 14, 61

*New York State Rifle & Pistol Ass'n v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) ......................................................... 34, 65

*New York State Rifle & Pistol Association v. Bruen*,
    142 S. Ct. 2111 (2022)............................................................... passim

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................ 61

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020)................................................................ 37, 40

*Owens v. State*,
    3 Tex. App. 404, 407 (1878) ............................................................. 49

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
    686 F.3d 889 (8th Cir. 2012)............................................................. 43

*Ramos v. Louisiana*,
    140 S. Ct. 1390 (2020)....................................................................... 53

*Redlich v. City of St. Louis*,
    550 F. Supp. 3d 734 (E.D. Mo. 2021)................................................ 26

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) ................................................................ 62

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973)............................................................................... 59

*Scotts Co. v. United Indus. Corp.*,
    315 F.3d 264 (4th Cir. 2002)............................................................. 45

*Smith v. Board of Educ.*,
    844 F.2d 90 (2d Cir. 1988) ................................................................ 22

**Cases**                                                           **Page(s)**

*South Ridge Baptist Church v. Industrial Comm'n of Ohio,*
  911 F.2d 1203 (6th Cir. 1990) ............................................... 39

*Sussman v. Crawford,*
  488 F.3d 136 (2d Cir. 2007) ................................... 14, 18, 41

*Tandon v. Newsom,*
  141 S. Ct. 1294 (2021) .............................................. 28, 34

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.,*
  450 U.S. 707 (1981) ........................................................ 56

*Timbs v. Indiana,*
  139 S. Ct. 682 (2019) ..................................................... 53

*Tony & Susan Alamo Found. v. Secretary of Labor,*
  471 U.S. 290 (1985) ........................................................ 38

*Tough Traveler, Ltd. v. Outbound Prods.,*
  60 F.3d 964 (2d Cir. 1995) ............................................... 62

*Trammel v. United States,*
  445 U.S. 40 (1980) .......................................................... 56

*United States Sec. & Exch. Comm'n v. Citigroup Glob. Mkts., Inc.,*
  752 F.3d 285 (2d Cir. 2014) ............................................. 66

*United States v. Class,*
  930 F.3d 460 (D.C. Cir. 2019) ......................................... 43

*United States v. Lee,*
  455 U.S. 252 (1982) ........................................................ 36

*United States v. Smythe,*
  363 F.3d 127 (2d Cir. 2004) ............................................. 65

*Village of Hempstead v. Roman Cath. Church of Our Lady
  of Loretto at Hempstead,*
  198 A.D.2d 409 (2d Dep't 1993) ....................................... 39

**Cases**                                                          **Page(s)**

*Walter v. State,*
   25 Ohio Cir. Dec. 567 (Cir. Ct. 1905)..................................................50

*Walz v. Tax Comm'n,*
   397 U.S. 664 (1970) ......................................................................41

*We The Patriots USA, Inc. v. Hochul,*
   17 F.4th 266 (2d Cir. 2021)................................................25-26, 31, 64

*Wilson v. State,*
   33 Ark. 557 (1878)........................................................................49

*Winter v. NRDC, Inc.,*
   555 U.S. 7 (2008).........................................................................64

*WPIX, Inc. v. ivi, Inc.,*
   691 F.3d 275 (2d Cir. 2012) .............................................................64

*YU Pride All. v. Yeshiva Univ.,*
   211 A.D.3d 562 (1st Dep't 2022) ........................................................38

**Constitutions**

U.S. Const. amend. I ...........................................................................18

**Laws**

*New York*

Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Sys.)..............................6

C.P.L.R. 4505...................................................................................56

Penal Law
   § 265.01-d .................................................................................28
   § 265.01-e ..............................................................1, 6-7, 20, 24
   § 265.03 .....................................................................................4
   § 265.20 .....................................................................................4
   § 400.00 .....................................................................................5

**Laws** **Page(s)**

*Other States (alphabetical)*

Act No. 13, 1889 Ariz. Terr. Sess. Laws 16.............................................. 48

Act No. 285, 1870 Ga. Laws 421 ...................................................... 47, 60

Penal Code of the State of Idaho § 4781 (1901).................................... 48

Act re Carrying Concealed Weapons, 1874 Mo. Laws 43...................... 47

Okla. Terr. Stat. ch. 25, art. 47 (1891)............................................... 48

Ch. 22, 1869 Tenn. Pub. Acts 23 (1st Sess.) ......................................... 48

Ch. 46, 1870 Tex. Gen. Laws 63 (Called Sess.)................................ 47, 60

Ch. 7, 1877 Va. Acts 301 (1877-1878 Assembly, 2d Sess.) .................... 47

*English*

4 Hen. 4, c. 29 (1403) ...................................................................54

26 Hen. 8, c. 6 (1534) .................................................................. 54

The Statute of Northampton of 1328, 2 Edw. 3, c. 3 (1328) ................. 54

**Miscellaneous Authorities**

A3005/S4005, 246th Sess. (2023) ........................................................ 21

Assembly Sponsor's Mem. A41001 (2022),
  https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=A4
  1001&term=2021&Memo=Y............................................................. 25

Christine P. Bartholomew, *Exorcising the Clergy Privilege*,
  103 Va. L. Rev. 1015 (2017)............................................................. 56

ix

## Miscellaneous Authorities            Page(s)

Faith Cmtys. Today & Hartford Inst. for Religion Rsch.,
    *Religious Education During the Pandemic: A Tale of
    Challenge and Creativity* (Apr. 2022),
    https://www.covidreligionresearch.org/wp-
    content/uploads/2022/04/Religious-Education-During-the-
    Pandemic_April-2022.pdf ................................................................. 57

Patrick J. Charles, *The Fugazi Second Amendment* (2022)
    (forthcoming Clev. St. L. Rev.),
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4222490 ........... 55

Senate Sponsor's Mem. S51001 (2022),
    https://www.nysenate.gov/legislation/bills/2021/s51001 ................... 25

x

## PRELIMINARY STATEMENT

In July 2022, the New York Legislature enacted the Concealed Carry Improvement Act ("CCIA") to update New York's firearm licensing and possession laws following the U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). As relevant to this case, the CCIA prohibits firearms in certain "sensitive locations," including "any place of worship or religious observation." N.Y. Penal Law § 265.01-e(2)(c).

Four months after the law was enacted and two months after it took effect, plaintiffs Michael Spencer and His Tabernacle Family Church, where Spencer serves as senior pastor, president, and chief executive officer, sued to challenge the place-of-worship provision as unconstitutional under the First, Second, and Fourteenth Amendments. The U.S. District Court for the Western District of New York (Sinatra, J.) preliminarily enjoined defendant Steven A. Nigrelli, in his official capacity as Acting

Superintendent of the New York State Police, from enforcing the provision statewide.[1] This Court should reverse.

Contrary to the district court's ruling, plaintiffs are unlikely to succeed on the merits of their First Amendment challenges to the place-of-worship provision. Spencer's admissions at the preliminary-injunction hearing demonstrated that the provision does not burden his religious activity. In any event, the provision is a neutral and generally applicable law that does not target religious activity for disfavored treatment in violation of the Free Exercise Clause. Nor does the provision interfere with "church governance" in violation of the Establishment Clause.

Plaintiffs are also unlikely to succeed on the merits of their Second Amendment challenge to the place-of-worship provision. Sensitive-place restrictions are presumptively lawful, and plaintiffs failed to overcome that presumption. In any event, the State identified numerous statutes and judicial precedents from the nineteenth century that prohibited fire-

---

[1] The injunction also applies to defendants Weeden Wetmore, in his official capacity as the District Attorney for Chemung County, New York, and Matthew Van Houten, in his official capacity as District Attorney for Tompkins County, New York. Defendants Wetmore and Van Houten have not appealed from the preliminary injunction.

arms in places of worship and introduced evidence that places of worship were analogous to other locations historically recognized as sensitive, including places expressly identified in *Bruen*.

Finally, the district court erred in its application of the remaining preliminary-injunction factors. Among other things, the court improperly speculated that plaintiffs would suffer irreparable harm absent an injunction and improperly based its public-interest finding on its policy disagreements with New York's elected leaders.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. Because the district court's order granting a preliminary injunction is an appealable interlocutory order, this Court has jurisdiction under 28 U.S.C. § 1292(a). The State timely filed its notice of appeal on December 30, 2022, within 30 days of the district court's December 29, 2022, order. Fed. R. App. P. 4(a)(1)(A).

# ISSUES PRESENTED

1.    Did plaintiffs fail to show a likelihood of success on their claims that the Free Exercise Clause and the Establishment Clause forbid States from designating places of worship as sensitive locations where firearms can be restricted?

2.    Did plaintiffs fail to show a likelihood of success on their claim that the Second Amendment forbids States from designating places of worship as sensitive locations where firearms can be restricted?

3.    Did plaintiffs fail to satisfy their burden with respect to the remaining preliminary-injunction factors?

# STATEMENT OF THE CASE

## A.   Legal Background

### 1.    The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*

Like dozens of States, New York requires a license to carry a concealed handgun in public. *See, e.g.*, Penal Law §§ 265.03 (criminal-izing possession of loaded handgun), 265.20(a)(3) (exempting license holders). New York has long set forth basic eligibility criteria for a license,

including being at least twenty-one years old, not having a felony record, and otherwise having "good moral character." *Id.* § 400.00(1)(a)-(c).

Until recently, New York also required demonstrating "proper cause" to obtain a concealed-carry license. *Id.* § 400.00(2)(f) (effective through June 23, 2022). In *Bruen*, the U.S. Supreme Court concluded that insofar as "proper cause" demanded showing "a special need for self-defense," this requirement implicated the Second Amendment right of law-abiding, responsible citizens to carry arms in public for self-defense and was invalid because it was unsupported by historical tradition. 142 S. Ct. at 2122, 2130-31. In so holding, *Bruen* rejected the framework previously used by nearly all federal courts of appeal to evaluate Second Amendment challenges in favor of a restated standard: if "the Second Amendment's plain text covers an individual's conduct," then the government seeking to regulate that conduct "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126; *see also id.* at 2129.

*Bruen* declined to "undertake an exhaustive historical analysis of the full scope of the Second Amendment." 142 S. Ct. at 2134 (quotation and alteration marks omitted). However, the Court "assume[d] it settled"

5

that certain locations are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* at 2133. The opinion endorsed such "'longstanding'" bans in schools, legislative assemblies, polling places, and courthouses, while recognizing that this list was non-exhaustive and "that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* The Court also made clear that its decision was not intended to be a "regulatory straightjacket" and that governments were not required to identify "historical twin[s]" or "dead ringer[s]" to support modern restrictions. *Id.* (emphasis omitted).

### 2. New York's prohibition on firearms in places of worship

On July 1, 2022, the New York Legislature passed the CCIA, which removed the proper-cause requirement that *Bruen* declared unconstitutional and made several other changes to New York's firearm licensing and possession laws. *See* Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Sys.).

As relevant here, the CCIA prohibits carrying "a firearm, rifle or shotgun" in several "sensitive location[s]," including in "any place of worship or religious observation." Penal Law § 265.01-e(1), (2)(c). The

6

sensitive-location provisions do not apply to law-enforcement officers, military personnel, and armed security guards. *Id.* § 265.01-e(3). The sensitive-location provisions took effect on September 1, 2022.

## B. Procedural Background

On November 3, 2022, plaintiffs filed suit under 42 U.S.C. § 1983 in the U.S. District Court for the Western District of New York against Acting Superintendent Nigrelli and two district attorneys, all in their official capacities, challenging the place-of-worship provision under the First, Second, and Fourteenth Amendments and seeking declaratory and injunctive relief. (J.A. 47, 60-68.) Plaintiffs claimed that the provision violated the Free Exercise Clause of the First Amendment by targeting places of worship for disfavored treatment and violated the Establishment Clause of the First Amendment by intruding into matters of church governance. (J.A. 62-64.) Plaintiffs also claimed that the provision violated the Second Amendment by infringing on Spencer's right to carry firearms for self-defense. (J.A. 65.)

Shortly thereafter, plaintiffs moved for a preliminary injunction barring defendants from enforcing the place-of-worship provision while the litigation was pending. (J.A. 69.) Spencer asserted in a supporting

7

declaration that a pastor has a religious obligation to provide for the physical safety of his congregants and that he carries a firearm into church "[c]onsistent with, and as an application of, these religious beliefs." (J.A. 74.) Spencer further stated that he had engaged a team of volunteers from the congregation to provide security for the church, by, among other things, carrying firearms and completing security-related trainings. (J.A. 73; *see also* J.A. 86-87 (declaration from a member of the security team).)

In opposition, the State offered the opinion of Patrick Charles, an expert in the history of American firearm regulations. (J.A. 101-102.) Charles described historical sensitive places as locations where (1) political activity took place, (2) children were frequently present, (3) people were known to congregate, and (4) alcohol was consumed. (*See* J.A. 112.) Charles further identified restrictions on firearms in places of worship—either directly or through broader laws that necessarily encompassed places of worship—that had been enacted during the nineteenth century, which the State attached to his declaration. (J.A. 107-112; *see also* J.A. 124-

171.) To Charles's knowledge, no court had ever invalidated a law prohibiting firearms in places of worship. (J.A. 112-113.)[2]

At the preliminary-injunction hearing, Spencer testified that he derives his belief that pastors needed to protect their congregants from biblical language referring to shepherds as carrying a staff and a sword to protect their flock. (J.A. 194-195, 197.) Some, but not all, of Spencer's assistant pastors also carry firearms; Spencer does not believe that the assistant pastors who choose not to carry firearms are acting inconsistently with his teachings. (J.A. 236-238.) Spencer has never made a public announcement to the congregation addressing the topic of firearms in church. (J.A. 200.) Although Spencer carries his firearm at church on weekdays, he does not carry a weapon on Sundays because he wants to focus on preaching. (J.A. 199, 231.) Instead, Spencer relies on his security team of 12 to 16 volunteers, at least two of whom are law enforcement members. (*See* J.A. 199, 201, 223-225, 233, 240.) Spencer is unsure if the entire security team carries firearms, and he has not asked. (*See* J.A. 225.)

---

[2] The district-attorney defendants opposed the preliminary injunction on the ground that they had not enforced the place-of-worship provision against anyone and did not intend to do so. (J.A. 95-96, 99-100.)

9

Spencer is not inclined to hire private security, because the current team members regard their roles as a spiritual calling, and the church purportedly lacks sufficient funds to hire outside security without undermining other programs. (J.A. 228-229, 242-245.)

## C. The District Court's Preliminary-Injunction Ruling

On December 29, the district court granted the preliminary-injunction motion. (J.A. 42-43.)

First, the district court determined that plaintiffs were likely to succeed on the merits of their Free Exercise Clause claim. The court concluded that the place-of-worship provision burdened Spencer's ability to "effectuate[]" his religious calling to provide for his congregants' safety. (J.A. 12, 19-20 (quotation marks omitted).) According to the district court, the statutory exception that would permit security guards to carry firearms on church premises did not reduce the burden on Spencer because hiring guards could strain the church's finances and such guards might not act pursuant to a religious calling. (J.A. 20-21.)

The district court next found that the place-of-worship provision was not neutral because it lacked a "secular meaning discernable from [its] language or context." (J.A. 22 (quotation marks omitted).) Even though

10

the CCIA also prohibits firearms in numerous secular places such as bars, casinos, amusement parks, theaters, and banquet halls, the district court found that the place-of-worship provision was not generally applicable because it "specifically target[ed] carrying of firearm[s] motivated by religious beliefs while permitting concealed carry in relation to numerous secular activities" in other non-sensitive locations such as hair salons, retail stores, shopping malls, and gas stations. (J.A. 22-24.) The district court concluded that the provision could not withstand strict scrutiny because, in its view, there was no apparent justification for any differential treatment between places of worship and any other privately owned location—including by implication those not designated as sensitive— and further found insufficient evidence that the provision would prevent mass shootings. (J.A. 26-27.)

Second, the district court determined that plaintiffs were also likely to prevail on their Establishment Clause claim. The court found that the place-of-worship provision encroached on a matter "closely linked" with the church's right to govern its own affairs, including selecting persons to provide armed security. (J.A. 28-30 (quotation marks omitted).) The court further chastised the State for making "no attempt" to justify such

11

an intrusion into church governance as consistent with historical tradition (J.A. 29-30), apparently disregarding the expert declaration submitted by the State.

Third, the district court determined that plaintiffs were likely to succeed on their Second Amendment claim. Placing the burden solely on the State to justify the place-of-worship provision with historical evidence, the court ruled that the State failed to show that places of worship were relevantly analogous to historic sensitive-location restrictions. (J.A. 32.) Relying on its earlier decision in *Hardaway v. Nigrelli*, No. 22-cv-771, 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022),[3] the court rejected numerous historical laws prohibiting firearms in places of worship as "outliers" because they were enacted in only a "handful" of States, of "unknown duration," in conflict with colonial-era laws that purportedly mandated guns in places of worship, and passed after the Second Amendment's ratification in 1791. (J.A. 33-34.)

_____

[3] This appeal has been calendared for oral argument together with the State's appeal from the district court's order in *Hardaway* and *Antonyuk v. Hochul*, another case involving the place-of-worship provision. *See* Order (Jan. 23, 2023), CA2 ECF No. 47.

Finally, the district court found that equitable concerns weighed in favor of a preliminary injunction. The court found that Spencer had shown irreparable harm because the place-of-worship provision deprived him of the "psychic comfort" of carrying a weapon for self-defense. (J.A. 36 (quotation marks omitted).) The court also found that the asserted religious-rights violations constitute irreparable harm per se. (J.A. 36-37.) The court further determined that enjoining the statute's enforcement would promote the public's "significant interest in the 'strong sense of the safety that a licensed concealed handgun regularly provides.'" (J.A. 38-39.)

Consistent with the stays pending appeal that this Court has issued in *Antonyuk* and *Hardaway*, the parties jointly requested that the district court stay its order pending the State's appeal, and that the terms of the stay permit plaintiffs to "designate individuals otherwise authorized by law to carry a firearm to do so on church premises for the purposes of keeping the peace." (J.A. 284.) The district court granted the parties' request. (J.A. 41-42.)

13

## STANDARD OF REVIEW

On appeal from an order granting injunctive relief, this Court reviews the district court's legal holdings de novo and its ultimate decision for abuse of discretion. *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.,* 764 F.3d 210, 214 (2d Cir. 2014).

When determining a movant's entitlement to a preliminary injunction, courts consider whether (1) the movant is likely to succeed on the merits, (2) the movant will suffer irreparable harm absent an injunction (3) an injunction is in the public interest, and (4) there are other equities that weigh for or against an injunction. *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). Where, as here, a preliminary injunction "will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," the moving party must satisfy a heightened standard, which requires a "clear" or "substantial" likelihood of success. *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quotation marks omitted). In all events, a "'preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion.'" *Id.* at 139 (emphasis in original).

14

## SUMMARY OF ARGUMENT

This Court should reverse the district court's order granting a preliminary injunction.

First, the district court was mistaken in finding that plaintiffs were likely to succeed on their free exercise claim. The place-of-worship provision does not burden plaintiffs' exercise of religion because they can comply with the CCIA while discharging any religious obligation to protect congregants. Moreover, plaintiffs failed to show that the provision treats religious activity less favorably than comparable secular activity or that it was enacted to disfavor religious activity. In finding otherwise, the district court rested on unfounded factual assumptions and an oversimplified legal analysis. In any event, the provision would survive strict scrutiny because it serves a compelling state interest and is the least restrictive means to do so.

Second, the district court erred in finding that plaintiffs established a likelihood of success on their Establishment Clause claim. A law prohibiting firearms in places of worship has no bearing on matters of faith and doctrine. And the place-of-worship provision does not intrude on protected matters of "church governance," especially given that Spencer

15

admitted that his church has no policy on the possession of firearms, either by clergy or by congregants. In any event, governments have long exercised their police powers to regulate firearms in order to protect the safety of congregants and others.

Third, the district court erred in concluding that plaintiffs showed a likelihood of success on their Second Amendment claim. The Supreme Court has recognized that sensitive-place regulations are presumptively lawful. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008). The district court improperly relieved plaintiffs of their burden to overcome this presumption with respect to the place-of-worship provision.

In any event, the State offered ample evidence that places of worship have been recognized as sensitive places throughout history, and the validity of such prohibitions has never been called into doubt. The district court summarily and erroneously rejected these Reconstruction-era statutes as irrelevant "outliers" and identified a conflict with colonial laws purportedly mandating firearms in places of worship. But nothing in *Bruen* suggests that some minimum number of historical precedents is necessary to justify a firearm regulation. And the colonial-era laws refer-

16

enced by the district court demonstrate that the presence (or non-presence) of firearms in places of worship has long been regarded as a matter appropriate for government regulation. The district court's suggestion that the State's historical evidence lacks probative value because it comes from the nineteenth century is inconsistent with *Bruen*, which considered both Founding-era and Reconstruction-era laws in its analysis.

Further, the place-of-worship provision is relevantly similar to other historical statutes protecting sensitive locations, including the places expressly referenced in *Bruen* and *Heller* (i.e., schools, government buildings, legislative assemblies, polling places, and courthouses). Like historic sensitive-place restrictions, the place-of-worship provision supports the exercise of other constitutional rights; protects vulnerable people such as children; and reduces the risk of chaos from firearm-related threats or fears in an enclosed and unusually crowded place. The district court erroneously disregarded these similarities.

Finally, the district court erred in its analysis of the equitable factors. The court improperly speculated that Spencer faced irreparable "psychic" harm in the absence of a preliminary injunction, even though Spencer had never claimed such harm. The court also found that the

17

injunction would be in the public interest because, in its view, the State had not made a sufficiently concrete showing that the presence of firearms in places of worship posed a threat to public safety. In so doing, the district court improperly substituted its own policy judgment for the decisions made by New York's elected leaders.

## ARGUMENT

### POINT I

#### PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR FIRST AMENDMENT CHALLENGES TO THE PLACE-OF-WORSHIP PROVISION

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I; *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (incorporating the Free Exercise Clause against the States); *Everson v. Board of Ed. of Ewing*, 330 U.S. 1, 8 (1947) (incorporating Establishment Clause against the States). For the reasons that follow, plaintiffs failed to meet their heightened burden, *see Sussman*, 488 F.3d at 140, to show a likelihood of success on the merits of their claims arising under either the Free Exercise or the Establishment Clause.

18

**A.** **The Place-of-Worship Provision Does Not Violate the Free Exercise Clause.**

The State's prohibition of firearms in places of worship did not violate Spencer's free exercise rights. The Free Exercise Clause protects both religious beliefs and practices—that is, action or inaction undertaken pursuant to those beliefs. *Employment Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990). However, the Free Exercise Clause does not "make an individual's obligation to obey [the] law contingent upon the law's coincidence with his religious beliefs." *Id.* at 885. A plaintiff in a free exercise case must show that (1) the government has burdened his sincere religious beliefs or practices, and (2) the law or policy imposing that burden is neither neutral nor generally applicable. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022). Only if the plaintiff makes these showings does the burden shift to the government to justify the law or policy under strict scrutiny. *Id.*

**1.** **The place-of-worship provision does not burden plaintiffs' religious beliefs or practices.**

Spencer asserts that, as a pastor, he has a religious obligation to protect his congregants. (J.A. 74, 194-195, 197.) Although the State does not question the sincerity of this belief, Spencer's own statements establish

19

that the place-of-worship provision does not meaningfully interfere with his ability to fulfill any obligation to protect his congregants.

As an initial matter, Spencer acknowledged that carrying firearms is not necessary to fulfill a religious obligation to protect congregants. Spencer admitted that several pastors in his church do not carry firearms and that their decisions not to do so do not undermine or contradict his teachings on protecting the flock. (J.A. 237-238.) Spencer even conceded that he did not regard it as religiously necessary for every member of the church's volunteer security team to carry firearms. (*See* J.A. 225, 237.) Indeed, Spencer did not know how many team members possessed carry licenses and has never found it necessary to inquire. (J.A. 225.) These admissions demonstrate that a law prohibiting firearms in places of worship would not prevent plaintiffs from discharging any perceived religious obligation to protect congregants.

Moreover, the CCIA includes an exception allowing multiple classes of individuals to bring firearms into places of worship and other sensitive locations, including active law enforcement, retired law enforcement, peace officers, active military, and registered security guards. Penal Law § 265.01-e(3)(a) to (f). Spencer admitted that he learned about the excep-

20

tion only days before the hearing (J.A. 240)—and thus after filing suit—and had not tried to bring the church's security into compliance with the CCIA, by, for example, hiring outside security or registering members of the volunteer security team as security guards.[4] (J.A. 246.)

The district court's finding that compliance with the CCIA's exception would be impracticable (J.A. 21) lacks support. The district court unquestioningly accepted Spencer's assertion that hiring private security guards would strain the church's financial resources (J.A. 21), even though plaintiffs provided no evidence regarding their operating expenses, the estimated cost of hiring private security guards, or the impracticality of recruiting volunteers for his security team who qualify or could become qualified as security guards. The district court irrationally disregarded the fact that Spencer has never tried to recruit volunteers for his security team that would qualify under the exception or register existing members

---

[4] Governor Kathy Hochul's proposed budget bill, introduced February 1, 2023, would amend the place-of-worship provision to create an additional exception for "persons responsible for security at such places of worship" even if they are not "registered security guards." A3005/S4005, 246th Sess., pt. F, subpt. A, § 1 (2023). If this measure becomes law during the pendency of this litigation, plaintiffs' Free Exercise and Establishment Clause claims will be rendered academic.

as "security guards" under Penal Law § 265.01-e(3)(e), even though he sends his volunteers for a variety of security-related trainings. (J.A. 73.) Although the district court found that there were too few qualifying volunteers to adequately protect the church (J.A. 21), that finding was premature where Spencer had yet to try. *See Brooks v. Giuliani*, 84 F.3d 1454, 1467-68 (2d Cir. 1996) (vacating preliminary injunction that was based in part on unsupported factual findings).

At most, plaintiffs have identified inconveniences associated with employing the CCIA's existing exception to allow certain persons to carry firearms to protect congregants. However, inconvenience alone is not the burden the Free Exercise Clause exists to protect against. For example, this Court has held that worshippers were not burdened by a prison's rescheduling of their quarterly meeting when they could not ascribe any religious significance to the rescheduled day. *Green Haven Prison Preparative Meeting of the Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 85 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2676 (2022). Similarly, a Saturday graduation ceremony did not burden a student who observed Saturday sabbaths when he would receive the diploma whether or not he attended the ceremony. *See Smith*

*v. Board of Educ.*, 844 F.2d 90, 91, 93-94 (2d Cir. 1988). Absent non-speculative evidence that compliance with the CCIA was impracticable or would itself interfere Spencer's religious beliefs, plaintiffs' free exercise claim rests on inconvenience alone, and must accordingly fail.

### 2. The place-of-worship provision is a neutral and generally applicable law.

Even if plaintiffs could show that the place-of-worship provision burdened religious exercise, any such burden would be permissible because it is incidental to a neutral and generally applicable law.

The Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Central Rabbinical Cong. of the U.S. & Can. v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014) (quotation marks omitted). A law that refers to a religious practice is facially neutral if it has "a secular meaning discernible from the language or context." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). A law is generally applicable when it does not "impose burdens only on conduct motivated by religious belief." *Id.* at 543. Neutrality and

general applicability are interrelated, such that a failure to satisfy one requirement typically signifies a failure to satisfy the other. *Id.* at 531.

The place-of-worship provision is both facially neutral and generally applicable, for several reasons.

First, the CCIA's sensitive-locations provision prohibits firearms in places of worship as well as in 19 other categories of secular locations such as schools, polling places, government buildings, bars, casinos, public parks, theaters, and banquet halls. *See* Penal Law § 265.01-e(2). The CCIA's prohibitions apply equally to those who carry firearms into places of worship as to those who carry firearms into any of the other enumerated sensitive locations. The law exempts certain categories of persons such as law enforcement officials, security guards, and military personnel, *id.* § 265.01-e(3), but does not exempt persons based on their asserted justification for carrying a firearm.

In other words, the CCIA does not "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *See Kennedy*, 142 S. Ct. at 2422 (quotation marks omitted). Nor does the law "invite[] the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*

24

*v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021) (quotation marks omitted).

Second, the State's rationale for designating places of worship as sensitive locations is decidedly secular in nature. As described in more detail *infra* at 55-58, places of worship are sensitive because, like court-houses and polling places, they host other constitutionally protected activity that may be chilled by the presence of firearms. In addition, places of worship, like schools, daycares, and public parks, are sensitive because they often contain a concentration of uniquely vulnerable persons such as children. And the use of firearms in places of worship, as in other sensitive locations prone to crowding, poses unique risks of gun-related injuries and deaths. The CCIA's legislative history confirms that the sensitive-location prohibitions were part of an effort to update the State's gun-control measures to comply with *Bruen* while continuing to address the dangers that firearms posed to society—a motive that is wholly secular. *See* Assembly Sponsor's Mem. A41001 (2022); Senate Sponsor's Mem. S51001 (2022);[5] *see also We The Patriots USA, Inc. v. Hochul*, 17 F.4th

_____

[5] For sources available online, full URLs appear in the Table of Authorities. All URLs were last visited on February 7, 2023.

25

266, 282-83 (2d Cir.) (record showed that broadening of vaccine mandate was most likely motivated by heath concerns, rather than religious animus), *clarified by* 17 F.4th 368 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2569 (2022).

Third, plaintiffs' mere assertion of an "adverse impact" on their claimed religious obligation to protect congregants does not change the analysis as to neutrality or general applicability. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 535. For example, courts have upheld over religious objections laws prohibiting controlled substances, *Smith*, 494 U.S. at 882; vaccine mandates, *We The Patriots*, 17 F.4th at 287-88; zoning ordinances, *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 651-52 (10th Cir. 2006); and food-safety rules, *Redlich v. City of St. Louis*, 550 F. Supp. 3d 734, 753 (E.D. Mo. 2021), *aff'd*, 51 F.4th 283 (8th Cir. 2022). Plaintiffs here have "not pointed to any evidence to support [their] conclusory allegation that the [State] specifically targeted religious groups or [their] denomination in its enforcement of the ordinance in this case." *Grace United Methodist Church*, 451 F.3d at 653. The place-of-worship provision specifically and the sensitive-locations provision as a whole represent a permissible policy choice to restrict the carrying of

firearms in places that are uniquely vulnerable to harms caused by intentional and accidental shootings. The secular activity at issue—possession of firearms in sensitive locations—is a proper subject for state regulation, even if a burden on purportedly religious activity happens to result incidentally. "The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, cannot depend on measuring the effects of a government action on a religious objector's spiritual development." *Smith*, 494 U.S. at 885 (quotation marks omitted).

The district court was mistaken that the place-of-worship provision was not neutral or generally applicable because secular property owners could decide whether to allow firearms. (J.A. 23-24.) The court made no effort to explain why "hair salons, retail stores, shopping malls, gas stations, office buildings, garages, and countless other private actors hosting secular activities" are "comparable" to places of worship. (*See* J.A. 24 (quotation marks omitted).) The State has not identified any of those places as sensitive locations, having made a policy judgment that the risk of gun violence at those locations—both of it occurring in the first place and the consequences if it does occur—is not uniquely acute and could be adequately

27

addressed by a separate provision prohibiting persons from carrying fire-arms onto others private property absent express consent. *See* Penal Law § 265.01-d. At the same time, the State made the judgment that places of worship are sufficiently vulnerable to warrant additional protection, together with other secular locations sharing sensitive features. *See Kane v. De Blasio*, 19 F.4th 152, 166 (2d Cir. 2021) (vaccine mandate was directed at a particularly high-risk group); *see also Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (stating that, when evaluating similarity, courts should look to the "risks various activities pose, not the reasons why people gather").

Plaintiffs corroborated the State's judgment by highlighting threats that the church and other religious institutions have received. (*See* J.A. 75; Mem. in Supp. of Mot. for Prelim. Injunction ("PI Mem.") at 2-3, Dist. Ct. ECF No. 13-3.) Rather than compare places of worship to other sensitive places such as bars, casinos, amusement parks, theaters, and banquet halls, however, the district court compared them to any place outside the home where firearms are not prohibited. But "neither the Supreme Court, [this] court, nor any other court of which we are aware

has ever hinted that a law must apply to all people, everywhere, at all times, to be "'generally applicable.'" *Kane*, 19 F.4th at 166.

Equally misplaced is the district court's conclusion that the place-of-worship provision had "no secular meaning discernible" from its text or context. (J.A. 22. (quotation marks omitted).) That conclusion rests on the unfounded assumption that the act of bringing a firearm into a place of worship necessarily has religious significance. *Church of the Lukumi Babalu Aye*, on which the district court relied (J.A. 21), does not support its conclusion. There the Supreme Court found facially neutral a prohibition on animal "sacrifice" in "ritual[s]"—a practice that was, in context, clearly religious. *See* 508 U.S. at 533-34 (quotation marks omitted). By contrast, the restricted conduct at issue here is carrying firearms—an activity that rarely, if ever, constitutes a specifically religious practice, regardless of whether it is performed in a place of worship. If the ban on ritual animal sacrifice in *Church of the Lukumi Babalu Aye* was facially neutral, so too must be the ban on carrying firearms in a place of worship at issue.

*Church of the Lukumi Babalu Aye* also undermines the district court's inference that the CCIA's prohibition on firearms in places of

29

worship must have been drafted to "ensure[] that carrying of concealed weapons for religious reasons at place of worship is prohibited, while the same carrying in numerous other circumstances remains permissible." (*See* J.A. 22-23.) The ban on ritual animal sacrifice upheld in *Church of the Lukumi Babalu* had myriad carveouts that guaranteed the restrictions would apply only to those who are trying to exercise their religious rights. *See* 508 U.S. at 535-36. In contrast, the CCIA's prohibition on firearms in places of worship is aimed at settings that are particularly vulnerable to gun violence and not at the exercise of religious rights; it prohibits firearms whether or not they are being held for religious purposes, and does not contemplate, much less target, any religious purpose. If every incidental impact on religion served as evidence of an intent to target religion, then the Constitution would seem to require "religious exemptions from civic obligations of almost every conceivable kind." *Smith*, 494 U.S. at 888. That is precisely what *Smith* rejected.

As a neutral and generally applicable law, the place-of-worship provision need only survive rational basis review. *See Central Rabbinical Cong.*, 763 F.3d at 193. Plaintiffs did not contend that the place-of-worship provision would fail under this standard, nor could they: governments

have a legitimate interest in preventing gun violence, and restrictions on firearm possession in sensitive locations are rationally related to that interest. *See We The Patriots*, 17 F.4th at 290 (vaccine mandates were rationally related to the State interest in stopping the spread of COVID-19).

In short, the district court held that the State cannot enforce the place-of-worship provision based on nothing more than plaintiffs' profession that they regard self-defense as a religious obligation. As the Supreme Court has observed, to endorse such reasoning would permit a person, "by virtue of his beliefs, to become a law unto himself." *Smith*, 494 U.S. at 885 (quotation marks omitted).

### 3. Alternatively, the place-of-worship provision survives strict scrutiny.

Although the district court should not have applied strict scrutiny to the place-of-worship provision in the first place, the provision would survive strict scrutiny as well.[6] Under that standard, the government

---

[6] Plaintiffs argued below that the free exercise claim was subject to strict scrutiny regardless of whether the law was generally applicable because they also raised a Second Amendment claim. (PI Mem. at 8.) This Court has long rejected such a theory, holding that it did "not see how a

*(continued on the next page)*

must prove that the restriction serves a compelling interest and is narrowly tailored to achieve that interest. *Kennedy*, 142 S. Ct. at 2426. In the context of the Free Exercise Clause, "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881.

The place-of-worship provision satisfies both components of strict scrutiny review. First, and as the district court recognized (J.A. 25-26), plaintiffs concede that the State has a compelling interest in protecting the public against gun violence. *See Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013). Plaintiffs dispute only that the place-of-worship provision was narrowly tailored to serve this interest. Narrow tailoring requires the government to demonstrate that "a policy is the least restrictive means of achieving its objective." *Kane*, 19 F.4th at 169 (quotation marks omitted).

The place-of-worship provision is the least restrictive means of reducing gun violence within this sensitive location. As explained at 25-28 and 55-58, the presence of firearms poses unique risks in all sensitive

---

state regulation would violate the [F]ree Exercise Clause if it implicates other constitutional rights but would not violate the Free Exercise Clause if it did not implicate other constitutional rights." *Leebaert v. Harrington*, 332 F.3d 134, 144 (2d Cir. 2003) (quotation marks omitted).

places, including places of worship. The only alternative the district court identified is to permit the leadership of each place of worship to decide for themselves whether and under what circumstances firearms will be permitted. (*See* J.A. 24-26.) This alternative does not achieve the State's interests as effectively. As explained in the amicus brief submitted by religious stakeholders in *Hardaway*, many clerical leaders have no desire to jeopardize their safety and undermine their relationships with congregants by attempting to eject persons carrying firearms. In addition, amici explained that criminal trespass remedies are uncertain under New York law and would provide a less effective deterrent than designating places of worship a sensitive location. Br. of *Amici Curiae* Bishops of the Episcopal Church in N.Y. & New England et al. at 16-18, *Hardaway v. Nigrelli*, No. 22-2933 (2d Cir. Jan. 24, 2023), ECF No. 85. The Free Exercise Clause does not require the government to make an accommodation that "would do nothing to advance the government's compelling interest." *See EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 594 (6th Cir. 2018), *aff'd*, 140 S. Ct. 1731 (2020).

Further, there is no way for the State to accommodate those who wish to carry firearms for religious reasons without rendering the entire

sensitive-place statute unworkable. If the State were forced to allow anyone to carry a firearm in a sensitive location—place of worship or otherwise—when they articulated a religious motive for doing so, it would defeat the purpose behind recognizing locations as sensitive in the first place. *See In re Subpoena 2018R00776,* 947 F.3d 148, 158-59 (3d Cir. 2020) (restriction on speech survived strict scrutiny where only alternatives were "impractical" and "ineffective").

The district court nevertheless concluded that the place-of-worship provision failed strict scrutiny because there was "no evident justification for the view that secular business owners are more qualified than religious leaders to determine whether to allow armed self-defense on their property." (J.A. 26-27.) The court misstated the issue it needed to address. By designating places of worship as sensitive locations, the State made a policy judgment that "the religious exercise at issue"—carrying firearms in places of worship—"is more dangerous than" carrying firearms in the secular locations not subject to a prohibition. *See Tandon*, 141 S. Ct. at 1297; *see also New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015) (courts should defer to state legislatures' predictive judgments). Just as the Sixth Circuit rejected a district court's attempt

34

to harmonize the parties' interests at the expense of distorting those interests, *see R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d at 593-94, this Court should reject the district court's distorted characterization of the interests at stake here.

To the extent the district court expressed doubt that the place-of-worship provision would serve a compelling government interest in the first place because "a bad-intentioned armed person looking to attack worshippers will not be deterred" (J.A. 26), it was mistaken. First, it is far from certain that the place-of-worship provision would be an ineffective deterrent. By prohibiting firearms in places of worship, the CCIA enables law enforcement to respond as soon as the presence of firearms therein becomes known—in contrast to the district court's proposal that congregants who observe firearms in their midst simply hope for the best. And second, the district court misguidedly equated mass shootings with *all* gun violence without confronting the other types of intentional *and* inadvertent gun injuries and deaths the State sought to address with the place-of-worship provision.

"To maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to

35

the common good. Religious beliefs can be accommodated, but there is a point at which accommodation would radically restrict the operating latitude of the legislature." *United States v. Lee*, 455 U.S. 252, 259 (1982) (citations omitted) (quotation marks omitted). Because the place-of-worship provision serves a compelling government interest and there is no viable alternative, it is constitutional regardless of the standard a court applies.

## B. The Place-of-Worship Provision Does Not Violate the Establishment Clause.

Plaintiffs also failed to show a likelihood of success on their Establishment Clause claim. The First Amendment creates "freedom for religious organizations, an independence from secular control or manipulation." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). This freedom shields religious organizations from government interference on matters of "faith and doctrine," as well as "matters of church government." *Id.* The scope of the Establishment Clause is often interpreted "by reference to historical practices and understandings." *Kennedy*, 142 S. Ct. at 2428 (quotation marks omitted).

For purposes of the Establishment Clause, "church government" consists of "internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). However, an interest does not become a "purely ecclesiastical" matter of church governance merely because a church asserts it. *McRaney v. North American Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 347-48 (5th Cir. 2020) (business torts did not necessarily implicate church governance); *see Drevlow v. Lutheran Church, Mo. Synod*, 991 F.2d 468, 471-72 (8th Cir. 1993) (same, as to defamatory statements); *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 742 (7th Cir. 2015) (asset transfers were not protected matters of church governance). In other words, religious organizations' autonomy over their internal affairs does not translate to "a general immunity from secular laws." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060.

The place-of-worship provision is a secular law from which plaintiffs enjoy no immunity. On its face, the provision does nothing more than prohibit the act of carrying a firearm into a place of worship. To the extent Spencer or anyone at his church performs that act out of a sense of

37

religious obligation, a law that makes a religious practice "perhaps more burdensome" is not synonymous with a government judgment on the beliefs underlying the practice. *See Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 305-06 (1985) (federal recordkeeping requirements did not violate the Establishment Clause).

In addition, the decision whether to allow firearms in places of worship is not a matter of church governance. In fact, Spencer readily confirmed that firearms play no overt role in church operations. Firearms are not part of his sermons, rather they are concealed at all times. (J.A. 199.) Nor are firearms part of any apparent church message. Spencer did not require his ministerial staff to carry firearms to protect congregants. (J.A. 237-238.) He did not inquire whether members of his security teams or congregants in general carried firearms. (J.A. 201, 225.) He did not discuss firearms with his supervising bishop. (J.A. 226.) He did not even communicate to members of the church community that firearms were welcome. (J.A. 200.) Where Spencer has treated the carry of firearms as a purely personal matter, he cannot demonstrate that free carry of firearms was essential to the "central mission" of the church itself. *See YU Pride All. v. Yeshiva Univ.*, 211 A.D.3d 562, 562 (1st Dep't 2022)

38

(denial of recognition to student group was not essential to religious university's stated mission as an institution of higher learning).

Insofar as plaintiffs retain an interest in their congregants' physical safety, that interest transcends church governance. Spencer's church, like others, is subject to "a variety of state public welfare regulations, from the zoning, building and fire codes." *See South Ridge Baptist Church v. Industrial Comm'n of Ohio*, 911 F.2d 1203, 1211 (6th Cir. 1990); *see also Village of Hempstead v. Roman Cath. Church of Our Lady of Loretto at Hempstead*, 198 A.D.2d 409, 410-11 (2d Dep't 1993) (church was bound by local building codes). Settled law leaves no dispute that this litany of public safety regulations does not implicate church governance in a way that offends the Establishment Clause, and the district court offered no explanation for why the place-of-worship provision should be treated differently.

According to the district court, it was enough to prove an Establishment Clause violation that the place-of-worship provision forced Spencer and much of his security team to abandon their spiritual calling to protect congregants. (J.A. 28-29 (citing *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060).) Apart from being inaccurate as a factual matter, the district

39

court's statement evinces a misreading of *Our Lady of Guadalupe School*. In that case, the Supreme Court held that the Establishment Clause protected Catholic schools' decisions to dismiss teachers because those teachers had core responsibilities that were "essentially the same" as formally designated ministers. *See* 140 S. Ct. at 2066. Thus, autonomy over their hiring and dismissal was necessary to make sure that such employees' conduct did not "contradict the church's tenets and lead the congregation way from the faith." *Id.* at 2060. By contrast, the record here shows that possession of firearms makes no difference to how Spencer's church communicates its message or orders its affairs.

Finally, the district court erred in concluding that the State "ma[de] no attempt" to offer historical support for the proposition that the place-of-worship provision does not violate the Establishment Clause. (J.A. 30.) As an initial matter, it is unnecessary to consider historical evidence where, as here, the challenged provision does not interfere with matters of faith or church governance. *See Kennedy*, 142 S. Ct. at 2428. But even if a historical analysis were appropriate, the State offered an expert report accompanied by myriad historical laws at the state and local levels that regulated firearms in places of worship. See *infra* at 47-50. In addition to

40

those laws, the district court referred to colonial laws that purported to mandate firearms in places of worship (J.A. 34.) In other words, the record reflects "more than a century of our history and uninterrupted practice" of laws regulating congregants' safety by regulating the presence of firearms in places of worship. *See Walz v. Tax Comm'n*, 397 U.S. 664, 680 (1970) (history showed that tax exemption did not violate the Establishment Clause). This unbroken tradition supplies an additional reason why the district court should have found that plaintiffs were unlikely to prevail on their Establishment Clause claim.

## POINT II

### PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR SECOND AMENDMENT CHALLENGE TO THE PLACE-OF-WORSHIP PROVISION

Plaintiffs similarly failed to meet their heightened burden, *see Sussman*, 488 F.3d at 140, to show a likelihood of success on the merits of their Second Amendment claim.

41

## A.    The Place-of-Worship Provision Is Presumptively Lawful.

As an initial matter, the district court erroneously excused plaintiffs from showing that their desired conduct—to carry firearms in places of worship—was protected by the Second Amendment. Instead, the court immediately placed the burden on the State to support the challenged provision with historical evidence. (J.A. 32.) However, *Bruen* made clear that the government's obligation to defend a firearms regulation is triggered only "[w]hen the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. To this end, the Supreme Court held the Second Amendment's plain text covered the right of "ordinary, law-abiding, adult citizens" to "'bear' arms in public for self-defense." *Id.* at 2134-35. Accordingly, the Court in *Bruen* "canvassed the historical record" to confirm that the plaintiffs made this predicate showing before shifting the burden to the State to provide historical support for the challenged proper-cause restriction. *Id.* at 2127, 2130.

This approach is consistent with the analytical approach to other constitutional claims. For example, courts require First Amendment plaintiffs to make a threshold showing that a regulation burdens religious rights or "speech." *See Fields v. City of Tulsa*, 753 F.3d 1000, 1009 (10th Cir.

42

2014); *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 686 F.3d 889, 893 (8th Cir. 2012). A Fourth Amendment plaintiff claiming to have endured a government-initiated "seizure" must likewise first show that a seizure occurred within the meaning of the Constitution. *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010). Similarly, a plaintiff who claims that the government drew a "distinction" that violates the Equal Protection Clause must first show that the Equal Protection Clause encompasses such distinctions. *Caswell v. Calderon*, 363 F.3d 832, 837-38 (9th Cir. 2004). And the Ex Post Facto Clause requires a threshold showing that a measure is punitive. *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997).

In this case, New York has defined places of worship as "sensitive locations." The Supreme Court has repeatedly explained that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful" and outside the "scope of the Second Amendment." *Heller*, 554 U.S. at 626-27 & n.26; *see also Bruen*, 142 S. Ct. at 2133; *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). Other courts analyzing sensitive-place laws have similarly concluded that "the Second Amendment does not give [persons] the right to bear arms in" a sensitive location, *United States v. Class*, 930

43

F.3d 460, 464 (D.C. Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2127 n.4, or that the Second Amendment "does not apply" to such restrictions, *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1125-26 (10th Cir. 2015).

Without grappling with any of this precedent, the district court relieved plaintiffs of their burden to establish the applicability of the Second Amendment to this dispute by rebutting the presumption of constitutionality for sensitive-place restrictions. Instead, the court concluded that the Second Amendment applied here insofar as it protects the right of a law-abiding and responsible citizen to "bear arms for self-defense outside of his own home." (J.A. 32 (quotation marks omitted).) Such reasoning is insufficient given that many of the sensitive locations identified as outside the scope of the Second Amendment by the Supreme Court and other courts of appeals are also located outside of one's home. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133 (schools, courthouses, and legislative assemblies); *Heller*, 554 U.S. at 626-27 (government buildings); *Bonidy*, 790 F.3d at 1125-26 (U.S. Post Office grounds).

Had the district court appropriately held plaintiffs to their burden, it would have been constrained to conclude that plaintiffs failed to esta-

blish a substantial likelihood of success. Spencer's stated desire to carry firearms to his church (J.A. 75) is not sufficient to rebut a presumption of constitutionality: if places of worship are legitimate sensitive locations, then plaintiffs have no Second Amendment right to carry firearms therein. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280-81 (4th Cir. 2002) (district court abused its discretion by issuing preliminary injunction in reliance on evidence that was immaterial to the merits question).

## B. The Place-of-Worship Provision Is a Sensitive-Place Restriction That Is Consistent with the Historical Tradition of Firearms Regulation.

Even if the district court's threshold analysis was correct, the historical evidence presented by the State amply demonstrated that places of worship are sensitive places within which restrictions on firearms are consistent with the Nation's history and tradition of firearms regulation.

Although *Bruen* declined to "comprehensively define" sensitive places for purposes of the Second Amendment analysis, 142 S. Ct. at 2133, it instructed lower courts on how to review such laws. First, the Court invited use of analogies to historical sensitive places to "determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis in original).

45

Second, the Court observed that historical analysis requires courts to focus their inquiry on "how and why the regulations burden a law-abiding citizen's right to armed self-defense," i.e., "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33. And third, the court clarified that this analogical reasoning "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133 (emphasis in original).

Here, the State identified numerous examples of historical restrictions on the possession of firearms in places of worship. These examples alone were enough to satisfy *Bruen*'s standard. Moreover, the State showed that places of worship were relevantly similar to other locations long recognized as sensitive, including by *Bruen*. Therefore, plaintiffs could not have established a likelihood of success on the merits of their Second Amendment challenge even in the absence of the State's ample historical evidence as to restrictions in places of worship.

46

1.   **Places of worship have long been regarded as sensitive places.**

As set forth above, *Bruen* permits a court to uphold a modern sensitive-place restriction when it is relevantly similar to sensitive-place restrictions that have historical recognition. It follows, then, that when the record shows that the challenged firearm law applies to a location that has *itself* been recognized in history as a sensitive place where firearm regulation is lawful, that will be compelling evidence that the law is constitutional. The State offered exactly such evidence here.

In particular, the State identified nineteenth-century laws from six States that imposed prohibitions on carrying firearms into places of worship. In 1870, Texas enacted a law criminalizing the possession of firearms in "any church or religious assembly." Ch. 46, 1870 Tex. Gen. Laws 63, 63 (Called Sess.) (see J.A. 148). Around the same time, Georgia enacted a law prohibiting any "deadly weapon," including pistols and revolvers, in "place[s] of public worship." Act No. 285, 1870 Ga. Laws 421, 421 (see J.A. 144). Four years later, Missouri banned concealed firearms in "any church or place where people have assembled for religious worship." Act re Carrying Concealed Weapons, 1874 Mo. Laws 43, 43 (*see* J.A. 152). In 1877, Virginia followed suit. Ch. 7, 1877 Va. Acts 301, 305 (1877-1878

47

Assembly, 2d Sess.) (see J.A. 155). Arizona barred pistols and other firearms from places of religious assembly in 1889. Act No. 13, 1889 Ariz. Terr. Sess. Laws 16, 17 (see J.A. 164). And the next year, Oklahoma made it unlawful to carry weapons, including firearms, into places of worship. Okla. Terr. Stat. ch. 25, art. 47 (1891) (see J.A. 168-169). In addition to these state-level statutes, an array of localities in Kansas, Missouri, and North Carolina passed ordinances during this time period that prohibited firearms in places of worship. (J.A. 107-110.)

As Patrick Charles, the State's expert historian, explained, several other jurisdictions had broader restrictions that also precluded firearms in places of worship. (J.A. 107-112.) For example, an 1869 Tennessee law prohibited firearms in any "public assembly of the people." Ch. 22, 1869 Tenn. Pub. Acts 23, 23 (1st Sess.) (see J.A. 176-177). Likewise, an 1889 Idaho law prohibited carrying arms in cities and towns altogether. *See* Penal Code of the State of Idaho § 4781 (1901). And laws from localities in Kansas and Utah prohibited guns within city limits, which would have encompassed places of worship. (J.A. 108.)

Charles further explained that there is no evidence that any court ever upheld a challenge to the authority of state or local governments to

48

regulate firearms in places of worship. (J.A. 112-113.) To the contrary, the Texas Supreme Court found it "little short of ridiculous" to claim a right to carry "into a peaceable public assembly, as, for instance, into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together." *English v. State*, 35 Tex. 473, 478-79 (1871); *see also Owens v. State*, 3 Tex. App. 404, 407 (1878) ("no excuse" for "wearing deadly weapons to church, or in a ball-room, or other places mentioned" in Texas's statute, because "lives of innocent people there assembled [may be] placed in jeopardy").

The Georgia Supreme Court elaborated: "carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee." *Hill v. State*, 53 Ga. 472, 475 (1874). The Tennessee Supreme Court similarly held that "a man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them." *Andrews v. State*, 50 Tenn. 165, 182 (1871); *see also Wilson v. State*, 33 Ark. 557, 560 (1878) ("No doubt in time of peace, persons might

49

be prohibited from wearing war arms to places of public worship, or elections, etc."). And an Ohio appellate court observed that laws that "prohibit carrying fire arms into churches, courthouses, theaters and polling places" do not infringe upon the right to bear arms.[7] *Walter v. State*, 25 Ohio Cir. Dec. 567, 568 (Cir. Ct. 1905).

Faced with these unrefuted historical facts, the district court nonetheless set aside these laws and judicial precedents as "outliers." (J.A. 33.) Unfortunately, the district court declined to explain what rendered the historical laws "outliers," leaving the State to guess as to how it could ever satisfy *Bruen*'s historical inquiry. To the extent the court simply found the State to have offered too few historical precursors, such a conclusion is incorrect as both a factual and a legal matter. Between the statutes

---

[7] Although some of the state courts referenced here did not recognize the Second Amendment to apply against the States in the nineteenth century, their States typically had state constitutional provisions analogous to the Second Amendment, and the courts decided these cases pursuant to those state constitutional provisions. Because the courts typically held "that, necessarily, the same rights, and for similar reasons, were being provided for and protected in both the Federal and State Constitutions," *e.g.*, *Andrews*, 50 Tenn. at 177, the courts' understanding of the analogous state constitutional provisions sheds important light on contemporary understandings of the Second Amendment, as well as its state analogues.

and judicial decisions, it would appear that firearm regulations virtually identical to the place-of-worship provision were accepted in all or part of at least 14 states—more than a "handful" by any measure. In any case, the historical analysis that *Bruen* directed is not synonymous with a numbers game—least of all when the State's burden is simply to show that the place-of-worship provision is relevantly analogous to historically recognized sensitive locations. Indeed, the State did not need to identify even a single "historical twin" to support a modern regulation. *Bruen*, 142 S. Ct. at 2133 (emphasis omitted). Thus, *Bruen* cannot reasonably support an order invalidating a law restricting firearms based on a finding that the enacting jurisdiction has not offered *enough* historical twins.

Likewise, *Bruen* imposed no requirement that historical laws be "continu[ing]" for some undefined period of time. (*See* J.A. 33 (quotation marks omitted).) Both *Bruen* and *Heller* regarded sensitive-place regulations to *already* be part of an American tradition of firearm regulation. By inviting courts to consider and uphold "new" sensitive-place regulations, *Bruen* necessarily recognized that some sensitive places did not exist—and some might not have developed characteristics that made them "sensitive"—until relatively recent times. *See* 142 S. Ct. at 2133.

51

The district court's tortured logic, by contrast, results in a catch-22 where new sensitive places are unconstitutional unless they have always been sensitive places.

The district court's reliance on seventeenth-century rules mandating that people bring firearms to church in certain circumstances was similarly mistaken. (*See* J.A. 34.) The State's expert historian explained that these laws largely were written to maintain the institution of slavery, and not to protect an underlying right to carry or bear arms. (J.A. 113-114.) Moreover, laws mandating guns in places of worship cannot logically signify a right to be free from government interference in the bearing of arms, which is what the Second Amendment codifies. If anything, these colonial laws support the opposite inference, insofar as they amount to a government-imposed obligation. The bottom line is that both before and after the States ratified the Second Amendment, they did not understand the regulation of firearms in places of worship as a policy option that was "off the table." *See Heller*, 554 U.S. at 636.

Contrary to the district court's remarks (J.A. 33-34), the fact that the State's proffer consisted of Reconstruction-era laws did not undermine its probative value. To the contrary, *Bruen* devoted a discrete section to

an assessment of "[e]vidence from around the adoption of the Fourteenth Amendment." 142 S. Ct. at 2145, 2150. And with respect to sensitive places in particular, the Court referred to "18th- *and 19th- century*" sensitive places as the starting point for historical analogues.[8] *Id.* at 2133 (emphasis added); *see also McDonald*, 561 U.S. at 770-78 (2010) (evaluating nineteenth-century history in determining that the Second Amendment was incorporated against the States).

As in *Bruen*, this case ultimately presents no occasion to choose between Founding-era and Reconstruction-era history, because "the public understanding of the right to keep and bear arms in both 1791 and 1868

_____

[8] This approach is consistent with the Court's use of historical materials from the time of the Fourteenth Amendment's ratification to inform its understanding of other constitutional rights that the Fourteenth Amendment incorporated against States. *See, e.g.*, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020) (consulting nineteenth-century treatises in support of holding that Fourteenth Amendment requires unanimous jury verdicts to convict a defendant of a serious crime); *Timbs v. Indiana*, 139 S. Ct. 682, 688-89 (2019) (relying on 1868 understanding of the Eighth Amendment to hold that the Fourteenth Amendment incorporated the Excessive Fines Clause); *see also Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038, 2059 (2021) (Thomas, J., dissenting) ("I would begin the assessment of the scope of free-speech rights incorporated against the States by looking to what ordinary citizens at the time of the Fourteenth Amendment's ratification would have understood the right to encompass.") (quotation and alteration marks omitted).

was, for all relevant purposes, the same with respect to" places of worship. *See* 142 S. Ct. at 2138. Here, *all* of the available history demonstrates that governments could regulate the possession of guns in places of worship. Where there was nothing to suggest that the public understanding was any different in 1791, the district court was mistaken to treat the State's proffered evidence as anything but a reflection of national consensus on governments' power to restrict the ability to bear arms in places of worship.

## 2. Places of worship are sufficiently analogous to other sensitive locations.

Even without evidence of nearly identical historical restrictions on firearms, however, the place-of-worship provision would be constitutional because it closely resembles other sensitive locations where firearms have historically been prohibited, including those *Bruen* expressly identified.

The historical record amassed to date evinces a tradition of restricting guns in sensitive locations that dates back to our English ancestors. *See* The Statute of Northampton of 1328, 2 Edw. 3, c. 3 (1328); 4 Hen. 4, c. 29 (1403); 26 Hen. 8, c. 6, § 3 (1534). These sensitive-place restrictions emigrated to what became the United States, expanded to include schools, and proliferated in the mid-to-late nineteenth century as advances in

54

weapons gave rise to police-power regulations. (*See* J.A. 106-107) (citing Founding-era laws from several States prohibiting armed assemblies).) *See* Patrick J. Charles, *The Fugazi Second Amendment* 88-90 & n.419 (2022) (forthcoming Clev. St. L. Rev.). As *Bruen* recognized, there is "no dispute[] regarding the lawfulness" of prohibitions on firearms in places like schools, legislative assemblies, polling places, and courthouses. 142 S. Ct. at 2133.

As Charles explained in his expert declaration below, historical sensitive-place restrictions generally, though not exclusively, fall into three categories: (1) locations that society has deemed worthy of special protection from the disruption caused by firearms because of other constitutional interests, such as voting, legislating, and access to courts; (2) locations containing vulnerable people who could not reasonably be expected to use firearms for self-defense; and (3) locations where the use of firearms, even by ordinary citizens for self-defense, was substantially more likely to increase, rather than decrease, the risk of causalities. (*See* J.A. 112.)

Places of worship can properly be considered part of each of these groups. First, places of worship are centers for the exercise of religion, one

of the most cherished individual rights in American society. *See Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 713 (1981). This special protection extends to worship as a congregation, as well as to individualized spiritual guidance. Indeed, countless people consult clergy on a host of deeply personal decisions. Christine P. Bartholomew, *Exorcising the Clergy Privilege*, 103 Va. L. Rev. 1015, 1071 (2017) ("clergy remain a primary source of advice and guidance on everything from legal guidance to marital problems"). Both federal and state law recognize that communications between clergy and parishioners are privileged. *See Trammel v. United States*, 445 U.S. 40, 51 (1980); N.Y. C.P.L.R. 4505. This is borne out of a recognition of "the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." *Trammel*, 440 U.S. at 51.

The possession of loaded firearms in places of worship would have a disruptive effect on these critical activities and could interfere with the relationship between clergy and parishioners. For example, parishioners may decline to attend services out of fear of armed conflict in enclosed spaces. Similarly, clergy may decline to give controversial or sensitive

advice to parishioners out of a fear of escalating a disagreement into armed conflict. Indeed, Spencer admitted that he does not carry firearms on Sundays because doing so distracts him from preaching. (*See* J.A. 231.) Just as the concern that firearms may chill constitutionally protected voting activity renders polling places sensitive, so too may the concern about interfering with religious exercise render places of worship sensitive.

Second, places of worship often are frequented by young children who cannot reasonably be expected to protect themselves. Many places of worship offer programming for religious instruction. By one measure, up to 88% of Christian churches offered religious instruction for children. Faith Cmtys. Today & Hartford Inst. for Religion Rsch., *Religious Education During the Pandemic: A Tale of Challenge and Creativity* 2 (Apr. 2022). Spencer's church is consistent with this trend: it holds regular classes for children and places special emphasis on keeping them safe. (J.A. 77, 204, 206-207, 209.)

Third, religious services are a paradigmatic form of public assembly. Whether the facility is large or small, multiple people come together to worship as a congregation, usually indoors. Although Spencer wants to carry firearms in church for self-defense, as a matter of sheer mechanics,

armed "self-defense" in this setting ordinarily would involve discharging a gun into a crowd of terrified congregants clamoring to escape the sanctuary. Simply put, the "self-defense" Spencer desires is just as likely to produce unnecessary causalities as it is to prevent them. Thus, at least one court has branded it as "little short of ridiculous" to assert a right to carry a firearm into "a peaceable public assembly, *as, for instance, into a church*." *English*, 35 Tex. at 478-79 (emphasis added).

In short, the "how and why" of the place-of-worship provision mirrors the "how and why" of the other longstanding sensitive places that *Bruen* identified.

By adopting its reasoning in *Hardaway* (J.A. 32), the district court implicitly found that places of worship are not analogous to the types of sensitive places recognized in *Bruen* because they are not "secure[]" and do not implicate "key functions of democracy." *Hardaway*, 2022 WL 16646220, at *14 (emphasis omitted). The source from which the district court extracted these limitations remains unclear. They did not originate in *Bruen*, which declined to enumerate any qualities that would render a place "sensitive." *See* 142 S. Ct. at 2133. If the Supreme Court believed that sensitive places were limited to those that were secure and impli-

cated key functions of democracy, it would have said so before broadly endorsing the recognition of new sensitive places by way of historical analogy.

If anything, the Supreme Court's remarks about sensitive places to date indicate that its conception of such locations is far broader than the district court perceives. For example, both *Bruen* and *Heller* identified "schools" among sensitive places. *Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626. Yet schools do not uniformly offer their own security, and it is unlikely that the justification for including schools was to protect a "key function of democracy," given that the federal Constitution does not recognize a right to education. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35-36 (1973). *Bruen* also rejected the argument that police presence was sufficient to render a place sensitive without further suggesting that police presence was nonetheless a necessary condition for that designation. 142 S. Ct. at 2134. And even though the Supreme Court has identified polling places as a quintessential sensitive place, some of the same statutes prohibiting firearms at polling places simultaneously prohibited them in other places that were open to the public, including

places of worship. *See, e.g.*, Ch. 46, 1870 Tex. Gen. Laws 63; Act No. 285, 1870 Ga. Laws 421.

Insofar as the district court read *Bruen* to reject the argument that crowded and confined places could be sensitive (J.A. 33), that view is misplaced. *Bruen* simply cautioned governments that they could not designate entire cities "sensitive" for no other reason than that they were densely populated. 142 S. Ct. at 2134. That remark does not preclude governments from analogizing to the many historical laws prohibiting firearms in crowded and confined areas like markets and parades. Under the district court's ill-advised limits, common-sense regulations on firearms in nurseries, hospital emergency rooms, and airplane cabins could all be invalidated. Specifically quoting language discussing sensitive places, two justices in *Bruen*'s six-justice majority wrote separately to underscore that the Second Amendment continues to permit a "variety" of gun regulations. 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (quotation marks omitted). Therefore, it is unlikely that the *Bruen* majority would endorse the district court's analysis.

60

# POINT III

## THE DISTRICT COURT ERRED IN APPLYING THE REMAINING PRELIMINARY-INJUNCTION FACTORS

A party seeking a preliminary injunction must separately show a likelihood of irreparable harm in the absence of an injunction, that a preliminary injunction serves the public interest, and that the balance of other equities weighs in favor of a preliminary injunction. *New York Progress & Prot. PAC*, 733 F.3d at 486. Where the party opposing a preliminary injunction is a government entity, harm to the nonmoving party and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The scant materials in plaintiffs' motion papers failed to satisfy their burden as to any of these factors.

## A. Plaintiffs Have Not Demonstrated Irreparable Harm Absent a Preliminary Injunction.

This Court considers irreparable harm in the event an injunction is not granted "to be the most important prerequisite for the issuance of a preliminary injunction." *NAACP, Inc. v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995). To assess whether a plaintiff has shown irreparable harm, "the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on

61

the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (quotation marks omitted).

Plaintiffs have not satisfied their burden to show irreparable harm. As an initial matter, plaintiffs' delay in filing this action and seeking preliminary-injunctive relief weighs strongly against an injunction. *See, e.g.*, *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995). Plaintiffs inexplicably waited until November 3, 2022, to file this suit—four months after the CCIA was enacted and two months after it took effect. See *supra* at 6-7. A party's "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (quotation marks omitted).

Even absent delay, plaintiffs have failed to make the required showing of irreparable harm. Spencer claims that he wishes to bring firearms into his church to protect himself and others from potential violence but cannot do so while the place-of-worship provision remains in effect. (J.A. 74-75.) But Spencer failed to explain why Penal Law § 265.01-e(3)'s

62

exception allowing armed security guards in sensitive places would not mitigate these concerns. Setting aside the reasonableness (or lack thereof) of Spencer's refusal to hire registered security guards, the district court's separate finding (J.A. 37) that it would be impracticable for Spencer to bring his existing volunteer security team into compliance with § 265.01-e(3) was based on pure speculation. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 120 (2d Cir. 2009) (vacating preliminary injunction premised on the district court's speculation of the risk the movant faced).

The district court likewise speculated when it surmised that the place-of-worship provision would result in "psychic" harm to Spencer for which there was no available compensation. (J.A. 36 (quotation marks omitted).) In both his papers and at the hearing, Spencer did not discuss anything even approaching this concern. On the contrary, he admitted that he did not even know who on his security team was armed, because he saw no reason to ask. (*See* J.A. 225.) In other words, the mere presence of the security team brought Spencer "psychic comfort" (J.A. 36 (quotation marks omitted)), whether or not the team members were also armed. Consequently, "[e]ven assuming the [psychic harm] alleged would be

63

irreparable, the threat of this harm is too remote" to support a prelimi-

nary injunction. *See Goff v. Harper*, 60 F.3d 518, 521 (8th Cir. 1995).

Finally, the district court erred in finding that asserted First

Amendment violations necessarily produced irreparable harm. As

explained *supra* at 19-41, Spencer failed to show that the purported

burden on his religious rights is of a constitutional dimension and in such

circumstances, his mere allegations cannot constitute irreparable harm.

*See We The Patriots*, 17 F.4th at 294.

## B.  The Preliminary Injunction Harms the Public Interest.

"[C]ourts of equity should pay particular regard for the public

consequences in employing the extraordinary remedy of injunction." *Winter

v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (quotation marks omitted). It is the

moving party's responsibility to convince the court that the requested

preliminary injunction would not harm the public interest. *WPIX, Inc. v.

ivi, Inc.*, 691 F.3d 275, 278 (2d Cir. 2012).

Plaintiffs failed to make such a showing here. Instead, plaintiffs

based their public-interest argument entirely on the assumption that the

place-of-worship provision "tramples on constitutional rights." (PI Mem.

at 25.) For the reasons discussed above, this assumption is incorrect.

Conversely, the preliminary injunction increases the risk of gun violence. *See, e.g.*, *Heller*, 554 U.S. at 693-99 (Breyer, J., dissenting) (detailing research linking firearms to casualties); *United States v. Smythe*, 363 F.3d 127, 129 (2d Cir. 2004) (federal criminal law recognizes that "the mere presence of a gun" creates a risk of violence) (quotation and alteration marks omitted). The district court's remark that "the State does not show that the lawful carrying of firearms in houses of worship has resulted in an increase in handgun violence" (J.A. 38) is misplaced. "[T]he legislature is 'far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *New York State Rifle & Pistol Ass'n*, 804 F.3d at 261 (quotation marks omitted). This includes the prediction that the proliferation of guns in places of worship will increase gun-related injuries and deaths.

The district court also overlooked the State's proffer of incidents— in both places of worship and other sensitive places (Mem. of Law in Opp'n to Pls.' Mot. for a Prelim. Inj. at 24-25 & nn.13-19, Dist. Ct. ECF No. 43)— where the presence of guns caused garden-variety disagreements between law-abiding citizens to escalate into unnecessary shootings, *see Brody v.*

65

*Village of Port Chester*, 261 F.3d 288, 290-91 (2d Cir. 2001) (vacating preliminary injunction where district court failed to consider the harm of further delay to the defendant village).

Nor can the district court decide for itself that "[t]he public has a significant interest in the strong sense of the safety that a licensed concealed handgun regularly provides, or would provide." (*See* J.A. 38 (quotation marks omitted).) This conclusion represents nothing more than the district court's policy view that a proliferation of guns would deter violence. New York's elected leaders have decided otherwise. "Federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones." *United States Sec. & Exch. Comm'n v. Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 296 (2d Cir. 2014) (quotation and alteration marks omitted); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 112 (1983) (federal courts should exhibit restraint when asked to use their equitable power to interfere with States' enforcement of their own laws). Few cases illustrate the necessity of such restraint as does this case, where an unelected district court judge has

66

enjoined the State from enforcing a duly enacted state law because he disagrees with the wisdom of that law.

## CONCLUSION

This Court should reverse the district court's order granting a preliminary injunction against enforcement of the place-of-worship provision.

Dated:  February 7, 2023
            Albany, New York

                             Respectfully submitted,

                             LETITIA JAMES
                               *Attorney General*
                               *State of New York*
                             Attorney for Appellant

By:  */s/ Jonathan D. Hitsous*
        JONATHAN D. HITSOUS
        Assistant Solicitor General

BARBARA D. UNDERWOOD        The Capitol
  *Solicitor General*             Albany, New York 12224
ESTER MURDUKHAYEVA         (518) 776-2044
  *Deputy Solicitor General*
JONATHAN D. HITSOUS
  *Assistant Solicitor General*
    *of Counsel*

67

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,034 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

 /s/ *Kelly Cheung*