# 22-3237

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

MICHAEL SPENCER, HIS TABERNACLE FAMILY CHURCH, INC.,

*Plaintiffs-Appellees*,

*v.*

STEVEN A. NIGRELLI, Acting Superintendent of the New York State Police, in his official and individual capacities,

*Defendant-Appellant*,

WEEDEN A. WETMORE, District Attorney for the County of Chemung, New York, in his official and individual capacities, MATTHEW VAN HOUTEN, District Attorney for the County of Tompkins, New York, in his official and individual capacities,

*Defendants*.

On Appeal from the United States District Court
for the Western District of New York

## BRIEF OF EVERYTOWN FOR GUN SAFETY
## AS AMICUS CURIAE IN SUPPORT OF DEFENDANT-APPELLANT

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
jcarter@everytown.org
February 14, 2023          (646) 324-8174

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 2

ARGUMENT ......................................................................................... 4

    I.    Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct ............. 4

    II.    The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 ...................................................................................... 6

    III.    This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers," Insufficiently Statistically "Representative," or of "Unknown Duration" .......................... 15

CONCLUSION ..................................................................................... 25

# TABLE OF AUTHORITIES

*Cases*

*Andrews v. State*,
  50 Tenn. 165 (1871) .................................................................... 24

*Antonyuk v. Hochul,*
  No. 1:22-cv-00986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ......passim

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018) ......................................................... 2

*Byrdsong v. State*,
  265 S.E.2d 15 (Ga. 1980) ............................................................ 24

*Christian v. Nigrelli*,
  No. 1:22-cv-00695, 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022)..... 15, 22

*Davenport v. Wash. Educ. Ass'n*,
  551 U.S. 177 (2007)...................................................................... 19

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)...............................................................passim

*Drummond v. Robinson Twp.*,
  9 F.4th 217 (3d Cir. 2021) ............................................................ 7

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011)..................................................... 6, 11

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015).......................................................... 18

*Gould v. Morgan*,
  907 F.3d 659 (1st Cir. 2018) .......................................................... 6

*Hardaway v. Nigrelli*
  No. 1:22-cv-00771 (W.D.N.Y. Nov. 3, 2022). .................................passim

*Hill v. State*,
  53 Ga. 472 (1874) ...................................................................... 24

*Kennedy v. Bremerton School District*,
142 S. Ct. 2407 (2022) ................................................................ 5

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ......................................................... 6, 11, 18

*New York State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022) ....................................................... passim

*Rehaif v. United States*,
139 S. Ct. 2191 (2019) ................................................................ 2

*Shelby Cnty., Ala. v. Holder*,
570 U.S. 529 (2013) ................................................................. 22

*Sockwell v. State*,
109 S.E. 531 (Ga. Ct. App. 1921) ........................................... 24

*State v. Howard*,
67 N.C. 24 (1872) ................................................................... 14

*Strickland v. State*,
72 S.E. 260 (Ga. 1911) ........................................................... 24

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012) ..................................................... 7

*Veasy v. State*,
62 S.E. 561 (Ga. Ct. App. 1908) ............................................. 24

*Walter v. State*,
13 Ohio N.P. (n.s.) (Ct. C.P. 1905), *aff'd*, 25 Ohio Cir. Dec. 567 (Cir.
Ct. 1905) ................................................................................ 24

### Statutes

1854 Iowa Acts 47 .................................................................... 14

1869 N.C. Sess. Laws 59-60 ...................................................... 14

1925 Tex. Crim. Stat. 101 ......................................................... 24

Act of Mar. 30, 1960, ch. 358, 1960 Va. Acts 458 ........................................ 24

Act of May 31, 2003, § 1, 2003 Ga. Laws 423 .............................................. 24

Ariz. Rev. Stat., Penal Code § 429 (1913) .................................................... 24

Ga. Code § 26-5102 (adopted 1933, effective 1935) ..................................... 24

Mo. Rev. Stat. § 564.610 (1959) ................................................................... 24

N.Y. Penal Law § 265.01-e(2)(c) .................................................................... 2

Okla. Stat., ch. 15, art. 90, § 2589 (1931) .................................................... 24

### *Other Authorities*

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) .......... 10

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) ........................................... 12, 16, 17

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) ...................................................................................... 12, 16, 17

Dept. of Interior, Compendium of Eleventh Census: 1890 (1892) ................. 20

James McPherson, *Revisionist Historians*, Persps. on Hist. (Sept. 1, 2003), https://www.historians.org/research-and-publications/perspectives-on-history/september-2003/revisionist-historians ............................................................................................... 21

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 .............. 10

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ............................................................................ 9

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ............................................................... 12

U.S. Bureau of the Census, *A Century of Population Growth* 9, Table 1 (1969), *available at* https://bit.ly/3QJizrn.................................................. 17

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country, including over 650,000 in New York. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of 40 cities, towns, and other localities in New York are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has filed more than 60 amicus briefs in Second Amendment and other firearms cases, including in this case below, *see Spencer v. Nigrelli*, No. 6:22-cv-06486, Dkt. 51 (W.D.N.Y. Dec. 12,

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person (including any party or party's counsel) contributed money to fund its preparation or submission. All parties on appeal consent to this brief's filing.

2022), and in similar challenges to the same New York law at issue here, *see Hardaway v. Nigrelli*, 1:22-cv-00771, Dkt. 47 (W.D.N.Y. Oct. 29, 2022); *Goldstein v. Hochul*, No. 1:22-cv-08300, Dkt. 46 (S.D.N.Y. Oct. 20, 2022). Several courts have expressly relied on Everytown's amicus briefs. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs-appellees challenge the restriction on carrying firearms in "places of worship or religious observation" in New York's Concealed Carry Improvement Act. *See* N.Y. Penal Law § 265.01-e(2)(c) (the "place of worship provision"). That restriction is constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons defendant-appellant Nigrelli ("the State") sets out in his brief, Dkt. 56 ("State Br.").[2] Everytown submits this amicus brief to expand on three points. *First*, on the initial, textual inquiry of the *Bruen* framework, plaintiffs have the burden, and they have not met that burden.

---

[2] This amicus brief addresses only aspects of plaintiffs-appellees' Second Amendment claims. The Court should reverse the district court's judgment for the reasons the State has set out.

*Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is neither a starting-line nor a cutoff; under *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), both earlier and later history are also relevant. *Third*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary—and it does not require a government to prove that the laws it presents were statistically representative of the nation or continuous over time.

Everytown recently filed amicus briefs in three other appeals challenging provisions of the CCIA that will be heard in tandem with this case. *See Antonyuk v. Nigrelli*, No. 22-2908, Dkt. 193 and No. 22-2972, Dkt. 140; *Hardaway v. Nigrelli*, No. 22-2933, Dkt. 89; *Christian v. Nigrelli*, No. 22-2987, Dkt. 79. To minimize any need to read overlapping but distinct briefs, Everytown notes that this brief, like the brief in *Hardaway*, largely tracks the *Antonyuk* brief in substance, except that it (a) details the evidence showing that restrictions on firearms in places of worship that the State relied on below persisted for decades, *see infra* note 19, (b) discusses laws restricting carrying

firearms on Sundays, *see infra* p. 14, and (c) omits the discussion of historical restrictions on firearms in parks (Section IV of the *Antonyuk* brief).

## ARGUMENT

### I.     Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)).

Plaintiffs-appellees have the burden at the initial, textual inquiry for at least two reasons. First, *Bruen* itself makes it clear, by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an extraordinary departure from ordinary principles of litigation—the Court would have said that the presumption exists from the outset. Second, placing the initial burden on the plaintiff accords with the Court's approach to other constitutional issues. For example, just a week after *Bruen*, the Court

announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421.

As the State explains, the district court erred in relieving plaintiffs of their burden. *See* State Br. 44. The court accepted the plaintiffs' view that, because *Bruen* established a right to carry in public and places of worship are "in public," the Second Amendment presumptively applies. But, as the State notes, that same reasoning would make the Second Amendment presumptively applicable to locations, like government buildings, that the Supreme Court has already said fall outside its scope. *See id*. The place of worship provision stands in stark contrast to the laws struck down in *Heller* and *Bruen*—respectively, an unusually "severe" restriction that "totally ban[ned] handgun possession in the home," *Heller*, 554 U.S. at 628-29, and a carry regime that "prevented law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose," *Bruen*, 142 S. Ct. at 2150. Accordingly, plaintiffs cannot rest their textual claim on the simple assertion that they wish to carry handguns in public for self-defense, as the *Bruen* petitioners did. At the very least, plaintiffs should be required to prove that the Second Amendment's text protects their

5

"proposed course of conduct," *id.* at 2134, of carrying firearms in places of worship. They have failed to do so, and so are not entitled to relief.

## II. The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791

If the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states.

Several circuits reached this conclusion in analyzing state and local laws under the Second Amendment at the first, historical step of the framework that applied prior to *Bruen*.[3] *See Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] confirms that if the claim concerns a state or local law, the 'scope' question

---

[3] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that Second Amendment analysis should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See id.* at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth* Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)).

*Bruen* does not alter that conclusion. The Supreme Court expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it need not resolve issue because public understanding "for all relevant purposes" in case before it was the same in 1791 and 1868). Moreover, *Bruen* concluded that "[s]tep one of the predominant framework [applied in the lower courts] is broadly consistent with *Heller*." *Id.* at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

For the reasons set out in the State's brief, this Court can uphold New York's challenged law under a historical analysis without deciding whether it should focus that analysis on the period around 1791 or the period around

1868. *See, e.g.*, State Br. 52-54.[4] But if this Court prefers to settle the issue the Supreme Court left open, it should conclude that 1868 is the correct focus.

To begin with, in a case involving a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791

---

[4] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the State's evidence), it should rely on 19th-century (and even 20th-century) history to clarify that meaning. *See infra* pp. 13-15.

meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports

9

the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[5] More recently, Professor Lash wrote—as quoted in *Bruen*— "When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: insisting that the 1791 understanding should apply against states does not make sense in

---

[5] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government").

light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Any claim that the founding era is the only relevant period is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive-places restrictions. There, the Court indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for

11

that proposition, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[6]

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843). Mr. Clement's new firm, Clement & Murphy, represents plaintiffs-appellees in this case.

---

[6] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae 11-17, *Bruen* (No. 20-843) ("Indep. Inst. *Bruen* Br.") (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

In sum, any historical inquiry this Court chooses to conduct should focus on the period around 1868, not 1791. Moreover, 1868 is not a cutoff; *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same).[7] *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2136-37 & 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison).

Here, state and local laws from the period beginning around Reconstruction—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of the CCIA's

---

[7] Nor is 1868 a starting line for the inquiry. Both *Heller* and *Bruen* examined history preceding even 1791. *See Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45. And the State correctly points to such history in its brief. *See* State Br. 54-55.

place of worship provision. *See, e.g.*, State Br. 47-50.[8] In addition to the laws the State cites, laws that broadly restricted carrying guns outside the home on Sundays provide further evidence that restricting firearms in places of worship was well within the government's constitutional power. *See, e.g.*, 1854 Iowa Acts 47 (providing criminal penalty for "any person … found on [Sunday] …, engaged in … carrying fire arms"; exceptions for Saturday-Sabbath observers and preventing travel); 1869 N.C. Sess. Laws 59-60 (providing criminal penalty for "any person or persons … [who] shall be found off of their premises on the Sabbath, having with him or them a shotgun, rifle or pistol"); *State v. Howard*, 67 N.C. 24, 24-25 (1872).[9] And even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, it should then consider this later historical evidence and

---

[8] To be clear, whether laws precisely like the challenged law existed in 1868 (or 1791) is not the question before this Court. *Bruen* stressed that the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

[9] The burden of these laws is not just "comparable" (*see Bruen*, 142 S. Ct. at 2133) to the burden of the place of worship provision, but significantly greater. A person who attends church on Sundays would not just be unable to carry their gun to church—they would not be able to carry it *anywhere* outside their home on that day.

recognize that this evidence "settle[s] the meaning of" the right as one that allows for regulations like the place of worship provision.

## III. This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers," Insufficiently Statistically "Representative," or of "Unknown Duration"

In preliminarily enjoining the place of worship provision in the CCIA, the district court below, the same district court in two other challenges currently on appeal (*Hardaway v. Nigrelli*, No. 22-2933 and *Christian v. Nigrelli*, No. 22-2987), and the *Antonyuk* district court, all discounted the State's robust and extensive record of historical laws in part by characterizing its laws as "outlier enactments," insufficiently statistically representative of the nation, or "spasmodic" or of "unknown duration." *See, e.g.*, JA 32-34 (requiring government to establish "continuity" of laws it cited and rejecting laws of "unknown duration"); *Christian v. Nigrelli*, No. 1:22-cv-00695, 2022 WL 17100631, at *8 (W.D.N.Y. Nov. 22, 2022); *Antonyuk v. Hochul,* No. 1:22-cv-00986, 2022 WL 16744700, at *76 (N.D.N.Y. Nov. 7, 2022) (rejecting State's laws as "outliers" that are "neither established nor representative"); *Hardaway v. Nigrelli*, No. 1:22-cv-00771, 2022 WL 16646220, at *16 (W.D.N.Y. Nov. 3, 2022). Each of these was in error. *Bruen* does not justify dismissing the historical laws the State has presented in these cases as "outliers," and it imposes no burden on the State to demonstrate statistical representativeness or

endurance over time. To the contrary, *Bruen*'s discussion of the historical laws justifying sensitive-places restrictions demonstrates that a small number of laws can establish a tradition, that even small-population jurisdictions matter, and that proof of "continuity" is not required.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Indep. Inst. *Bruen* Br. 11-12.[10] Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were enacted three years apart, in 1647 and 1650, in a single colony, Maryland, that made up an estimated 8.7

---

[10] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133.

percent of the total population in 1650.[11] *See id.*; Kopel & Greenlee, 13 Charleston L. Rev. at 235.

Under *Bruen*'s sensitive-places analysis, therefore, a small number of laws covering a small proportion of the nation's population can suffice to establish a tradition of regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[12] Moreover, as demonstrated further below, *see infra* pp. 22-23, nothing in *Bruen*'s sensitive-places analysis suggests that a government must establish "continuity" of a

---

[11] *See* U.S. Bureau of the Census, *A Century of Population Growth* 9, Table 1 (1969), *available at* https://bit.ly/3QJizrn.

[12] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative comment should not be given undue weight given the Supreme Court's discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *See id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is no such "overwhelming" evidence of a right to carry in places of worship (or, indeed, in *any* of the locations the CCIA regulates). As the State explains, plaintiffs' and the district court's attempt to find support for such a right in seventeenth-century laws requiring people to bring firearms to church in certain circumstances, which were largely to maintain the institution of slavery, is baseless. *See* State Br. 52. And—to be clear—even if there were evidence of a traditional *practice* of carrying in those locations, that would not be enough. *Compare* Kopel & Greenlee, 13 Charleston L. Rev. at 235 (arguing that Americans historically tolerated arms in legislative assemblies and that it was "common for Congressman to be armed"), *with Bruen*, 142 S. Ct. at 2133 (relying on Kopel & Greenlee article in endorsing constitutionality of prohibiting arms in legislative assemblies).

location restriction over time before the Supreme Court will assume it "settled" that guns may be prohibited in that location. Indeed, its approval of prohibitions in legislative assemblies on the basis of two laws in a three-year span indicates the opposite.

Concluding that a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states

18

historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.

Similarly, courts should not reject historical laws merely because they covered a small percentage of the nation's population, for at least three reasons. *First*, as explained above, such an approach runs counter to *Bruen*'s discussion of sensitive places, which approved restrictions in (for example) legislative assemblies without looking further than two laws in one small jurisdiction. *See supra* pp. 16-17.[13] Some district courts have concluded

---

[13] Indeed, the district court in *Antonyuk* seems to have understood this point when it discussed restrictions on firearms in preschools, noting that "the Supreme Court has already recognized the permissibility of this restriction as it applies to 'schools.'" *Antonyuk*, 2022 WL 16744700, at *68 (quoting *Heller*, 554 U.S. at 626). The court explained that it "[could] see why this is so, based on the historical analogues" it had examined. *Id.* It then cited four laws prohibiting any person from carrying weapons in schools: an 1870 Texas law, an 1883 Missouri law, an 1889 Arizona territorial law, and an 1890 Oklahoma

19

otherwise based on *Bruen*'s brief reference to "miniscule territorial populations," 142 S. Ct. at 2154. *See* JA 33-34; *Hardaway*, 2022 WL 16646220, at *15; *Antonyuk*, 2022 WL 16744700, at *7. But the Supreme Court there was merely explaining why a handful of territorial carry restrictions did not counteract the "overwhelming evidence" it had already found in favor of "an otherwise enduring American tradition permitting public carry." *Bruen*, 142 S. Ct. at 2154. Accordingly, absent "overwhelming" evidence of a widespread contrary tradition, a jurisdiction's relatively small population size is no reason to deny it a role in the nation's historical tradition.[14] *Second*, as multiple historians have commented, the process of unearthing and understanding

---

territorial law. *Id.* at *68 n.112; *see also id.* (citing two university rules and Mississippi law concerning college students only as "*cf.*"). Those four jurisdictions made up only about 8 percent of the American population in 1890. *See* Dept. of Interior, Compendium of Eleventh Census: 1890, at 9 (1892); *cf. Antonyuk*, 2022 WL 16744700, at *61 (finding 12.9 percent insufficiently representative of the total population). But, as *Antonyuk* seemingly understood, those two state and two territorial laws nevertheless demonstrate a robust tradition of completely prohibiting firearms in schools.

[14] For similar reasons, there is no basis in *Bruen* for concluding that city ordinances are not "part of this Nation's historical tradition of firearm regulation" unless "accompanied by similar laws from states," as the court did in *Antonyuk*. *See* 2022 WL 16744700, at *44. *Bruen*'s discussion of city ordinances was limited to a single paragraph about a Kansas law that would have applied to three cities in 1890 and, as with the territorial laws, cut against what it called the overwhelming weight of other evidence. *See* 142 S. Ct. at 2155-56. To glean from that passage a categorical rule that local ordinances form no part of the nation's historical tradition is nonsensical.

historical laws demands patience and openness to constant reevaluation.[15] Where a state—particularly in expedited preliminary litigation—has produced historical laws covering only a small percentage of the nation's population, newly-discoverable historical sources may later yield more examples and increase that percentage.[16] To discard a state's proffered laws for failing to meet some unstated population threshold is to fundamentally misunderstand the gradual and cumulative nature of historical research. *Third*, dismissing the laws of states with smaller populations is in tension with what the Supreme Court has deemed a "historic tradition" and "fundamental principle" of our constitutional bargain: "that all the States enjoy equal sovereignty." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 540, 544 (2013) (citations omitted). If the

---

[15] *See* Decl. of Prof. Zachary Schrag, *Angelo v. District of Columbia*, No. 1:22-cv-01878, Dkt. 18-13 (Sept. 16, 2022) (explaining historical research process and basis for conclusion (at ¶ 41) that 60 days would be inadequate even for a team of professional historians to "adequately research the questions presented in *Bruen*" in challenge to firearms prohibition on DC's metro); James McPherson, *Revisionist Historians*, Persps. on Hist. (Sept. 1, 2003), https://www.historians.org/research-and-publications/perspectives-on-history/september-2003/revisionist-historians ("History is a continuing dialogue between the present and the past. Interpretations of the past are subject to change in response to new evidence, new questions asked of the evidence, new perspectives gained by the passage of time.").

[16] *Compare, e.g.*, *Antonyuk*, 2022 WL 16744700, at *64-67 (considering eight park ordinances in addressing CCIA's restriction on guns in parks), *with* State's Exhibits 12 to 78, *Christian*, No. 1:22-cv-00695, Dkts. 33-3, 33-4, 34, 35 (in a case focused more narrowly on CCIA's parks restriction, exhibiting over sixty 19th- and early-20th-century parks prohibitions).

people of a small state responded to local needs by enacting certain policies, the fact that their neighbors in a larger state chose a different path does not nullify the constitutional agency of the smaller state.

The demands that the district court made for "continuity" of laws the State presents likewise has no foundation in *Heller* or *Bruen*.[17] The primary originalist inquiry asks how the public understood the scope of the right "*when the people adopted*" it, *Heller*, 554 U.S. at 634-35 (emphasis added)—not over some unspecified period of continuous time. Certainly, evidence from before, during, or after 1868 can all help demonstrate how the public understood the right in 1868. *See, e.g.*, *id.* at 605 ("[E]xamination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification … is a critical tool of constitutional interpretation."); *see also supra* pp. 13-15. But nothing in *Heller*, *Bruen*, or originalist principles says that the understanding at the time of adoption must also be a "continu[ous]" one. In concluding otherwise, the district court relied on

---

[17] The district court judge in this case also decided *Christian* and *Hardaway*, and applied this "continuity" requirement in both of those cases as well. *See Christian*, 2022 WL 17100631, at *8; *Hardaway*, 2022 WL 16646220, at *16. The district court in *Antonyuk* found "no reason to disagree" with *Hardaway*'s analysis. *Antonyuk*, 2022 WL 16744700, at *60. Errors we identify in the district court's "continuity" discussion in this case apply equally to any such requirement in other decisions.

*Bruen*'s discussion of territorial enactments, which the Supreme Court described as "short lived," 142 S. Ct. at 2155. *See* JA 33; *cf. Antonyuk*, 2022 WL 16744700, at \*6. *Bruen* explained that territorial carry restrictions, due in part to their transitory nature, could not outweigh the "overwhelming" evidence of a contrary tradition in support of public carry. 142 S. Ct. at 2155. But absent overwhelming contrary evidence, there is no reason to dismiss territorial laws out of hand. And there is even less reason to require states to prove affirmatively the continuity of every state or local law they rely on, because unlike territorial laws—which, *Bruen* said, were "transitional," "temporary," and regularly did not survive the ascension to statehood, *id.* at 2154-55—state and local laws have no such presumptive termination.[18] There is thus no basis for dismissing laws of "unknown duration."

Leaving aside the error in requiring proof of continuity, the district court below (and in *Hardaway*) erred in failing to recognize that the record *already contained* that proof—namely, that the State's historical laws persisted for decades. *See, e.g.*, Everytown Amicus Br., *Hardaway*, No. 1:22-cv-00771, Dkt.

---

[18] If plaintiffs wish to argue that certain historical laws were promptly repealed, they are free to submit proof to that effect—but nothing in *Bruen* suggests that it is the state's burden to prove the duration of historical state and local laws.

47, at 11-12;[19] *see also* State Br. 9 (noting expert's evidence that, to his

knowledge, "no court had ever invalidated a law prohibiting firearms in places

of worship"). The district court simply chose to ignore those facts.

---

[19] Everytown's brief laid out statutes and cases showing prohibitions in the pertinent states over time. *See id.* at 11 (citing Act of May 31, 2003, § 1, 2003 Ga. Laws 423 (misdemeanor to carry any firearm "at a public gathering," defined as "includ[ing], but not limited to, … churches or church functions"); *Byrdsong v. State*, 265 S.E.2d 15, 16 (Ga. 1980) (setting out statutory language, including as to churches, in case concerning firearm in bar); Ga. Code § 26-5102 (adopted 1933, effective 1935) (similar statutory language to original 1870 prohibition); *Sockwell v. State*, 109 S.E. 531 (Ga. Ct. App. 1921) (affirming conviction for carrying pistol at place of public worship); *Veasy v. State*, 62 S.E. 561, 562 (Ga. Ct. App. 1908) (same); 1925 Tex. Crim. Stat. 101 (similar to 1870 original); Mo. Rev. Stat. § 564.610 (1959) (similar to 1874 original); Act of Mar. 30, 1960, ch. 358, 1960 Va. Acts 458 (similar to 1877 original); Okla. Stat., ch. 15, art. 90, § 2589 (1931) (state law, similar to 1890 territorial original); and Ariz. Rev. Stat., Penal Code § 429 (1913) (state law, similar to 1889 territorial original)). Everytown's brief also laid out caselaw demonstrating a continuity of understanding that the right to keep and bear arms does not prevent states from prohibiting guns in places of worship. *See id.* at 11-12 (citing *Andrews v. State*, 50 Tenn. 165, 181-82 (1871); *Hill v. State*, 53 Ga. 472, 475 (1874); *Strickland v. State*, 72 S.E. 260, 264 (Ga. 1911); and *Walter v. State*, 13 Ohio N.P. (n.s.) (Ct. C.P. 1905), *aff'd*, 25 Ohio Cir. Dec. 567 (Cir. Ct. 1905)).

## CONCLUSION

This Court should reverse the district court's order granting a

preliminary injunction.

Dated: February 14, 2023

Respectfully submitted,

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Ave, P.O. Box 4184
New York, NY 10017
jcarter@everytown.org
(646) 324-8174

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) and Local Rules 29.1(c) and 32.1(a)(4)(A) because this brief contains 6,101 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Calisto MT font.

/s/ Janet Carter
Janet Carter
*Counsel for amicus curiae*
*Everytown for Gun Safety*