# No. 22-3237

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

MICHEAL SPENCER, HIS TABERNACLE FAMILY CHURCH, INC.,

*Plaintiffs-Appellees*,

v.

STEVEN A. NIGRELLI, Acting Superintendent of the New York State Police, in his official and individual capacities,

*Defendant-Appellants*,

WEEDEN A. WETMORE, District Attorney for the County of Chemung, New York, in his official and individual capacities, MATTHEW VAN HOUTEN, District Attorney for the County of Tompkins, New York, in his official and individual capacities, EVERYTOWN FOR GUN SAFETY,

*Defendants.*

On Appeal from the United States District Court for the Western District of New York, No. 22-cv-6486

## BRIEF FOR PLAINTIFFS-APPELLEES

DAVID J. HACKER
JEREMY DYS
KEISHA RUSSELL
RYAN GARDNER
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway
Suite 1600
Plano, TX 75075

ERIN E. MURPHY
 *Counsel of Record*
ANDREW C. LAWRENCE[*]
NICHOLAS M. GALLAGHER[*]
CLEMENT & MURPHY, PLLC
706 Duke Steet
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

(*Additional counsel listed on inside cover*)
*Counsel for Plaintiffs-Appellees*

February 28, 2023

JORDAN E. PRATT
FIRST LIBERTY INSTITUTE
1301 Pennsylvania Avenue, NW
Suite 1410
Washington, DC 20003

ANJAN K. GANGULY
GANGULY BROTHERS, PLLC
140 Allens Creek Road
Suite 220
Rochester, NY 14618

*Supervised by principals of the firm who are members
of the Virginia bar

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), His Tabernacle Family Church, Inc., certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock. Pastor Micheal Spencer is an individual.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES.................................................................. iv

INTRODUCTION ......................................................................... 1

JURISDICTION.......................................................................... 3

STATEMENT OF THE ISSUE............................................................... 3

STATEMENT OF THE CASE AND FACTS ...................................................... 3

    A.    Legal Background ................................................................. 3

    B.    Factual & Procedural Background .................................................. 10

SUMMARY OF ARGUMENT.................................................................. 16

STANDARD OF REVIEW ................................................................... 18

ARGUMENT ............................................................................. 19

I.    The District Court Correctly Concluded That Pastor Spencer And The Church Are Likely To Succeed On The Merits Of Their Claims ................................................................. 19

    A.    The Place-of-Worship Provision Violates the Free Exercise Clause Because It Singles Out Religious Worship for Burdens That It Does Not Impose on Secular Activities................................ 19

    B.    The Place-of-Worship Provision Encroaches on Church Autonomy in Violation of the Free Exercise and Establishment Clauses.......................................................... 38

    C.    The Place-of-Worship Provision Violates the Second Amendment by Prohibiting Congregants From Carrying Firearms for Self-Defense ................................................. 46

II.    The District Court Did Not Abuse Its Discretion By Finding That The Remaining Factors All Favor Injunctive Relief .................................... 55

CONCLUSION ....................................................................................................... 59

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Agudath Israel of Am. v. Cuomo*,
  983 F.3d 620 (2d Cir. 2020) ....................................................... 19, 57

*Bouldin v. Alexander*,
  82 U.S. 131 (1872) ...................................................................... 40

*Brown v. Entm't Merchants Ass'n*,
  564 U.S. 786 (2011) ........................................................ 31, 35, 36

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) ..................................................................... 38

*Carson v. Makin*,
  142 S.Ct. 1987 (2022) ...................................................... 20, 24, 30

*Cent. Rabbinical Cong. of U.S. & Canada*
  *v. N.Y. City Dep't of Health & Mental Hygiene*,
  763 F.3d 183 (2d Cir. 2014) ....................................................... 20

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ....................................................... 4, 20, 27, 29

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985) ....................................................... 57

*District of Columbia v. Heller*,
  554 U.S. 570, 592, 595 (2008) ....................................... 4, 50, 51, 58

*Employment Div. v. Smith*,
  494 U.S. 872 (1990) .............................................................. 20, 26

*English v. State*,
  35 Tex. 473 (1871) ...................................................................... 53

*Espinoza v. Mont. Dep't of Revenue*,
  140 S.Ct. 2246 (2020) .................................................. 22, 24, 26, 36

*Everson v. Bd. of Educ.*,
  330 U.S. 1 (1947) ........................................................................ 39

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ........................................................ 19, 56

*Fulton v. City of Philadelphia*,
141 S.Ct. 1868 (2021) ................................................................. 31, 32

*GeorgiaCarry.Org, Inc. v. Georgia*,
687 F.3d 1244 (11th Cir. 2012) ..........................................................41

*German Reformed Church v. Commonwealth ex. rel. Seibert*,
3 Pa. 282 (Pa. 1846) ..........................................................................39

*Gonzalez v. Roman Catholic Archbishop of Manila*,
280 U.S. 1 (1929) ...............................................................................40

*Grace v. District of Columbia*,
187 F.Supp.3d 124 (D.D.C. 2016) .....................................................57

*Harmon v. Dreher*,
Speers Eq. 87 (S.C. Ct. App. Equity 1843) .......................................39

*Hill v. State*,
53 Ga. 472 (1874) ..............................................................................53

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) .........................................................56

*Holt v. Hobbs*,
574 U.S. 352 (2015).............................................................................33

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012)..................................................................... 4, 40, 42

*Jones v. Wolf*,
443 U.S. 595 (1979).......................................................................... 39, 40

*Kane v. DeBlasio*,
19 F.4th 152 (2d Cir. 2021) .............................................................. 30, 56

*Kedroff
v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
344 U.S. 94 (1952)..............................................................................40

*Kennedy v. Bremerton Sch. Dist.*,
    142 S.Ct. 2407 (2022) ............................................................... *passim*

*Kreshik v. Saint Nicholas Cathedral*,
    363 U.S. 190 (1960) ........................................................................40

*Larson v. Valente*,
    456 U.S. 228 (1982) ........................................................................42

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
    485 U.S. 439 (1988) ........................................................................20

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ........................................................................33

*McCutcheon v. Fed. Election Comm'n*,
    572 U.S. 185 (2014) ........................................................................38

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) .............................................................. 4, 49, 51

*Md. & Va. Eldership of Churches of God
    v. Church of God at Sharpsburg, Inc.*,
    396 U.S. 367 (1970) .................................................................. 39, 40

*Moore v. Consol. Edison Co. of N.Y.*,
    409 F.3d 506 (2d Cir. 2005) .............................................................18

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S.Ct. 2111 (2022) ............................................................. *passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) .............................................................35

*New York v. Cathedral Acad.*,
    434 U.S. 125 (1977) ........................................................................44

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................19

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S.Ct. 2049 (2020) ............................................................. *passim*

*Presbyterian Church in the U.S.*
   *v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*,
   393 U.S. 440 (1969) ..................................................................... 39, 40

*PruneYard Shopping Ctr. v. Robins*,
   447 U.S. 74 (1980) .............................................................................30

*Roberts v. Neace*,
   958 F.3d 409 (6th Cir. 2020) ............................................................27

*Rogers v. Grewal*,
   140 S.Ct. 1865 (2020) .......................................................................49

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   141 S.Ct. 63 (2020) .................................................................... *passim*

*S. Bay United Pentecostal Church v. Newsom*,
   141 S.Ct. 716 (2021) .........................................................................25

*Serbian Eastern Orthodox Diocese for U.S. & Canada v. Milivojevich*,
   426 U.S. 696 (1976) ..................................................................... 39, 40

*Shannon v. Frost*,
   3 B. Mon. 253 (Ky. Ct. App. 1842) ..................................................39

*Shepard v. Barkley*,
   247 U.S. 1 (1918) ..............................................................................39

*Sherbert v. Verner*,
   374 U.S. 398 (1963) ..........................................................................22

*Sir John Knight's Case*,
   3 Mod. 117, 87 Eng. Rep. 75 (K.B. 1686) ........................................49

*State ex rel. Watson v. Farris*,
   45 Mo. 183 (Mo. 1869) ................................................................ 39, 40

*Tandon v. Newsom*,
   141 S.Ct. 1294 (2021) ............................................................... *passim*

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*,
   450 U.S. 707 (1981) ..................................................................... 23, 38

*Tony & Susan Alamo Found. v. Sec'y of Lab.*,
 471 U.S. 290 (1985)..................................................................43

*Tough Traveler, Ltd. v. Outbound Prods.*,
 60 F.3d 964 (2d Cir. 1995)........................................................57

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
 137 S.Ct. 2012 (2017)...............................................................22

*United States v. Smythe*,
 363 F.3d 127 (2d Cir. 2004).......................................................58

*Uzuegbunam v. Preczewski*,
 141 S.Ct. 792 (2021).................................................................38

*Walz v. Tax Comm'n of City of N.Y.*,
 397 U.S. 664 (1970)..................................................................46

*Watson v. Jones*,
 80 U.S. 679 (1871)....................................................................39

## Constitutional Provisions

U.S. Const. amend. I .....................................................................4

U.S. Const. amend. II...................................................................47

U.S. Const. amend. IV .................................................................41

## Statutes

Ark. Code §5-73-306(15)(B) ........................................................33

1870 Ga. Laws 421 .................................................................51, 52

La. Code. §40:1379.3(N)(8)..........................................................33

Mich. Comp. Laws §28.425o(1)(e)................................................33

1883 Mo. Laws 76 ........................................................................51

Mo. Stat. §571.107(1)(14) ............................................................33

Neb. Rev. Stat. §69-2441(1)(c) .....................................................33

N.D. Code §62.1-02-05(2)(m) .................................................33

N.Y. Gen. Bus. Law §89-e *et seq.* .........................................24

N.Y. Penal Law §70.00(2)(e) .................................................21

N.Y. Penal Law §265.01-d(1) ........................................... 9, 25

N.Y. Penal Law §265.01-e .....................................................9

N.Y. Penal Law §265.01-e(1) ........................................... 9, 25

N.Y. Penal Law §265.01-e(2)(a) ....................................... 9, 21

N.Y. Penal Law §265.01-e(2)(c) ................................... 9, 25, 41

N.Y. Penal Law §265.01-e(2)(d) ........................................... 37

N.Y. Penal Law §265.01-e(3) .................................................9

N.Y. Penal Law §265.01-e(3)(e) ..............................................24

N.Y. Penal Law §265.01-e(q) .................................................9

Ohio Code §2923.126(B)(6) .................................................33

Revised Ordinances of City of Huntsville, Mo. of 1894, §2 ....................51

S.C. Code §23-31-215(M)(8) ..................................................33

1870 Tex. Gen. Laws 63, ch. 46, §1 .........................................51

Utah Code §76-10-530 .......................................................33

1877 Va. Acts 305, §21 ..................................................... 51

## Other Authorities

*Acts* 20:28 (English Standard Version) .......................................11

Giavanni Alves, *N.Y.'s New Gun Control Laws*, Staten Island Live
(July 9, 2022), https://archive.ph/7by4T................................. 8

*Black Friday Shooting Shutters New York Mall; 1 Injured*, NBC N.Y.
(Nov. 30, 2019), https://bit.ly/3YjBCLD................................ 29

Jake Bleiberg & Jamie Stengle, *Firearms Instructor Took Out Gunman at Texas Church Service*, AP (Dec. 31, 2019), https://bit.ly/3YWktHT ........................................................................... 13

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 Liberty U.L. Rev. 653 (2014) ...................... 42, 44, 52

Patrick J. Charles, *The Fugazi Second Amendment* (forthcoming Clev. St. L. Rev.)........................................................... 49

*Colossians* 1:18 (English Standard Version) ............................................ 11

*I Corinthians* 12:27 (English Standard Version)....................................... 11

*Ephesians* 4:15-16 (English Standard Version) ....................................... 11

*Ezekiel* 34:1-10 (English Standard Version) ............................................ 11

*Guilderland Police Make Arrests in Crossgates Mall Shooting*, WRGB (May 25, 2022), https://bit.ly/3HQ3CzB................................... 28

Richard Harbus, Stephanie Pagonus, & Emily Saul, *2 Injured in Shooting in Upstate New York Mall*, N.Y. Post (Nov. 26, 2017), https://bit.ly/3jNEr8W ....................................................................... 29

*Hebrews* 13:17 (English Standard Version).............................................. 11

Luis Andres Henao & Deepa Bharath, *US Houses of Worship Increase Security After Shootings*, Religion News Service (July 19, 2022), https://archive.ph/Z4ek3 ...................................................................... 12

Gov. Kathy Hochul, N.Y. State, *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision* (July 1, 2022), https://on.ny.gov/3E1Uuat ........................................... 8

*Isaiah* 40:11 (English Standard Version) ................................................. 11

*John* 21:15-17 (English Standard Version)............................................... 11

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018)................................................... 4, 50

x

*Matthew* 9:36 (English Standard Version) ................................................................11

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) ..................................3

Myles Miller, Jonathan Dienst, & Marc Santia, *Three Teens Charged in Connection With Kings Plaza Mall Shooting That Left 2 Hurt*, NBC N.Y. (Feb. 2, 2022), https://bit.ly/3JWzg0Z ..............................................29

*I Peter* 5:2-3 (English Standard Version) ..................................................................11

Robert Pozarycki, *Pair Sought for Queens Shopping Mall Shooting That Left Three Injured*, AMNY (Dec. 19, 2021), https://bit.ly/3XAXbXb ......................................................................29

*Romans* 12:5 (English Standard Version) .................................................................11

*Roosevelt Field Nordstrom Locked Down After Shots Fired Into Store*, WABC (Apr. 7, 2022), https://7ny.tv/3JXNVsJ.................................................29

S. Rep. 103-111 (1993) ...............................................................................................4

Statement by First Deputy Superintendent of State Police Steven Nigrelli, *Governor Hochul Delivers a Press Conference on Gun Violence Prevention* (Aug. 31, 2022), https://bit.ly/3Yr7Ggp ...........................10

Reis Thebault, *Too Small to Hire Guards, Too Worried to Go Gun-Free, Community Churches Are Now Arming Themselves*, Wash. Post (Feb. 14, 2020), https://archive.ph/U5yjb..................................................33

Va. Att'y Gen. Op. No. 11-043, 2011 WL 4429173 (Apr. 8, 2011)........................52

xi

**INTRODUCTION**

This case concerns a New York firearms law that defies multiple Supreme Court precedents. In 2020, the Supreme Court admonished New York that it could not single out places of worship for especially harsh treatment relative to comparable secular establishments. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63 (2020) (per curiam). And in 2022, the Supreme Court admonished New York that it could not prohibit law-abiding citizens from carrying firearms in public for self-defense unless that prohibition accords with historical tradition. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). Remarkably, those admonitions had the exact opposite of their intended effect. Just days after *Bruen*, the state rushed out a sweeping new set of restrictions on carrying firearms outside the home in a law known as the "Concealed Carry Improvement Act" (CCIA). As relevant here, the CCIA flatly bans carrying firearms in places of worship—even though proprietors of comparable secular establishments may authorize the carrying of firearms on their property as they wish.

Pastor Micheal Spencer is the pastor at His Tabernacle Family Church, which has two campuses in New York. Pastor Spencer sincerely believes that he has a religious duty to protect his congregants' safety, and for years, he has acted in accordance with that belief by carrying firearms on Church premises and by permitting other congregants to do the same. Accordingly, soon after the CCIA took

effect, Pastor Spencer and the Church filed suit to challenge the place-of-worship provision and sought a preliminary injunction, alleging that the place-of-worship provision violates the Free Exercise and Establishment Clauses of the First Amendment, as well as the Second Amendment.

The district court correctly granted that relief. As the court recognized, the Free Exercise Clause prohibits laws that treat places of worship less favorably than even one comparable secular establishment unless the state can satisfy strict scrutiny, and the CCIA's place-of-worship provision plainly discriminates in that manner and is not the *rara avis* that satisfies that exceedingly demanding test. Furthermore, the Religion Clauses preclude state interference in core matters of church governance, yet the place-of-worship provision declares that places of worship may welcome congregants into their sacred spaces only in a state-approved manner. In addition, the Second Amendment's plain text presumptively protects carrying firearms outside the home, and aside from a few outlier laws enacted a century or more after the Nation's founding, there is no historical precedent for the place-of-worship provision. Plaintiffs are thus exceedingly likely to succeed on all of their constitutional claims. And given that the place-of-worship provision is unconstitutional thrice over, the irreparable harm to Pastor Spencer and the Church is palpable, and the public interest in enjoining the place-of-worship provision is undeniable.

The state offers no cogent reason to disturb the district court's decision. Indeed, the state does not even cite the Supreme Court's decision in *Roman Catholic Diocese*, much less explain how the place-of-worship provision could survive its clear teachings; it repeatedly second-guesses Pastor Spencer's sincere religious beliefs, even as it concedes that they are not in dispute; and it resuscitates a bevy of arguments that *Bruen* already rejected. The state does not disagree that the remaining preliminary-injunction factors are satisfied if Pastor Spencer and the Church are likely to succeed on the merits. Because the state has no chance of prevailing on the merits, the path forward here is clear: affirmance.

## JURISDICTION

Pastor Spencer and the Church agree with the state's jurisdictional statement.

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in preliminarily enjoining the CCIA's place-of-worship provision.

## STATEMENT OF THE CASE AND FACTS

### A. Legal Background

1. Before the founding of our Nation, "England suffered from chronic religious strife and intolerance." Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1421 (1990). English subjects lived under "the control of the national church" and lacked the freedom to practice their "own modes of worship." *Hosanna-Tabor*

3

*Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 182 (2012). Moreover, Parliament prohibited subjects from exercising certain fundamental rights—including the right to bear arms—on religiously discriminatory grounds. *See Bruen*, 142 S.Ct. at 2142.

The Framers of the Constitution set out to provide more robust protection for religious liberty and self-defense. *See, e.g.*, S. Rep. 103-111 at 4 (1993); David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 230 (2018). To that end, the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Those twin protections prohibit the government from "impos[ing] special disabilities on the basis of … religious status," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993), and secure a "broad" right for churches "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine," *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2055 (2020). The Second Amendment, in turn, guarantees the "right of the people to keep and bear Arms, shall not be infringed," U.S. Const. amend. II, thus protecting an individual right to keep and bear arms for the core purpose of self-defense. *See District of Columbia v. Heller*, 554 U.S. 570, 592, 595, 630 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

2.     Unfortunately, some states have struggled to live up to these constitutional ideals.  And in recent years, few states have flouted their First and Second Amendment obligations as audaciously as New York.  Early in the COVID-19 pandemic, for example, state officials targeted religious communities for special burdens that did not apply to comparable establishments.  Worse, those burdens struck at the heart of religious organizations' internal decision-making:  how to conduct worship in their own sacred spaces.

Among other restrictions, then-Governor Cuomo issued an executive order establishing a color-coded system imposing capacity restrictions at places of worship.  *See Roman Catholic Diocese*, 141 S.Ct. at 65-66.  In "red zones," the state prohibited places of worship from welcoming more than 10 people at any time; in "orange zones," the state set the limit at 25 people.  *Id.* at 66.  In either scenario, the restriction applied without regard to the size of a religious community's facilities and no matter the precautions it undertook to assure congregant safety.  Meanwhile, "essential" services in the very same "zones" did not have to comply with any capacity restrictions at all.  *Id.*  And while "essential" services spanned everything from liquor stores to acupuncturists, the state took the stunning position that religious worship is not "essential."  *Id.* at 66-67; *id.* at 69 (Gorsuch, J., concurring).

After Catholic and Jewish groups challenged those regulations under the First Amendment, the Supreme Court readily concluded—in the emergency posture of an

application for an injunction pending appeal—that New York's edict likely violated the irreducible "minimum" of the First Amendment: The government may not "single out houses of worship for especially harsh treatment." *Id.* at 66. Because the "disparate treatment" between worship and those activities deemed "essential" rendered the restrictions neither neutral nor generally applicable, they triggered strict scrutiny. *Id.* at 66-67. And the Court found it "hard to see" how New York's restrictions could be "narrowly tailored" when there was no evidence that places of worship posed a unique risk of spreading COVID-19, let alone that less restrictive alternatives could not sufficiently address any risk that might exist. *Id.* at 67.

Not long after the Supreme Court instructed New York to comply with the First Amendment, it did the same with respect to the Second Amendment. While *Heller* and *McDonald* made clear that the Second Amendment guarantees an individual right to keep and bear arms for self-defense that is protected against infringement by the states, the state nevertheless continued to deprive law-abiding citizens of any avenue to bear arms for self-defense outside the home by making it nearly impossible to obtain the license that state law required to do so. *See Bruen*, 142 S.Ct. at 2122. Specifically, to obtain a license and thereby avoid criminal punishment just for exercising a constitutional right, a law-abiding citizen had to "demonstrate a *special need* for self-protection distinguishable from that of the general community." *Id.* at 2123 (emphasis added).

The Supreme Court dispatched that argument in *Bruen*, confirming that the right "to keep and bear Arms" means just that—the right to keep *and bear* arms, whether inside or outside the home. *Id.* at 2134-35. The Court reiterated, moreover, that this is no "second-class right" subject to a unique set of rules or available to only those with "some special need" to exercise it. *Id.* at 2156. The Court also made clear that, when evaluating government burdens on the Second Amendment's "unqualified command," courts must assess "this Nation's historical tradition" of firearms regulation; "the government may not simply posit that the regulation promotes an important interest" and call it a day. *Id.* at 2125-34. Only if the state can "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" may a court uphold a restriction on that right. *Id.* at 2127. Applying that test, the Court invalidated New York's special-need restriction. *Id.* at 2134-56.

In the course of elaborating on how the historical burden-shifting regime it established worked, the Court observed that laws forbidding the carrying of firearms in certain "sensitive places" may accord with historical tradition, although it noted that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses." *Id.* at 2133. And the Court explicitly rejected New York's attempt to justify its special-need restriction as a "sensitive place" law,

7

stating that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly" and has "no historical basis." *Id.* at 2133-34.

3.      With the ink on *Bruen* still drying, New York embarked on a campaign "to offset the impact of the court's decision"—and trample First Amendment rights to boot. Giavanni Alves, *N.Y.'s New Gun Control Laws*, Staten Island Live (July 9, 2022), https://archive.ph/7by4T. In July 2022—just eight days after the Supreme Court issued *Bruen*—New York enacted the CCIA, which imposes far-reaching new restrictions on where law-abiding citizens may carry firearms by designating large swathes of the state "sensitive places." According to its chief proponents, the CCIA furthers the state's interest in "combat[ting] … gun violence." Gov. Kathy Hochul, N.Y. State, *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision* (July 1, 2022), https://on.ny.gov/3E1Uuat; *see* D.Ct.Dkt.13-3 at 9 n.5.

As relevant here, one of the "sensitive locations" where firearms are now flatly prohibited is "any place of worship or religious observation." Hence, New York law now provides:

> A person is guilty of criminal possession of a firearm, rifle or shotgun in a sensitive location when such person possesses a firearm, rifle or shotgun in or upon a sensitive location, and such person knows or reasonably should know such location is a sensitive location. For the

purposes of this section, a sensitive location shall mean … any place of worship or religious observation[.]

N.Y. Penal Law §265.01-e(1), (2)(c).  But although the CCIA defines "sensitive location" to include certain other areas—*e.g.*, government buildings and polling places, *see id.* §265.01-e(2)(a), (q)—it creates a wide exception for private property, provided that it has no religious affiliation.  While firearms are presumptively prohibited on private property, owners or lessees of private property are free to override that presumption by posting "clear and conspicuous signage" or "otherwise giv[ing] express consent" to carry firearms on their property.  *Id.* §265.01-d(1).

Severe penalties await those who violate the sensitive-place provision, including the place-of-worship provision.  Possession of a firearm in any "sensitive location" is a Class E felony if one "knows or reasonably should know such location is a sensitive location."  *Id.* §265.01-e.  Thus, it is now a felony in New York to carry a firearm in a place of worship, regardless whether one has a license to carry a firearm and regardless whether the place of worship expressly authorizes carrying firearms on its property.  That otherwise-blanket ban is subject to only a handful of narrow exceptions for federal and state law enforcement officers, registered business security guards, and active military duty personnel.  *See id.* §265.01-e(3).

The CCIA took effect in September 2022, and New York officials have confirmed their intent to vigorously enforce it.  In a statement announcing that she had signed the CCIA, Governor Hochul—after denouncing *Bruen* as a "reckless"

9

decision that necessitated a "bold" response from New York—warned that "[i]ndividuals who carry concealed weapons in sensitive locations or in contravention of the authority of an owner of private property will face criminal penalties." Hochul, *supra*. Similarly, the Acting Superintendent of the New York State Police, Steven Nigrelli (Appellant here), has warned that state law enforcement officers will have "zero tolerance" for violations of the CCIA: "If you violate this law, you will be arrested. Simple as that." Statement by First Deputy Superintendent of State Police Steven Nigrelli, *Governor Hochul Delivers a Press Conference on Gun Violence Prevention* (Aug. 31, 2022), https://bit.ly/3Yr7Ggp (remarks at 38:01).

### B. Factual & Procedural Background

1. His Tabernacle Family Church is a nondenominational Christian church founded by Pastor Spencer in 1998. JA72. The Church initially met at a hotel in Horseheads, New York, but it moved to a small commercial location shortly thereafter and then to a series of progressively larger buildings. JA71-72. Today, the Church ministers to more than 1,100 people at three campuses—one in Horseheads (the main campus); a second in Ithaca; and a third in Mansfield, Pennsylvania. *See* JA71-72. Pastor Spencer serves as the Church's senior pastor, and he is the President and CEO of the Church's corporate entity. JA71.

Pastor Spencer is a responsible and law-abiding citizen—as the state has recognized. He owns several firearms, all of which are registered in accordance with New York law, and since 1996, he has held a New York license to carry a concealed pistol or revolver. JA72. As the Church's pastor, Pastor Spencer believes that he has a moral and a religious duty to take reasonable measures to protect the safety of his congregation, as the Christian scriptures often refer to a worship leader as a "shepherd" tasked with caring for and protecting his "flock." JA74; *see* Ezekiel 34:1-10; Isaiah 40:11; Matthew 9:36; John 21:15-17; I Peter 5:2-3; Acts 20:28; Hebrews 13:17. Pastor Spencer thus sincerely believes that providing for the safety of the Church—the "Body of Christ"—is a religious act for a pastor. JA74; *see* Romans 12:5; I Corinthians 12:27; Ephesians 4:15-16; Colossians 1:18. Consistent with his view of the Christian scriptures, and as an "application" of that view, Pastor Spencer regularly carried a concealed firearm on the Church's New York campuses before the CCIA's place-of-worship provision went into effect. JA74.

Other members of the Church's congregation share Pastor Spencer's conviction that the scriptures call on them as members of a single "family" united in Jesus Christ to love, serve, and protect one another. JA85-88. Thus, before the CCIA's enactment, Pastor Spencer—who has the authority to determine which personal items people may bring onto the Church's campuses—allowed congregants to carry concealed firearms at both New York campuses, and he continues to allow

congregants to carry concealed firearms at the Mansfield campus because that remains permissible in Pennsylvania (and every other state but New York). JA74-75. And Pastor Spencer did not restrict the carrying of firearms to congregants blessed with the "gift" of providing security to the Church; he instead permitted all licensed congregants to carry firearms on Church premises. JA199-200, 242, 244.

Pastor Spencer's concerns for his Church's safety are not hypothetical. Pastor Spencer regularly receives threatening mail, and he has received at least two death threats that necessitated law enforcement involvement. JA76. In one incident, a neighbor threatened to kill Pastor Spencer and discharged his firearm multiple times near Pastor Spencer's home—prompting a responding New York State Police officer to say that Pastor Spencer "was 'smart'" to keep a firearm with him. JA77. In another incident, someone sent Pastor Spencer a Facebook message conveying a desire that "someone execute[]" Pastor Spencer and his late wife. JA76. The Church has also experienced several other security threats, including burglary and vandalism. JA77. And sadly, in recent years, armed assailants have attacked several other places of worship. *See* Luis Andres Henao & Deepa Bharath, *US Houses of Worship Increase Security After Shootings*, Religion News Service (July 19, 2022), https://archive.ph/Z4ek3. While those attacks have caused many deaths, places of worship have succeeded in minimizing the damage through the lawful and prudent

use of firearms. *See* Jake Bleiberg & Jamie Stengle, *Firearms Instructor Took Out Gunman at Texas Church Service*, AP (Dec. 31, 2019), https://bit.ly/3YWktHT.

Following the enactment of the CCIA's place-of-worship provision, however, Pastor Spencer stopped carrying firearms onto the Church's New York campuses, and he expected other congregants to comply with the law. JA74. But for the place-of-worship provision, Pastor Spencer would carry concealed firearms on the Church's New York campuses and permit other licensed congregants to do the same. JA75.

2. In November 2022, Pastor Spencer and the Church filed suit alleging that the CCIA's place-of-worship provision violates both the First Amendment's Free Exercise and Establishment Clauses and the Second Amendment. JA44-68. Pastor Spencer and the Church sought declaratory and injunctive relief, as well as nominal damages. JA67-68. Five days later, Pastor Spencer and the Church filed a motion for a preliminary injunction, JA69-70, which the district court granted in December 2022 after holding a lengthy hearing that, at the state's request, included extensive testimony from Pastor Spencer, JA8-43, 180-282.

The district court first concluded that the CCIA's place-of-worship provision likely violates the Free Exercise Clause. JA17-27. The court explained that the provision burdens religious exercise because "Pastor Spencer and Church members have a religious belief that they, themselves, must protect the flock," yet they are

13

unable to carry firearms for such purposes due to the place-of-worship provision. JA19-20.  The court further concluded that the provision is not "neutral" toward religion because it "discriminate[s] on its face" against religion and is explicitly "directed at religious activity."  JA22.  Nor is it "generally applicable," as "[i]t specifically targets carrying of firearm[s] motivated by religious beliefs while permitting concealed carry in relation to numerous secular activities"—*e.g.*, in "hair salons, retail stores, shopping malls, gas stations, office buildings, garages, and countless other [areas]."  JA23-24.  The court then concluded that the law cannot satisfy strict scrutiny, JA262—an issue relegated to a footnote in the state's briefing, D.Ct.Dkt.43 at 12 n.5.  Even if the state has a compelling interest in preventing violent crime, the court reasoned, it is doubtful that the place-of-worship provision will further that interest because it will not "deter[]" "a bad-intentioned armed person looking to attack worshippers," and "[t]here is no evident justification for the view that secular business owners are more qualified than religious leaders to determine whether to allow armed self-defense on their property."  JA26.

The court next concluded that the CCIA's place-of-worship provision likely violates the Establishment Clause.  JA27-30.  "Pastor Spencer and members of the Church's security team provide armed security to the congregation because they sincerely believe that God has called them to do so."  JA28.  By broadly prohibiting firearms in places of worship, the court recognized, "the place of worship exclusion

14

encroaches on matters 'closely linked' with the Church's right to determine how best to conduct its own affairs." JA29. The court then explained that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings,'" and noted that "the State ma[de] no attempt to demonstrate that the regulation is consistent with this Nation's historical tradition in this area." JA29-30.

Turning to the Second Amendment, the court concluded that the place-of-worship provision likely violates it too. JA30-35. As the court explained, Pastor Spencer and other congregants seek to engage in conduct that the "plain text" of the Second Amendment covers: "carry[ing] firearms for the purpose of defending [themselves] and the Church as [they] go[] about … daily life." JA32. And the court concluded that "the State fail[ed] to demonstrate that the houses of worship exclusion is consistent with this Nation's historical tradition of firearm regulation." JA32. The only historical evidence the state could identify, the court observed, "involv[ed] a small minority of jurisdictions governing a small minority of population," which "were passed nearly a century after the Second Amendment's ratification in 1791." JA33-34. As the court thus put it, "[t]he State's proffered enactments are far too remote, far too anachronistic, and very much outliers—insufficient, then, in the search for an American tradition." JA34.

15

The court next determined that the remaining preliminary-injunction factors—irreparable harm and the public interest—favored Pastor Spencer and the Church. JA35-39. The "denial of a constitutional right ordinarily warrants a finding of irreparable harm," the court wrote, and "the State does not show that the lawful carrying of firearms in houses of worship has resulted in an increase in handgun violence, or that public safety would be impaired if this exclusion is enjoined." JA35-38. Although those findings entitled Pastor Spencer and the Church to a preliminary injunction, the court stayed the injunction pending resolution of the state's appeal to this Court, subject to the condition that plaintiffs may "designate individuals otherwise authorized by law to carry a firearm to do so on church premises for the purposes of keeping the peace." JA41-43.

## SUMMARY OF ARGUMENT

The CCIA's place-of-worship provision puts Pastor Spencer and his congregants to an untenable choice: forgo your First Amendment rights to worship at the Church or forgo your Second Amendment rights to bear arms for self-defense. Pastor Spencer and his congregants cannot lawfully exercise both rights at the same time. Under settled Supreme Court precedent, emanating largely from cases that New York itself lost, the state has the burden to justify that state-mandated choice thrice over. As the district court correctly determined, the state cannot do so.

16

The CCIA's place-of-worship provision violates both the Free Exercise Clause and the Establishment Clause of the First Amendment.  By explicitly prohibiting the exercise of a fundamental constitutional right in places of worship while permitting its exercise on other private property—and by denying to religious leaders the authority it reserves to other private property owners to permit firearms—the place-of-worship provision both on its face and in its effect treats comparable secular activity more favorably than religious exercise, thus discriminating on the basis of religion.  As *Roman Catholic Diocese* and its progeny made crystal clear, such a law triggers strict scrutiny, which is fatal here.  And the place-of-worship provision encroaches on church autonomy too by telling places of worship whom they can admit into their sanctuaries to worship and under what circumstances—precisely what the Religion Clauses forbid.  The state resists those conclusions only by ignoring *Roman Catholic Diocese* altogether, failing to meaningfully engage with other directly on-point Supreme Court precedent, and second-guessing Pastor Spencer's sincerely held religious beliefs.

The CCIA's place-of-worship provision likewise violates the Second Amendment.  By prohibiting ordinary, law-abiding citizens from carrying arms for self-defense in places of worship that otherwise would allow them to do so, the place-of-worship provision severely restricts conduct that is covered by the Second Amendment's plain text.  As *Bruen* confirmed, such a law can survive only if the

state can demonstrate that it is consistent with historical tradition, and the state remains unable to make that showing. As in the district court, the only historical evidence the state has identified is a handful of outlier late-nineteenth century laws assembled by an "expert" who has publicly renounced *Bruen*. The state cannot paper over that deficiency with its collection of *Bruen*-defying arguments, such as its remarkable claim that it bears no burden to produce historical evidence at all simply because it has intoned the words "sensitive place."

Because Pastor Spencer and the Church are all but guaranteed to succeed on the merits of their constitutional claims, the district court acted well within its broad discretion by finding the remaining preliminary-injunction factors met. After all, constitutional injury is always irreparable, and remedying it is always in the public interest. The state does not disagree with those propositions; it simply denies that there is any constitutional injury. Because that position is triply incorrect, this Court should affirm.

## STANDARD OF REVIEW

"The district court has wide discretion in determining whether to grant a preliminary injunction, and this Court reviews the district court's determination only for abuse of discretion." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 511 (2d Cir. 2005).

## ARGUMENT

When the government is the opposing party, a preliminary injunction is appropriate when plaintiffs establish that their "claims are likely to prevail, that denying them relief would lead to irreparable injury, and that granting relief would not harm the public interest." *Roman Catholic Diocese*, 141 S.Ct. at 66; *see Nken v. Holder*, 556 U.S. 418, 435 (2009). When First and Second Amendment rights are at stake, "the likelihood of success on the merits is the dominant, if not the dispositive, factor." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020); *see Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). Here, the district court correctly concluded that Pastor Spencer and the Church are likely to succeed on the merits of all three of their constitutional claims—and that the remaining factors are satisfied as a matter of course.

## I.    The District Court Correctly Concluded That Pastor Spencer And The Church Are Likely To Succeed On The Merits Of Their Claims.

### A.    The Place-of-Worship Provision Violates the Free Exercise Clause Because It Singles Out Religious Worship for Burdens That It Does Not Impose on Secular Activities.

The Free Exercise Clause "protect[s] the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022). Although there are "various ways" laws can burden religious exercise, *id.*, religious exercise is plainly burdened when people are "coerced by the

Government's action into violating their religious beliefs," *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988); *see Kennedy*, 142 S.Ct. at 2422; *Roman Catholic Diocese*, 141 S.Ct. at 65-66, or when "governmental action penalize[s] religious activity by denying any [religious] person an equal share of the rights, benefits, and privileges enjoyed by other citizens," *Lyng*, 485 U.S. at 449; *see Carson v. Makin*, 142 S.Ct. 1987, 1996-97 (2022).

To be sure, the Supreme Court has held that the government may burden religious exercise pursuant to a neutral and generally applicable law. *See Employment Div. v. Smith*, 494 U.S. 872, 879 (1990). "A law burdening religious conduct that is *not* both neutral and generally applicable, however, is subject to strict scrutiny," *Cent. Rabbinical Cong. of U.S. & Canada v. N.Y. City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014), under which the government must show that the law furthers "interests of the highest order" by means "narrowly tailored in pursuit of those interests," *Lukumi*, 508 U.S. at 546. "That standard is not watered down; it really means what it says." *Tandon v. Newsom*, 141 S.Ct. 1294, 1298 (2021) (per curiam) (quotation marks omitted). Thus, when strict scrutiny applies, a law "rare[ly]" survives. *Carson*, 142 S.Ct. at 1997. Applying these principles, the district court correctly concluded that the CCIA's place-of-worship provision burdens religious exercise, is neither neutral nor generally applicable, and flunks strict scrutiny. JA17-27.

1.     The CCIA's place-of-worship provision burdens free-exercise rights in at least two ways.  First, Pastor Spencer sincerely believes that he has a religious duty to protect his congregants—his flock—that God has entrusted to his charge. JA74.  Before the state enacted the place-of-worship provision, Pastor Spencer consistently acted in accordance with that belief, regularly carrying a firearm on the Church's New York campuses.  JA74.  Pastor Spencer and his congregation likewise share a conviction that the scriptures call on all members to use their individual "gifts" and talents to love, serve, and protect one another as members of a single family united in Jesus Christ.  JA194, 242, 244.  For those Church members proficient in handling firearms and legally permitted to possess and carry them, that may mean volunteering to attend Church armed and prepared to protect fellow congregants.  JA72, 74-75, 87, 201, 244.  Once again, Pastor Spencer and others in the Church acted consistent with that belief previously.  JA72, 74, 86-87.

Because of the place-of-worship provision, however, it is now a crime—indeed, a Class E felony punishable by up to four years in prison—for Pastor Spencer and members of his congregation to carry a firearm in "any place of worship or religious observation," including the Church.  N.Y. Penal Law §§70.00(2)(e), 265.01-e(2)(c).  The state thus coerces Pastor Spencer and other congregants to cease doing something that they believe God asks of them.  That is a textbook burden on free-exercise rights.  *See Kennedy*, 142 S.Ct. at 2422 (high school football coach's

free-exercise rights burdened when school "disciplined" him for "praying quietly" in accordance with his "sincerely" held beliefs); *cf. Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2022 (2017) (finding free-exercise burden even where state "ha[d] not criminalized" religious exercise).

Moreover, even assuming (contrary to fact) that Pastor Spencer and other congregants did not hold those sincere religious beliefs, the burden on free-exercise rights would remain glaring. The state has declared that exercising Second Amendment rights is impermissible for those who choose to gather in a place of worship but permissible for those who choose to gather in a litany of secular places. The place-of-worship provision thus is obviously a "law[] that impose[s] special disabilities on the basis of religious status." *Espinoza v. Mont. Dep't of Revenue*, 140 S.Ct. 2246, 2254 (2020). Indeed, if the Supreme Court thought it "too late in the day" 60 years ago "to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege," *Sherbert v. Verner*, 374 U.S. 398, 404 (1963), it is surely too late to doubt that First Amendment rights are infringed when the state conditions their exercise on the relinquishment of other constitutional rights. That Pastor Spencer and his congregants wish to carry firearms while they engage in constitutionally protected worship thus is itself enough to demonstrate that prohibiting them from doing so burdens their religious exercise.

The state's efforts to resist those conclusions fall flat.  The state first contends that its law does not prevent Pastor Spencer "from discharging any perceived religious obligation to protect congregants" because not "every" congregant believes that it is "religiously necessary" to carry firearms at the Church.  NY.Br.20.  That effort to second-guess Pastor Spencer's beliefs is misguided on multiple levels.  Even setting aside the bedrock principle that "the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect," *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 715-16 (1981), there is no inconsistency here.  As Pastor Spencer explained, and the state ignores, "the scripture calls us the household of faith," and "everybody has a *different* responsibility" in that household (*i.e.*, the Church).  JA195-96 (emphasis added).  Pastor Spencer and certain congregants believe that their religious responsibilities include protecting the flock with firearms.  *See* JA74, 87.  The state "does not question the sincerity of this belief," NY.Br.19-20, and the CCIA's place-of-worship provision unquestionably burdens conduct motivated by it.

The state faults Pastor Spencer for not "hiring outside security."  NY.Br.21.  But apart from the insuperable problem of paying "outside security" when the Church is currently "$38,008 in arrears"—another fact the state ignores—hiring outside security is itself inconsistent with Pastor Spencer's beliefs.  As he explained, "[t]here's something in the Bible called a hireling"—*i.e.*, a "hired shepherd"—and

Pastor Spencer believes that such hirelings "don't have the same care and concern and love" for his congregants because they lack a "spiritual calling." JA243. Once again, it is not for the state to second-guess that belief.

Finally, the state asserts that the Church could resolve its state-created problem by trying to squeeze members of the Church's security team into the CCIA's "exception" for "security guards." NY.Br.21-22. Wrong again. A law that allows the Church to authorize its congregants to carry firearms only if they can navigate a lengthy process to obtain state approval to work as "security guards"—a designation that would require the Church to first formally "employ" its security volunteers, who must then receive a "special armed registration card" from the state that would authorize them to provide security "during their work hours," N.Y. Penal Law §265.01-e(3)(e); *see* N.Y. Gen. Bus. Law §89-e *et seq.* (enumerating requirements for "security guards")—"effectively penalizes the free exercise of religion," *Carson*, 142 S.Ct. at 1997 (quotation marks omitted), as the CCIA authorizes owners of myriad secular establishments to provide security without jumping through those hoops. Contrary to the state's blithe suggestion, such a religiously discriminatory policy is no mere "inconvenience" to which the Constitution is indifferent; such discrimination is "odious to our Constitution." *Espinoza*, 140 S.Ct. at 2262-63.

2.     The CCIA's burdensome place-of-worship provision just as surely triggers strict scrutiny. Indeed, the provision triggers strict scrutiny for the same

reason New York's place-of-worship occupancy restrictions in *Roman Catholic Diocese* did:  It imposes on places of worship restrictions that it does not impose on places where comparable secular activities occur.  That is plain on the face of the law.  By its terms, the place-of-worship provision prohibits carrying firearms "in or upon a sensitive location," which it explicitly defines to include "any place of worship or religious observation."   N.Y. Penal Law §265.01-e(1), (2)(c). Conversely, the law explicitly states that countless *other* "private property" owners remain free to authorize visitors to carry a firearm on their premises.  *See id.* §265.01-d(1).  Proprietors of shopping malls, office buildings, coffee shops, retail stores, gas stations, hair salons, garages, and countless other private locations hosting secular activities thus remain free to do what a place of worship may not: decide for themselves whether to permit the otherwise-lawful carrying of firearms on their property.  *See Roman Catholic Diocese*, 141 S.Ct. at 66-67; *Tandon*, 141 S.Ct. at 1296-97 (treating such establishments as appropriate comparators for places of worship); *S. Bay United Pentecostal Church v. Newsom*, 141 S.Ct. 716, 719 (2021) (statement of Gorsuch, J.) (same).  Thus, for instance, a New Yorker who hosts a crowd of friends for a March Madness viewing party may carry a firearm and authorize his guests to do the same.  But a pastor who invites a crowd of congregants to watch the same tournament in the church recreational room to build community fellowship may not. JA265 (state confirming that place-of-worship provision is "not

limited to the sanctuary," but rather covers "anterooms, offices, et cetera"). The only way to avoid that disability is for the church to "divorce itself from any religious control or affiliation"—*i.e.*, to choose between religious exercise and armed self-defense. *Espinoza*, 140 S.Ct. at 2256.

The state nevertheless insists that the CCIA's place-of-worship provision is neutral and generally applicable, but each of its arguments—all of which pretend *Roman Catholic Diocese* does not exist, and some of which the state never asserted below, *see* D.Ct.Dkt.43 at 10-12—is unavailing. At the outset, the state ignores the obvious: The CCIA is not facially neutral. That alone differentiates this case from nearly all the cases the state cites, as the state repeatedly relies on cases that involved the application of facially neutral laws to religious activity, not laws that single out religion for disfavored treatment on their face. *See* NY.Br.26-27. Indeed, the state's entire argument seems to misunderstand the "neutral" component of *Smith*, which focuses not on whether a law was the product of "religious animus," NY.Br.24-25, but on whether a law is neutral toward religion *on its face*, *see Smith*, 494 U.S. 877-78.

It is therefore beside the point whether the state's "rationale" for designating places of worship "sensitive places" was "decidedly secular." NY.Br.25. To be sure, the reasoning behind a law, or "statements made in connection" its enactment, can certainly condemn even a facially neutral law. *Roman Catholic Diocese*, 141 S.Ct.

at 66; *see Lukumi*, 508 U.S. at 533-34. But a court can "put those comments aside" when (as here) a law *on its face* "single[s] out houses of worship for especially harsh treatment." *Roman Catholic Diocese*, 141 S.Ct. at 66. After all, "[t]he constitutional benchmark is 'government *neutrality*,' not 'governmental avoidance of bigotry.'" *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020) (per curiam).[1]

That alone suffices to defeat the state's argument that the place-of-worship provision is neutral and generally applicable simply because the CCIA prohibits firearms not "only" in places of worship, but also in some secular places, such as "bars" and "casinos." NY.Br.24; *see also* NY.Br.30. But the state's argument would not help it even if the CCIA *were* facially neutral, as the Supreme Court has now made emphatically clear—twice—that even facially neutral laws "are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable activity more favorably than religious exercise." *Tandon*, 141 S.Ct. at 1296 (citing *Roman Catholic Diocese*, 141 S.Ct. at 66-67). It is therefore "no answer" that a state "treats some comparable secular businesses or other activities as poorly as or even less favorably than" places of

---

[1] The state's argument that its law is "facially neutral" because carrying firearms "rarely, if ever, constitutes a specifically religious practice," NY.Br.29, is even more confused. The law in *Lukumi* was invalid even though it was *facially* neutral because it was designed to single out religious exercise. *See* 508 U.S. at 533-34. That hardly means that any law that does *not* target "a specifically religious practice" must be "facially neutral."

worship.  *Id.* (citing *Roman Catholic Diocese*, 141 S.Ct. at 73 (Kavanaugh, J., concurring)).  The analysis must focus on what a law treats better, not what it treats worse.

The relevant question then, is whether the places the state has *not* designated "sensitive locations" are "comparable" to places of worship when "judged against the asserted government interest that justifies the regulation," as "[c]omparability is concerned with the risks various activities pose."  *Id.*  The state offers three theories as to why "houses of worship" are among those places that "pose[] unique risks of gun-related injuries and deaths."  NY.Br.25.  But none differentiates places of worship from the many places that are left off the list.

To start with the rationale it actually offered below, the state argues that places of worship and "other sensitive locations" "pose[] unique risks of gun-related injuries and deaths" because they are "prone to crowding."  NY.Br.25, 27-28.  But places of worship, "bars, casinos, amusement parks, theaters, and banquet halls" are hardly alone in being "prone to crowding."  NY.Br.28.  That aptly describes numerous secular establishments that remain free to choose whether to permit firearms on their property—*e.g.*, shopping malls, which unfortunately have proven vulnerable to gun violence.[2]  The CCIA thus is indisputably "underinclusive" with

---

[2] *See, e.g.*, *Guilderland Police Make Arrests in Crossgates Mall Shooting*, WRGB (May 25, 2022), https://bit.ly/3HQ3CzB; *Roosevelt Field Nordstrom Locked*

regard to the state's asserted interest in protecting "uniquely vulnerable" locations, for it leaves out innumerable places that "endanger[]" that interest "in a similar or greater degree." *Lukumi*, 508 U.S. at 543.

The state's remaining two justifications suffer from the same problem. The state argues that places of worship are sensitive because they "often contain ... children." NY.Br.25. Setting aside the problem that the state made no such argument below, *see* D.Ct.Dkt.43 at 11 (asserting only that sensitive places qualify as such because they are "often busy, crowded, and dense locations where individuals are often seated or moving slowly"); JA23, it does not explain its seeming assumption that children do not frequent malls, retail stores, and the many other forms of private property not designated "sensitive locations."

Finally, the state posits that places of worship "are sensitive because, like court-houses and polling places, they host other constitutionally protected activity that may be chilled by the presence of firearms." NY.Br.25. Setting aside whether

---

*Down After Shots Fired Into Store*, WABC (Apr. 7, 2022), https://7ny.tv/3JXNVsJ; Myles Miller, Jonathan Dienst, & Marc Santia, *Three Teens Charged in Connection With Kings Plaza Mall Shooting That Left 2 Hurt*, NBC N.Y. (Feb. 2, 2022), https://bit.ly/3JWzg0Z; Robert Pozarycki, *Pair Sought for Queens Shopping Mall Shooting That Left Three Injured*, AMNY (Dec. 19, 2021), https://bit.ly/3XAXbXb; *Black Friday Shooting Shutters New York Mall; 1 Injured*, NBC N.Y. (Nov. 30, 2019), https://bit.ly/3YjBCLD; Richard Harbus, Stephanie Pagonus, & Emily Saul, *2 Injured in Shooting in Upstate New York Mall*, N.Y. Post (Nov. 26, 2017), https://bit.ly/3jNEr8W.

the state has a legitimate interest (or an interest consistent with the Establishment Clause) in suppressing the exercise of one constitutional right in favor of encouraging the exercise of another, again, places of worship are hardly unique in that regard. Free speech regularly occurs at shopping malls, coffee shops, office buildings, and hair salons, *cf. PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 77-78 (1980), and many people routinely "live out their faiths in daily life,'" *Kennedy*, 142 S.Ct. at 2421.

None of that is to suggest that "a law must apply to all people, everywhere, at all times, to be 'generally applicable.'" NY.Br.28-29 (quoting *Kane v. DeBlasio*, 19 F.4th 152, 166 (2d Cir. 2021)). But if a state wants to avail itself of the protections of neutral and generally applicable laws, then it must regulate in a way that actually maps onto its asserted interests in a neutral and generally applicable way. A facially neutral law that regulates all Department of Education employees and contractors in service of protecting students endeavors to respect that principle. The same cannot be said of a law that explicitly singles out places of worship on the theory that they are "prone to crowding," frequented by children, and host constitutionally protected activity, yet leaves unregulated all manner of places where children are welcome and people gather to speak and pray.

3. The place-of-worship provision therefore triggers strict scrutiny, and it is not one of the "rare" laws that can clear that high bar. *Carson*, 142 S.Ct. at 1997.

Although the New York legislature—in its haste to countermand *Bruen*—never mentioned what compelling government interest the CCIA (let alone its place-of-worship provision) serves, *but see Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011) ("The State must specifically identify an 'actual problem' in need of solving[.]"), its chief proponents appeared animated by the state's general interest in preventing the commission of violent crimes with firearms, *see* p.8, *supra*. The state picks up that mantle, explaining that it "has a compelling interest in protecting the public against gun violence." NY.Br.32.

Of course, no one doubts that the state has a compelling interest in preventing violent crime, and—putting aside church autonomy and Second Amendment concerns—perhaps an interest at that level of generality might suffice to sustain a neutral and generally applicable law. But when, as here, a law is *not* neutral and generally applicable, the state must identify a compelling interest in "singl[ing] out houses of worship"—and in particular, the Church—"for especially harsh treatment." *Roman Catholic Diocese*, 141 S.Ct. at 66; *see Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1881 (2021) ("The question … is not whether the City has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to CSS."). Yet the state has "offer[ed] no compelling reason why it has a particular interest" in preventing the Church from deciding for itself whether congregants may bear arms on its property

"while making [that option] available to" secular establishments. *Fulton*, 141 S.Ct. at 1882. That oversight alone dooms the state's attempt to satisfy strict scrutiny.

In all events, even assuming the state's undifferentiated interest in combatting gun violence qualifies as compelling in this context, flatly prohibiting firearms in places of worship is not a remotely narrowly tailored means of accomplishing it. The state makes no effort to demonstrate that people who frequent places of worship are more likely to misuse firearms, so presumably its concern is that places of worship are more likely to be targets of criminals bent on using firearms to commit acts of violence. But any remotely tailored effort to address that interest would at the very least have to couple the decision to disarm places of worship with an offer to supply them with some alternative means of protection provided by the state. Otherwise, the state is depriving the very people it has deemed most vulnerable to gun violence of the means to defend themselves against it. That is not even a rational mode of regulating, let alone a narrowly tailored one. Yet the state leaves disarmed churches with no means to defend their congregants save hiring state-approved private security guards at their own costs.

Moreover, "it is hard to see how" the state's blanket ban "can be regarded as 'narrowly tailored'" when it is "far more restrictive than any [similar] regulations that have previously come before the Court, [and] much tighter than those adopted by many other jurisdictions." *Roman Catholic Diocese*, 141 S.Ct. at 67; *cf.*

32

*McCullen v. Coakley*, 573 U.S. 464, 494 (2014) (similar); *Holt v. Hobbs*, 574 U.S. 352, 368-69 (2015) (similar).  After all, armed violence, both generally and targeting places of worship, is hardly confined to New York.  Yet every other state in the Nation plus the District of Columbia has found means of addressing that problem that are more protective of First (and Second) Amendment rights than categorically disarming places of worship.  In fact, several states have codified the right of churches to decide for themselves who may carry firearms on their premises.  *See, e.g.*, Ark. Code §5-73-306(15)(B); La. Code. §40:1379.3(N)(8); Mich. Comp. Laws §28.425o(1)(e); Mo. Stat. §571.107(1)(14); Neb. Rev. Stat. §69-2441(1)(c); N.D. Code §62.1-02-05(2)(m); Ohio Code §2923.126(B)(6); S.C. Code §23-31-215(M)(8); Utah Code §76-10-530.  And other states have recently contemplated similar changes.  *See* Reis Thebault, *Too Small to Hire Guards, Too Worried to Go Gun-Free, Community Churches Are Now Arming Themselves*, Wash. Post (Feb. 14, 2020), https://archive.ph/U5yjb.

Indeed, New York itself has taken that approach when it comes to other private property, allowing most property owners to decide for themselves whether to permit the otherwise-lawful carrying of firearms on their property.  If the owners of shopping malls, office buildings, coffee shops, retail stores, gas stations, hair salons, garages, and an untold array of other private property owners are all trustworthy enough to decide whether they are better or worse off permitting patrons

with concealed-carry licenses to carry firearms on their property, then it is difficult to understand why the same is not true for those who lead places of worship. That much more calibrated regime shows that "there are many other less restrictive rules that could be adopted to" address the state's asserted public-safety interests. *Roman Catholic Diocese*, 141 S.Ct. at 67; *see Tandon*, 141 S.Ct. at 1297 ("Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied."). Simply put, "[t]here is no evident justification for the view that secular business owners are more qualified than religious leaders to determine whether to allow armed self-defense on their property." JA26.

The state's tailoring arguments fare no better when its law is assessed against its professed justifications for deeming places of worship more sensitive than other locations. The state offers no explanation, for instance, for why it must ban firearms on *all* property that comprises a "place of worship" at *all* times, without regard to who is there or how "crowded" a location it is. Under the state's law, Pastor Spencer could not even carry a firearm when working alone in his office on a weeknight, with few if any visitors on campus. And the place-of-worship provision is equally overbroad as measured by the state's late-breaking interest in protecting children, as it imposes a blanket ban covering all property where "worship or religious exercise"

34

occurs—including "anterooms, offices, et cetera," JA265—without regard to whether any children are present.

The state's contrary arguments miss the mark. Unable to identify any evidence to support the extraordinary view that "carrying firearms in places of worship" is categorically "'more dangerous than' carrying firearms in the secular locations not subject to a prohibition," the state asks this Court to "defer" to its "'predictive judgment.'" NY.Br.34. But whatever role "predictive judgments" may play in the intermediate-scrutiny context from which the state lifts that language, *see* NY.Br.34 (citing *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015)), that argument is misplaced here, as the state's "burden is much higher" in the strict-scrutiny context, *Brown*, 564 U.S. at 799-800. "Where the government permits other activities to proceed with precautions, it must *show* that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied"; it "cannot" simply "assume the worst when people go to worship but assume the best when people go" elsewhere. *Tandon*, 141 S.Ct. at 1297 (emphasis added).

Yet far from actually showing its "predictive judgments" are likely to be true, the state itself concedes (with considerable understatement) that whether the provision will actually protect innocent churchgoers from a "bad-intentioned armed person" is "far from certain." NY.Br.35. That is a damning (but unavoidable)

concession in the strict-scrutiny context, where the state's restriction "must be actually necessary to the solution." *Brown*, 564 U.S. at 799. And while the state posits that the provision will reduce "*other* types of intentional and inadvertent gun injuries and deaths," NY.Br.35 (emphasis altered), it offers no evidence that such injuries and deaths occur more frequently in places of worship as compared to the numerous other secular establishments not included on its sensitive-place list. "The consequence is that its regulation is wildly underinclusive when judged against its asserted justification, which … is alone enough to defeat it." *Brown*, 564 U.S. at 802; *see Espinoza*, 140 S.Ct. at 2261 ("A law does not advance 'an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited.'").

Relying on an amicus brief from another case, the state contends that "permit[ting] the leadership of each place of worship to decide for themselves whether and under what circumstances firearms will be permitted … does not achieve the State's interests as effectively." NY.Br.33. According to that amicus brief, "many clerical leaders have no desire to jeopardize their safety and undermine their relationships with congregants by attempting to eject persons carrying firearms." NY.Br.33. But protecting the relationship between clerical leaders and their congregants is not an interest the state itself has ever before asserted in defense of its law—and understandably so, as that would make the Establishment Clause

problems all the more acute. *See* Part I.B, *infra*. Nor does the state explain why secular establishments can adequately navigate these purported problems while places of worship cannot. The state also posits that "criminal trespass remedies are uncertain under New York law and would provide a less effective deterrent than designating places of worship a sensitive location." NY.Br.33. But if the state honestly believes that its "uncertain" criminal-trespass laws are an obstacle, it should enact more "certain" ones. After all, the state has demonstrated that it can act with impressive speed when it puts its mind to it.

The state protests that "there is no way … to accommodate those who wish to carry firearms for religious reasons without rendering the entire sensitive-place statute unworkable." NY.Br.33-34. If it "were forced to allow anyone to carry a firearm in a sensitive location—place of worship or otherwise—when they articulated a religious motive for doing so," the state complains, "it would defeat the purpose behind recognizing locations as sensitive." NY.Br.34. But Pastor Spencer and the Church's congregants are not claiming a First Amendment right to carry a firearm in (for example) "zoos." N.Y. Penal Law §265.01-e(2)(d). And if any other plaintiff ever asserted such a theory, presumably a court would quickly dismiss it because the zoo provision (like every other sensitive-place provision that does not target places of worship on its face) is neutral and generally applicable toward religion.

The state's insistence that it has "no viable alternative," NY.Br.36, is particularly hard to take seriously, moreover, when the legislature is actively considering an alternative that is at least *less* restrictive than the current place-of-worship provision—*i.e.*, "amend[ing] the place-of-worship provision to create an additional exception for 'persons responsible for security at such places of worship' even if they are not 'registered security guards.'" NY.Br.21 n.4. While that proposal is still not the "*least* restrictive" alternative, *Thomas*, 450 U.S. at 718 (emphasis added), its very existence gives the lie to the state's claim that its current approach is. *Cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728-32 (2014) (considering less restrictive means while reserving judgment on whether they were permissible); *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 221-23 (2014) (plurality op.) (same).[3] The district court thus correctly concluded that plaintiffs are likely to succeed on their free-exercise claims.

**B. The Place-of-Worship Provision Encroaches on Church Autonomy in Violation of the Free Exercise and Establishment Clauses.**

1. The CCIA's place-of-worship restriction also violates the Free Exercise and Establishment Clauses by encroaching on a place of worship's "independence

---

[3] The state suggests that, if this proposal is enacted, plaintiffs' First Amendment claims "will be rendered academic." NY.Br.21 n.4. Not so. Tinkering with a security-guard exception that secular establishments are free to ignore does not eliminate the religious discrimination, and the state still envisions a role for itself in church governance. Moreover, the state forgets that plaintiffs have sought damages. JA68; *Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021).

in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe*, 140 S.Ct. at 2061. This "broad" "principle of church autonomy," *id.*, is so firmly rooted in American traditions that many state courts recognized it—whether as a matter of state common law or of the religion guarantees under their own constitutions—long before the incorporation of the Establishment Clause against the states in *Everson v. Board of Education*, 330 U.S. 1 (1947). *See, e.g.*, *Shannon v. Frost*, 3 B. Mon. 253, 258 (Ky. Ct. App. 1842); *Harmon v. Dreher*, Speers Eq. 87, 120 (S.C. Ct. App. Equity 1843); *German Reformed Church v. Commonwealth ex. rel. Seibert*, 3 Pa. 282, 291 (Pa. 1846); *State ex rel. Watson v. Farris*, 45 Mo. 183, 197-98 (Mo. 1869).

Over the decades, the Supreme Court has enforced the Religion Clauses' guarantee of church autonomy to prevent state interference in a multitude of areas, such as religious doctrine and the line between orthodoxy and heresy[4]; rules for church governance (or "ecclesiology")[5]; appointing, removing, and fixing the

---

[4] *See Watson v. Jones*, 80 U.S. 679, 725-33 (1871); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449-51 (1969); *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970) (per curiam).

[5] *See Shepard v. Barkley*, 247 U.S. 1, 2 (1918) (aff'd mem.); *Serbian Eastern Orthodox Diocese for U.S. & Canada v. Milivojevich*, 426 U.S. 696, 708 (1976); *Jones v. Wolf*, 443 U.S. 595, 606-09 (1979).

authority of church leaders[6]; and the admission and discipline of church members.[7]

While many of these sensitive issues of faith, doctrine, and governance arose in disputes involving church property[8] or the hiring and firing of church personnel,[9] the principle that the Court has consistently applied across all of them is much more fundamental. *See, e.g.*, *Milivojevich*, 426 U.S. at 709 ("[T]his case essentially involves not a church property dispute, but a religious dispute[.]"). At bottom, it is for the religious institution to decide what is necessary for the propagation and protection of the faith. A law that forbade the singing of hymns, or required churches to conduct all services in Latin, or mandated the pre-approval of a minister's sermons, or directed that churches celebrate communion with grape juice or not at all, thus not only would infringe on the free exercise of religion, but would impermissibly encroach on church autonomy.

As the district court again correctly recognized, the CCIA's place-of-worship provision clearly encroaches on matters "closely linked" with the Church's right to

---

[6] *See Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16 (1929); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952); *Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 191 (1960) (per curiam).

[7] *See Bouldin v. Alexander*, 82 U.S. 131, 139-40 (1872).

[8] *See Church of God at Sharpsburg*, 396 U.S. at 368; *Presbyterian Church*, 393 U.S. at 445-47; *Kreshik*, 363 U.S. at 191; *Jones*, 443 U.S. at 598-99; *Milivojevich*, 426 U.S. at 709; *Watson*, 80 U.S. at 734; *Kedroff*, 344 U.S. at 95-96.

[9] *See Hosanna-Tabor*, 565 U.S. 171; *Our Lady of Guadalupe*, 140 S.Ct. 2049.

determine how best to conduct its own affairs. *Our Lady of Guadalupe*, 140 S.Ct. at 2061; *see* JA28-29. By its very terms, the place-of-worship provision regulates religious entities specifically with respect to the places where they conduct "worship" or "religious observation." N.Y. Penal Law §265.01-e(2)(c). The provision not only tells places of worship what worshippers may "possess[]" while in those places, *id.*, but also dictates how they may (and may not) protect worshippers in their sanctuaries.

If anything, the intrusion into religious affairs is even more objectionable here than in the property and employment disputes. When it comes to ejectment actions and employment disputes, the state is at least acting within an area of general competence. But the state ordinarily has no power to tell private property owners whom to admit to their property and under what conditions. *See* U.S. Const. amend. IV. That is why every "private property owner"—including a church—ordinarily has the "right to control who may enter, and whether that invited guest can be armed." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012). Yet while the state has preserved that right for private property owners conducting secular activities, it purports to restrict whom and what churches may admit and how they may protect themselves *even while conducting worship in the sanctuary*. That gets things backwards. A church's right to control activities in its sanctuary stems not just from the protection of private property, but from "the general principle of

church autonomy" protected by the Establishment Clause. *Our Lady of Guadalupe*, 140 S.Ct. at 2061; *see* Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 Liberty U.L. Rev. 653, 687 (2014). For a state to dictate whether and how a place of worship may protect itself and its worshipers thus strikes at the core of the Religion Clauses.

Of course, that is not to say that places of worship are immune from all neutral and generally applicable restrictions on their own conduct or that of their congregants. *See Our Lady of Guadalupe*, 140 S.Ct. at 2060. But there is no question that protecting congregants is a core "'matter[] of church government,'" *id.*; *see* Boyd, *supra*, at 689 ("The Church's determination of policies on the control and presence of weapons will unavoidably be a matter of church government and internal church polity[.]"), and even neutral and generally applicable secular rules must sometimes give way in that context, *see Hosanna-Tabor*, 565 U.S. at 190. And in all events, the CCIA's place-of-worship is not a neutral and generally applicable law, as it explicitly denies to places of worship rights that it preserves for other property owners. *See* Part I.A, *supra*. That provision thus can survive church autonomy constraints, if at all, only if the state can prove that it "accord[s] with history and faithfully reflect[s] the understanding of the Founding Fathers," *Kennedy*, 142 S.Ct. at 2428 (brackets altered), or at the very least survives strict scrutiny, *see Larson v. Valente*, 456 U.S. 228, 246-47 (1982). But "the State ma[d]e

no attempt to demonstrate that the regulation is consistent with this Nation's historical tradition in this area" in its briefing below, JA30, and its attempt to satisfy strict scrutiny has failed in spectacular fashion, *see* Part I.A, *supra*.

2.      The state's church autonomy defense is no more persuasive than its free exercise defense.  The state's lead argument is that the place-of-worship provision is a purely "secular law" from which places of worship "enjoy no immunity." NY.Br.37; *see* NY.Br.39.  But the state does not explain how the place-of-worship provision could qualify as "secular" when—quite unlike the "recordkeeping requirements of the Fair Labor Standards Act" or "fire inspections and building and zoning regulations," none of which discriminates on religious grounds, *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 291, 305-06 (1985)—it "single[s] out houses of worship for especially harsh treatment," *Roman Catholic Diocese*, 141 S.Ct. at 66.  Moreover, the state does not dispute that the church autonomy doctrine exempts places of worship even from "secular" laws when those laws intrude into areas that are "essential to the institution's central mission." NY.Br.37.

The state thus shifts to arguing that "the decision whether to allow firearms in places of worship" is simply "not a matter of church governance," as purportedly confirmed by Pastor Spencer's own statements.  NY.Br.38.  That assertion blinks reality.  Far from suggesting that he "treated the carry of firearms as a purely personal

matter" that "makes no difference" from a religious perspective, NY.Br.38, Pastor Spencer said well-nigh the opposite, *see, e.g.*, JA74 ("I believe that I have a moral and religious duty to take reasonable measures to protect the safety of those who enter the Church. … Consistent with, and as an application of these religious beliefs,  … I carried, and allowed others to carry, concealed firearms at church to ensure protection of the Church and its worshippers[.]"); JA194-95 (similar).  Nor is Pastor Spencer's religious belief unique.  *See* Boyd, *supra*, at 685 ("Pastors … have a duty to guard, protect and defend the sheep, rather than refusing to defend them or rendering them defenseless by banning weapons in the Church[.]"). Ultimately, the state's insistence that this Court should resolve a debate over how essential the carrying of firearms into the Church is to the Church's efforts to protect and propagate its faith only underscores the intrusion on matters that the Constitution leaves to the Church.  *See New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977) ("The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment[.]").

The state's attempt to square its law with *Our Lady of Guadalupe* also goes nowhere.  According to the state, the Court found the church autonomy doctrine applicable in *Our Lady of Guadalupe* only because the "hiring and dismissal" of the Catholic school teachers in that case "was necessary to make sure that such

employees' conduct did not 'contradict the church's tenets and lead the congregation [a]way from the faith,'" whereas the CCIA's place-of-worship provision purportedly does not affect "how Spencer's church communicates its message or orders its affairs." NY.Br.40. To the extent that the state is suggesting that churches possess autonomy only vis-à-vis the hiring and dismissal of church personnel, that position ignores that the "ministerial exception" is simply an *application* of the "broad" rule that the First Amendment "protects the[] autonomy" of a religious institution "with respect to … the institution's central mission." *Our Lady of Guadalupe*, 140 S.Ct. at 2060. And to the extent the state is suggesting that the place-of-worship provision does not affect the Church's affairs in any way, that argument remains irreconcilable with Pastor Spencer's stated beliefs—which, to reiterate, "the State does not question." NY.Br.19.

The state lastly asserts that the place-of-worship is consistent with "unbroken" "historical" "tradition." NY.Br.40-41. Even if the Court excuses the state's failure to make any such argument below, *see* D.Ct.Dkt.43 at 12-14, the notion that the founding generation would have tolerated a law that forced places of worship concerned for their safety to invite state-registered security guards to monitor their services does not pass the straight-face test. It is little surprise, then, that the only historical evidence the state has gathered is a handful of outlier late-nineteenth-century laws. NY.Br.47-50. How laws not enacted until 1870 "faithfully reflect[t]

the understanding of the Founding Fathers" regarding the Religion Clauses, *Kennedy*, 142 S.Ct. at 2428, the state does not say. *Cf. Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 680 (1970) (relying on "more than a century of our history and uninterrupted practice" *before* "1885" to resolve Establishment Clause question). And while the state briefly invokes "colonial laws" cited below that "mandate[d] firearms in places of worship," NY.Br.41, those laws pre-date and do not appear to have survived the ratification of the Constitution, and thus hail from a time when many colonies maintained established churches. Accordingly, while they may speak volumes about whether there was a historical tradition of treating churches as "sensitive places" in which the carrying of firearms was verboten, *see* Part I.C, *infra*, they provide little if any insight on the degree to which government can interfere with the autonomy of places of worship under the historical traditions that the Religion Clauses enshrine. The state thus does nothing to undermine the conclusion that the place-of-worship provision runs afoul of both Religion Clauses.

### C. The Place-of-Worship Provision Violates the Second Amendment by Prohibiting Congregants From Carrying Firearms for Self-Defense.

1. The CCIA's place-of-worship restriction also violates the Second Amendment. In *Bruen*, the Supreme Court held (and New York agreed) that "ordinary, law-abiding citizens have a … right to carry handguns publicly for their self-defense." 142 S.Ct. at 2122; *id.* at 2134 (noting that New York "do[es] not

dispute" that "the plain text of the Second Amendment protects … carrying handguns publicly for self-defense"). And by carrying firearms "publicly," *Bruen* meant carrying firearms "outside the home." *See id.* at 2122 ("We … now hold … that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense *outside the home*" (emphasis added)); *id.* at 2134 ("Nothing in the Second Amendment's text draws *a home/public distinction* with respect to the right to keep and bear arms." (emphasis added)).

When Pastor Spencer and other law-abiding citizens attend the Church carrying a firearm, they unquestionably "bear Arms" outside the home. U.S. Const. amend. II. The CCIA's ban on carrying firearms in places of worship thus indisputably prohibits activity that "the Second Amendment's plain text covers." *Bruen*, 142 S.Ct. at 2126. As a result, "the Constitution presumptively protects that conduct," making it the state's job to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. As the district court correctly concluded, the state comes nowhere close to meeting that burden. JA30-35.

2. The state resists that conclusion only by resisting *Bruen* itself. The state begins by asserting that, because (in 2022) it legislatively "defined" its list of "sensitive locations" to include places of worship, carrying firearms in such locations is *ipso facto* "presumptively lawful" and "outside 'the scope of the Second

Amendment,'" such that Pastor Spencer and the Church must "rebut[] the presumption" and prove that there is an enduring tradition that *contradicts* the state's approach. NY.Br.43-44. That argument is squarely in the teeth of *Bruen*. As that decision explained—at least nine different times—a government regulation that prohibits carrying firearms outside the home for self-defense falls "outside the scope of the Second Amendment" only if *the state* can "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 141 S.Ct. at 2126; *see also id.* at 2127, 2130, 2133, 2135, 2138, 2149 n.25, 2150, 2156.

Far from exempting sensitive-places laws from that rule, the Court used them as its prime example of how the burden-shifting regime works. New York tried there, just as it does here, to justify its regulation as a "sensitive places" restriction, on the theory that "all places of public congregation that are not isolated from law enforcement" are "sensitive." *Id.* at 2134. The Court squarely rejected that argument because the state failed to identify any "historical basis" for its effort "to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* *Bruen* thus affirmatively refutes the state's claim that it can eliminate its burden "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation," *id.* at 2126, by simply declaring any locations it chooses to be "sensitive places."

Shifting gears, the state insists that the historical record *does* support the CCIA's place-of-worship provision. NY.Br.45-60. Relying on the analysis of its "expert historian" Patrick Charles—whose research is a favorite of Supreme Court *dissents*, *see Bruen*, 142 S.Ct. at 2180-98 (Breyer, J., dissenting); *McDonald*, 561 U.S. at 914 (2010) (Breyer, J., dissenting); *cf. Rogers v. Grewal*, 140 S.Ct. 1865, 1870 n.3 (2020) (Thomas, J., dissenting from denial of certiorari) (noting that "other scholars" had "repudiated" Charles' analysis), and who recently derided *Bruen* as creating a "fugazi Second Amendment" that is "historically ruined and fake," Patrick J. Charles, *The Fugazi Second Amendment* 3 (forthcoming Clev. St. L. Rev.)—the state makes the sweeping claim that "*all* of the available history" confirms the "governments' power to restrict the ability to bear arms in places of worship." NY.Br.54. That claim is wrong from start to finish.

At the outset, although the state purports to conduct a holistic historical analysis, it does no such thing. While the state briefly alludes to the legacy of our "English ancestors" and the 1328 Statute of Northampton, NY.Br.54, it fails to mention that the leading English case involving that statute—*Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75 (K.B. 1686)—specifically established that carrying firearms *in church* is not a crime unless done "with evil intent or malice," *Bruen*, 141 S.Ct. at 2141. Nor does the state mention that the misguided prosecution of Knight helped prompt the English Parliament to *strengthen* the right to arms by

including in the 1689 Bill of Rights "the 'predecessor to our Second Amendment.'" *Id.* at 2141-42. Or that the long history of efforts in England to disarm people based on religion is part of why the Framers of *our* Nation's founding documents made sure to enshrine a Second Amendment even more protective than the 1689 Bill of Rights. *See Heller*, 554 U.S. at 592-94, 606.

And that is not all. While the state seemingly believes that various "colonial-era laws" support the constitutionality of the CCIA's place-of-worship provision, NY.Br.16-17, 52, those laws required congregants to *bring* firearms to church, *see* JA58-59; Boyd, *supra*, at 698-99; Kopel & Greenlee, *supra*, at 233, which is the exact opposite of the tradition the state must establish. And the state does not and cannot argue that it has any support from the first several generations following the Nation's founding—when the states promptly ratified the Second Amendment and began providing similar guarantees in their own charters. *See Heller*, 554 U.S. at 602-03.

Instead of seriously arguing that English or early American history supports its cause, the state places all of its chips on a handful of outlier laws enacted years or even decades after the Civil War. But the state's "reliance on late-19th-century laws has several serious flaws even beyond their temporal distance from the founding." *Bruen*, 142 S.Ct. at 2154. The state identifies four former Confederate

states *resisting* Reconstruction—Georgia, Texas, Virginia, and Missouri[10]—that enacted place-of-worship prohibitions contemporaneous with other laws aimed at disarming newly emancipated black Americans. *See* NY.Br.47-48; *Heller*, 554 U.S. at 614 ("Blacks were routinely disarmed by Southern States after the Civil War."). That is a dubious place to look for the historical traditions of our Nation—which the Supreme Court has recognized by giving little credence to similar enactments. *See Bruen*, 142 S.Ct. at 1253; *cf. McDonald*, 561 U.S. at 846-48 (Thomas, J., concurring in part and concurring in the judgment). But even those laws typically did not prohibit firearms to the degree that the CCIA's place-of-worship provision does.

Texas, for example, permitted carrying by "persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law." 1870 Tex. Gen. Laws 63, ch. 46, §1. Virginia exempted those carrying with "good and sufficient cause" and others when places of worship constituted their "own premises." 1877 Va. Acts 305, §21. And in at least one Missouri locality, a defendant had a defense to prosecution when he "ha[d] been threatened with great bodily harm, or had good reason to carry" for self-defense. Revised Ordinances of City of Huntsville, Mo. of 1894, §2. To the extent any of these laws ever approached the severity of New York's, moreover, states have since walked them back. Virginia's Attorney General,

---

[10] *See* 1870 Ga. Laws 421; 1870 Tex. Gen. Laws 63, ch. 46, §1; 1877 Va. Acts 305, §21; 1883 Mo. Laws 76.

for example, has construed that state's law to permit carrying weapons for self-protection. *See* Va. Att'y Gen. Op. No. 11-043, 2011 WL 4429173, at *1 (Apr. 8, 2011). And while Georgia originally appears to have imposed a categorical ban on carrying in places of worship, *see* 1870 Ga. Laws 421, that law later evolved to allow church leaders to decide the issue themselves, *see* Boyd, *supra*, at 657-59.

The state also leans on laws enacted in Arizona in 1889 and Oklahoma in 1891, *see* NY.Br.48, but they are even less instructive. For one thing, the state overlooks that both Oklahoma and Arizona remained territories at the time, and each had "miniscule … populations."[11] *Bruen*, 142 S.Ct. at 2154. As the Supreme Court stated in *Bruen* when casting aside Oklahoma and Arizona territorial laws enacted during the *same legislative sessions* as those the state invokes here, "we will not stake our interpretation [of the Second Amendment] on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also 'contradic[t] the overwhelming weight' of other, more contemporaneous historical evidence." *Id.* at 2154-55.

The state's remaining historical evidence does not move the needle. The state seizes on a handful of "ordinances" enacted in "localities" like "the North Carolina

---

[11] The state commits this same error for Utah. *See* NY.Br.48; JA108.

religious campgrounds of Stanley Creek and Rock Spring." NY.Br.48; JA108-09. But those isolated examples of regulations in isolated areas plainly do not "demonstrate a broad tradition of States" categorically prohibiting firearms in places of worship. *Bruen*, 142 S.Ct. at 2156. The state suggests that "several other jurisdictions had broader restrictions" on public carry writ large that effectively "precluded firearms in places of worship." NY.Br.48. But *Bruen* just surveyed the same historical record and *rejected* New York's argument that it demonstrates that "American governments … broadly prohibited the public carry of commonly used firearms for personal defense." 142 S.Ct. at 2156. The state's reliance on five state court decisions from the late-nineteenth century addressing place-of-worship bans, *see* NY.Br.49-50, suffers from a similar deficiency, as they largely embraced a view of the right to bear arms that *Bruen* and *Heller* rejected. Indeed, the state's favorite case—*English v. State*, 35 Tex. 473 (1871), *see* NY.Br.49, 58—is one whose "rationale" *Bruen* invoked only to repudiate it as an "outlier[]." 142 S.Ct. at 2153; *see, e.g.*, *Hill v. State*, 53 Ga. 472 (1874) (embracing militia-based view of the right to bear arms that *Heller* rejected).

Thus, in the final tally, all the state has mustered is "a handful of seemingly spasmodic enactments involving a small minority of jurisdictions governing a small minority of population"—all of them "passed nearly a century after the Second Amendment's ratification in 1791." JA33-34. The state is thus left insisting that

*Bruen*'s history-based test is not a "numbers game," and that *Bruen* "imposed no requirement that historical laws be 'continu[ing]' for some undefined period of time." NY.Br.51. *Bruen* itself begs to differ: After asking whether the New York law at issue reflected "an *enduring American tradition* of state regulation," the Court it concluded that a "*handful* of late-19th-century" examples falls far short of establishing such a tradition. 142 S.Ct. at 2138, 2155 (emphases added).

Implicitly recognizing that history is not on its side when it comes to churches, the state retreats to a higher level of generality, arguing that the CCIA's place-of-worship provision "closely resembles *other* sensitive locations where firearms have historically been prohibited." NY.Br.54 (emphasis added). But reasoning by analogy does not work here, as *Bruen* sanctioned the "use [of] analogies" only when it comes to "*new* and analogous sensitive places." 142 S.Ct. at 2133 (emphasis original). To state the obvious, places of worship are nothing new in America. Their presence long predates the founding of the Republic. And the risk of violent attacks on places of worship is neither an "unprecedented societal concern[]" nor the product of some "dramatic technological change[]." *Id.* at 2132. To the contrary, it is a "general societal problem that has persisted since the 18th century," *id.* at 2131, as evidenced by the fact that most colonies had laws addressing it—laws that looked nothing like the place-of-worship provision.

And the state's problems run deeper. The state asserts that the CCIA's place-of-worship provision is similar to historical precursors because it is designed to safeguard "other constitutional interests," like the "exercise of religion." NY.Br.55. That is a bewildering argument to make when Pastor Spencer has attested that the place-of-worship provision *impedes* the First Amendment rights of himself, his Church, and his congregation. That argument is also at profound odds with the First Amendment, as whatever is true of government-*run* sites like courthouses and polling places, where the government itself can supply whatever protection it believes warranted, *see* NY.Br.55, the First Amendment makes emphatically clear that it is for places of worship, not the government, to decide what best promotes their faith. And in all events, the state fails to identify any historical tradition whatsoever for the notion that it may choose to suppress constitutional rights it disfavors in service of promoting rights it favors—let alone in favor of promoting religious exercise. Accordingly, the state's argument succeeds only in underscoring that banning firearms in places of worship violates both the First and the Second Amendment.

## II. The District Court Did Not Abuse Its Discretion By Finding That The Remaining Factors All Favor Injunctive Relief.

Because the CCIA's place-of-worship provision violates the First and Second Amendments, the district court acted well within its broad discretion in finding the remaining preliminary-injunction factors—irreparable harm and the public

interest—readily satisfied. One the one hand, unless Pastor Spencer and other congregants leave their firearms at home, they cannot worship. On the other hand, if Pastor Spencer and other congregants comply with the place-of-worship provision, they leave themselves vulnerable to threats of violence that even the state has described as "genuine." D.Ct.Dkt.43 at 24. It is axiomatic that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese*, 141 S.Ct. at 67; *see Kane*, 19 F.4th at 171 ("We do not gainsay the principle that those who are unable to exercise their First Amendment rights are irreparably injured *per se*."). The same is true of Second Amendment rights, as the Second Amendment "protects similarly intangible and unquantifiable interests" that "cannot be compensated by damages." *Ezell*, 651 F.3d at 699. Pastor Spencer and the Church thus satisfy the irreparable-injury factor many times over.

Just so with the public-interest factor. Quite obviously, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1147 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). And precisely because the CCIA's sensitive-place provision is facially discriminatory and excepts so many secular activities, there is little reason to think that the public interest "would be imperiled if" the state had to choose from among those "less restrictive

measures." *Roman Catholic Diocese*, 141 S.Ct. at 68; *see Agudath*, 983 F.2d at 637 ("No public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal.").

In response, the state kicks a cloud of dust. As to irreparable harm, it claims that Pastor Spencer's and the Church's purported "delay" in filing suit and seeking preliminary injunctive relief "weighs strongly against an injunction." NY.Br.62. No such argument occurred to the state below, *see* D.Ct.Dkt.43 at 23, presumably because the modest two months it took plaintiffs to connect with pro bono counsel and prepare legal filings exposing multiple constitutional infirmities with the place-of-worship provision bears no resemblance to those the state invokes, *see Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (plaintiff delayed "at least nine months" before filing suit and "some four months longer" before seeking preliminary injunction); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (similar). The state suggests that Pastor Spencer and the Church face no irreparable harm due to the CCIA's "security guard" exception. *See* NY.Br.62-63. But as already explained, that exception is part of the constitutional problem, not a solution to it. The state quibbles that, in conducting its irreparable-harm analysis, the district court briefly quoted a decision that used the phrase "psychic harm." *See* NY.Br.13, 17, 63-64; JA36 (quoting *Grace v. District of Columbia*, 187 F.Supp.3d 124, 150 (D.D.C. 2016)). But the state omits that this fleeting reference came amidst

57

a broader discussion explaining why the violation of constitutional rights inflicts irreparable harm *per se*, *see* JA35-37—a proposition the state does not dispute.

Nor does the state dispute that Pastor Spencer and the Church satisfy the public-interest factor if the Court agrees that they are likely to succeed on the merits. NY.Br.64. The state instead just doubles-down on its "prediction" that places of worship are uniquely susceptible to gun violence. NY.Br.65. But that just underscores the harm Pastor Spencer and the Church stand to suffer from being disarmed by the state. As for the notion that "the mere presence of a gun' creates a risk of violence," NY.Br.65; that is neither what the case the state cites says, *see United States v. Smythe*, 363 F.3d 127, 129 (2d Cir. 2004) ("[T]he mere presence of firearms *in connection with a drug transaction* can increase the risk of violence." (emphasis added)), nor the kind of argument that cuts it after *Bruen*, which declares the carrying of firearms by law-abiding citizens a constitutional right, not a threat always and everywhere to public safety. To be sure, the "New York's elected leaders" may make some "policy choices" when it comes to regulating the carrying of firearms. NY.Br.65-66. "But the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. And the triply unconstitutional place-of-worship provision is plainly one of them.

58

# CONCLUSION

The Court should affirm.

Respectfully submitted,

DAVID J. HACKER
JEREMY DYS
KEISHA RUSSELL
RYAN GARDNER
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway
Suite 1600
Plano, TX 75075

JORDAN E. PRATT
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Avenue, NW
Suite 1410
Washington, DC 20003

s/Erin E. Murphy
ERIN E. MURPHY
 *Counsel of Record*
ANDREW C. LAWRENCE[*]
NICHOLAS M. GALLAGHER[*]
CLEMENT & MURPHY, PLLC
706 Duke Steet
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

ANJAN K. GANGULY
GANGULY BROTHERS, PLLC
140 Allens Creek Road
Suite 220
Rochester, NY 14618

[*]Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiffs-Appellees*

February 28, 2023

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Local R. 32.1(a)(4)(A) because it contains 13,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

February 28, 2023

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that, on February 28, 2023, an electronic copy of the foregoing Brief for Appellant was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.


s/Erin E. Murphy
Erin E. Murphy