# No. 22-3237

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

―――――

MICHEAL SPENCER, HIS TABERNACLE FAMILY CHURCH, INC.,
Plaintiffs-Appellees,

v.

STEVEN A. NIGRELLI, Acting Superintendent of the New York State Police,
in his official and individual capacities,
Defendant-Appellant,

WEEDEN A. WETMORE, District Attorney for the County of Chemung, New York,
in his official and individual capacities, MATTHEW VAN HOUTEN, District Attorney
for the County of Tompkins, New York, in his official and individual capacities,
Defendants.

―――――

On Appeal from the United States District Court
for the Western District of New York

**AMICI CURIAE BRIEF OF THE SYNAGOGUE SECURITY COUNCIL OF NORTH AMERICA,
AND THE AMERICAN CENTER FOR LAW & JUSTICE
IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

―――――

JAY ALAN SEKULOW
The American Center for Law & Justice
201 Maryland Avenue
Washington, D.C. 20002
(202) 546-8890
sekulow@aclj.org
*Counsel for Amici Curiae*

Dated: March 7, 2023

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

CORPORATE DISCLOSURE STATEMENT .......................................1

INTEREST OF AMICI ............................................................................1

INTRODUCTION ...................................................................................3

ARGUMENT ..........................................................................................4

I.  Firearm Restrictions that Categorize Religious Organizations as a "Sensitive Place" Relegate Them to a Disfavored Category and Are Presumptively Unconstitutional.............................................................4

    A. There is No Substantial Burden Requirement When a Law Discriminates against Religion on its Face. ......................................5

    B. The CCIA's Favored Treatment of Countless Businesses Triggers Strict Scrutiny. ...................................................................................7

    C. Proper Characterization of the State's Interest Is Critical to Strict Scrutiny Review...............................................................................8

    D. Annual FBI Active Shooter Incidence Reports Show that, Generally Speaking, Houses of Worship Are at Low Risk of Gun Deaths. ...................9

II. The Church Autonomy Principle Necessarily Includes Authority over Church Members' Exercise, Within the Organization, of Other Constitutional Rights. ........................................................................12

CONCLUSION .....................................................................................16

i

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Calvary Chapel Dayton Valley v. Sisolak*,
140 S. Ct. 2603 (2020).......................................................................4

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
508 U.S. 520 (1993)............................................................................5

*Corp. of Presiding Bishop v. Amos*,
483 U.S. 327 (1987)............................................................................4

*District of Columbia v. Heller*,
554 U.S. 570 (2008)............................................................................3

*Espinoza v. Mont. Dep't of Revenue*,
140 S. Ct. 2246 (2020).......................................................................5

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021)....................................................................4, 8

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006)............................................................................8

*Hartmann v. Stone*,
68 F.3d 973 (6th Cir. 1995) ...............................................................6

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171, 189 (2012) .............................................................4, 12

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*,
344 U.S. 94 (1952).............................................................................13

*McDaniel v. Paty*,
435 U.S. 618 (1978)............................................................................5

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S. Ct. 2049 (2020)..................................................................14, 15

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*,
    393 U.S. 440 (1969)......................................................................................13

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)......................................................................................12

*Roman Cath. Diocese v. Cuomo*,
    141 S. Ct. 63 (2020)...................................................................................4, 5

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976)......................................................................................13

*Spencer v. Nigrelli*,
    2022 U.S. Dist. LEXIS 233341 (W.D.N.Y. Dec. 29, 2022) ....................7, 14

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021)................................................................4, 5, 6, 8, 12

*Tenafly Eruv Ass'n v. Borough of Tenafly*,
    309 F.3d 144 (3d Cir. 2002) ...........................................................................6

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    137 S. Ct. 2012 (2017).....................................................................................5

*Walz v. Tax Comm'n*,
    397 U.S. 664 (1970)........................................................................................5

*Watson v. Jones*,
    80 U.S. 679 (1872)........................................................................................13

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)...................................................................................5, 12

**Statutes**

N.Y. Penal Law § 265.01-e........................................................................................3

**Other Authorities**

*Active Shooter Incidents in the United States in 2016 and 2017*, Fed. Bureau of Investigation (2018), https://www.fbi.gov/file-repository/active-shooter-incidents-us-2016-2017.pdf/view ................................................................10

*Active Shooter Incidents in the United States in 2018*, Fed. Bureau of Investigation (2018), https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2018-041019.pdf/view ............................................................10

*Active Shooter Incidents in the United States in 2019*, Fed. Bureau of Investigation (2020), https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2019-042820.pdf/view ............................................................10

*Active Shooter Incidents in the United States in 2020*, Fed. Bureau of Investigation (July 2021), https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2020-070121.pdf/view ....................................................9, 10

*Active Shooter Incidents in the United States in 2021*, Fed. Bureau of Investigation (May 2022), https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2021-052422.pdf/view .........................................................9

Amir Vera, et al., *NYPD Investigates 6 Attacks at 4 Synagogues Over a Two-Day Span*, CNN (Apr. 25, 2021, 9:59 PM), https://www.cnn.com/2021/04/25/us/new-york-synagogue-vandalism-hate-crimes/index.html ................................................................11

Appellant's Brief .......................................................................................8

Appellee's Brief ........................................................................................8

*Audit of Antisemitic Incidents 2021*, Anti-Defamation League 23 (Apr. 2022), https://www.adl.org/sites/default/files/pdfs/2022-05/ADL_2021%20Audit_Report_042622_v11.pdf ....................................11

Ben Sales, *Synagogues Are Now Conducting Active Shooter Drills During Services*, Jewish Telegraphic Agency (July 1, 2019, 2:26 PM), https://www.jta.org/2019/07/01/united-states/synagogues-are-now-conducting-active-shooter-drills-during-services ..........................................11

iv

Bradley J. Lingo & Michael G. Schietzelt, *A Second-Class First Amendment Right? Text, Structure, History, and Free Exercise After Fulton*, 57 Wake Forest L. Rev. 711 (2022) ...............................................................4

Dakin Andone, *Jewish Communities Across the US on Heightened Alert After the Texas Standoff: 'Is Our Community Under Attack Again?'*, CNN (Jan. 17, 2022, 9:16 AM), https://www.cnn.com/2022/01/17/us/jewish-communities-security-colleyville/index.html ....................................................11

Douglas Laycock, *The Remnants of Free Exercise*, 1990 S. Ct. Rev. 1 (1990) ...............................................................4

*Ephesians* 5:4 ...............................................................13

Eric Berger, *Jewish Interest in Active Shooter Training Soared After Recent Attacks*, Jewish Telegraphic Agency (July 12, 2022, 3:26 PM), https://www.jta.org/2022/07/12/united-states/jewish-interest-in-active-shooter-trainings-soared-after-recent-attacks .................................11

*FBI Law Enforcement Bulletin*, https://leb.fbi.gov/ ....................................1

J. Pete Blair & Katherine W. Schweit, *A Study of Active Shooter Incidents in the United States Between 2000 and 2013*, Tex. State Univ. & Fed. Bureau of Investigation (2014), https://www.fbi.gov/file-repository/active-shooter-study-2000-2013-1.pdf/view .......................................................10

Katherine W. Schweit, *Active Shooter Incidents in the United States in 2014 and 2015*, Fed. Bureau of Investigation (2016), https://www.fbi.gov/file-repository/activeshooterincidentsus_2014-2015.pdf/view ............................10

Kiara Alfonseca, *Synagogue Attack Puts Jewish Community on Edge*, ABC News (Jan. 19, 2022, 5:15 AM), https://abcnews.go.com/US/synagogue-attack-puts-jewish-community-edge/story?id=82311539 ........................................11

Kiddushin 68b ...............................................................13

*Hebrews* 10:25 ...............................................................13

Helen M. Alvare, *Church Autonomy After* Our Lady of Guadalupe School: *Too Broad? Or Broad as it Needs to Be?*, 25 Tex. Rev. L. & Pol. 319 (2021) ...15

Roy Maurer, *FBI: Over 80 Percent of Active Shooter Incidents Occur at Work*, Soc'y for Hum. Res. Mgmt. (Mar. 3, 2015), https://www.shrm.org/ResourcesAndTools/hr-topics/risk-management/Pages/FBI-Active-Shooter-Work.aspx ...................................10

Sherif Girgis, *Defining "Substantial Burdens" on Religion and Other Liberties*, 108 Va. L. Rev. 1759 (2022) ..........................................................................6

*Sikh Rehat Maryada* [Official Sikh Code of Conduct and Conventions] Sec. 6, Ch. XIII, Art. XXIV, *available at* http://gurunanakdarbar.net/sikhrehatmaryada.pdf.........................................13

*Sikhism and the Sikh Kirpan Fact Sheet*, Sikh Coal., https://www.sikhcoalition.org/wp-content/uploads/2016/12/kirpan-factsheet-aug2018.pdf (last visited Mar. 6, 2023) .......................................................13

U.S. Const. amend. I ...................................................................................4

## CORPORATE DISCLOSURE STATEMENT

The American Center for Law and Justice is a nonprofit organization that has no parent and issues no stock.

## INTEREST OF *AMICI*[1]

The Synagogue Security Council of North America is an organization formed to help synagogues protect themselves in an era of increasing threats of violence targeting synagogues. According to the FBI,[2] the median law enforcement response time to a priority one active shooter call in the United States is over three minutes. In rural areas, this could be over thirty minutes. This means that in case of an attack, congregants will always be the first responders. In the past twenty years, according to FBI statistics, there is an average of twelve victims per minute in an active threat attack. This means that without an armed component to a synagogue's security plan, they need to be willing to potentially sacrifice the lives of thirty-six members of their community before the police arrive on scene.

In addition, it is not financially tenable or effective to expect that an armed guard will always be present when there is a gathering of congregants in a

---

[1] All parties consented to the filing of this amicus brief. No party's counsel in this case authored this brief in whole or in part. No party or party's counsel contributed any money intended to fund preparing or submitting this brief. No person, other than amicus, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

[2] *FBI Law Enforcement Bulletin*, https://leb.fbi.gov/.

synagogue. Orthodox Jews pray 3 times a day in addition to study classes and other synagogue programming, which means Orthodox synagogues would need an armed guard present essentially most of the time the building is open. Also, since armed guards are not part of the synagogue community, they cannot know who belongs to the faith community. They are therefore generally incapable of serving as greeters or screeners in order to vet with any accuracy who belongs and who doesn't, who is a threat and who is not. The only effective way to do this, according to the subject matter experts on the SSCNA board of directors and advisors, is to have members of the community trained as effective armed first responders.

The American Center for Law & Justice ("ACLJ") is an organization dedicated to the defense of constitutional liberties secured by law. ACLJ attorneys have argued before the Supreme Court of the United States in numerous cases involving the freedoms of speech and religion.

Amici respectfully submit this brief to make four points. First, the Supreme Court's most recent Free Exercise Clause jurisprudence essentially forecloses classification of religious organizations as "sensitive places" in firearm restriction laws. Second, there is no "substantial burden" requirement when a law discriminates against religious institutions by placing them into a disfavored category. Third, annual FBI data compilations belie the assertion that houses of worship are at heightened risk of active shooter deaths. Fourth, the church autonomy principle

encompasses church authority over the daily lives of church members, including exercise of their constitutional rights within the church.

## INTRODUCTION

In *District of Columbia v. Heller*, the Court stated that nothing in its decision "should be taken to cast doubt on longstanding … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. 570, 626 (2008). In the "Concealed Carry Improvement Act" (CCIA), New York classified a "place of worship or religious observation" as a "sensitive place" justifying severe restrictions on the right to carry firearms:

> Criminal possession of a firearm, rifle or shotgun in a sensitive location. 1. A person is guilty of criminal possession of a firearm, rifle or shotgun in a sensitive location when such person possesses a firearm, rifle or shotgun in or upon a sensitive location, and such person knows or reasonably should know such location is a sensitive location. 2. For the purposes of this section, a sensitive location shall   mean: ... (c) any place of worship or religious observation.

N.Y. Penal Law § 265.01-e(1)–(2), (2)(c) (Consol. 2022). Other locations such as government buildings and polling places are also designated sensitive places, *see id.* § 265.01-e(2)(a), (q), but most secular private property owners are excluded.

Whatever the Supreme Court may have had in mind when it articulated the "sensitive places" presumption in *Heller*, its subsequent Free Exercise Clause decisions establish that churches and other religious organizations cannot constitutionally be lumped into that category, absent extraordinary circumstances.

3

Under *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021), *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 66-67 (2020), and *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (per curiam), the Free Exercise Clause entitles religious entities to "most-favored-nation"[3] status when a law creates any favored class of comparable activity.

## ARGUMENT

I.  **Firearm Restrictions that Categorize Religious Organizations as a "Sensitive Place" Relegate Them to a Disfavored Category and Are Presumptively Unconstitutional.**

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. The Free Exercise Clause requires "special solicitude to the rights of religious organizations," *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012), and justifies laws that favor religion in some circumstances. *See, e.g. Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 338 (1987) ("Where . . . government

_____

[3] In *The Remnants of Free Exercise*, 1990 S. Ct. Rev. 1, 49-50 (1990), Professor Douglas Laycock coined the label "most favored nation." Justice Kavanaugh's dissenting opinion in *Calvary Chapel Dayton Valley v. Sisolak*, incorporated the term while summarizing the Court's Free Exercise Clause law. 140 S. Ct. 2603, 2612 (2020) (Kavanaugh, J., dissenting). In *Tandon* and *Roman Cath. Diocese,* the Court fully embraced the principle though not the label. *See generally* Bradley J. Lingo & Michael G. Schietzelt, *A Second-Class First Amendment Right? Text, Structure, History, and Free Exercise After Fulton*, 57 Wake Forest L. Rev. 711, 728-29 (2022).

acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption comes packaged with benefits to secular entities."); *Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972) (noting that if the Amish's social values were based on purely philosophical views, they would not be protected); *Walz v. Tax Comm'n*, 397 U. S. 664, (1970) (upholding the constitutionality of tax exempt status for churches).

Laws that discriminate against religion are "odious to" the Free Exercise Clause. *Espinoza v. Mont. Dep't. of Revenue*, 140 S. Ct. 2246, 2255 (2020); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2025 (2017). Similarly, laws that create favored and disfavored categories also violate the Free Exercise Clause when religious organizations are assigned to the disfavored category and no compelling government interest justifies the assignment. *Roman Cath. Diocese*, 141 S. Ct. at 66-67; *Tandon v. Newsom*, 141 S. Ct. at 1297.

### A. *There is No Substantial Burden Requirement When a Law Discriminates against Religion on its Face.*

As a preliminary matter, there is no substantial burden requirement when government discriminates against religious conduct. *See Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531-47 (1993) (proceeding directly to the compelling interest test without considering whether the ordinances posed a substantial burden); *McDaniel v. Paty*, 435 U.S. 618 (1978) (no substantial burden

analysis of state constitutional provision prohibiting "ministers of the Gospel or priests of any denomination whatever" from serving as delegates to constitutional convention); *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002) ("Applying such a burden test to non-neutral government actions would make petty harassment of religious institutions and exercise immune from the protection of the First Amendment.") (citations omitted); *Hartmann v. Stone*, 68 F.3d 973, 979 n.4 (6th Cir. 1995) (rejecting substantial burden requirement); *see generally* Sherif Girgis, *Defining "Substantial Burdens" on Religion and Other Liberties*, 108 Va. L. Rev. 1759, 1768 (2022) (noting that "courts and commentators agree" that laws targeting religious entities for disfavored treatment "are unlawful whether or not the burden they impose is 'substantial'").

This principle was reaffirmed recently in *Tandon v. Newsom*, 141 S. Ct. 1294 (holding unconstitutional Covid regulations disfavoring churches). The Court reiterated the analytical framework governing laws that are not neutral and generally applicable without reference to any burden on the law's challenger. "This Court's decisions have made the following points clear. First, government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise." *Id*. at 1296. Second, the comparability of the religious and secular activity "must be judged against the asserted government

interest that justifies the regulation at issue." *Id*. Third, the government bears the burden to prove that the challenged law satisfies strict scrutiny. *Id*.

> **B.** **The CCIA's Favored Treatment of Countless Businesses Triggers Strict Scrutiny.**

Analysis of the constitutionality of the CCIA therefore begins with determining whether the law treats "any comparable secular activity more favorably than religious exercise." *Id.* at 1296. Even a single comparable secular activity treated more favorably than religious exercise triggers strict scrutiny. *See id.* (holding that it was immaterial that California treated equally in-home secular meetings and in-home religious gatherings). Central to the Court's holding was California's favored treatment of various businesses, including hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants. The state offered no justification other than the speculation that the Covid precautions required in those places "might not translate readily to the home." *Id*. at 1297.

The CCIA treats numerous businesses and other privately sponsored secular activities more favorably than houses of worship. *See Spencer v. Nigrelli*, 2022 U.S. Dist. LEXIS 233341, at *20 (W.D.N.Y. Dec. 29, 2022) (noting CCIA's favorable treatment of hair salons, shopping malls, gas stations, office buildings, and garages). Judged against the state's asserted interest of reducing the risk of gun injuries and deaths, the CCIA's disfavored treatment of houses of worship cannot be justified in

the absence of credible evidence demonstrating that houses of worship are at greater risk for gun injuries and deaths. As Appellee persuasively establishes, the State's assertion that houses of worship pose a unique risk of gun injuries is based purely on conjecture and naked assertions, not evidence. *See* Appellee's Br. at pp. 28-30 (discrediting the State's claims that its disfavored treatment of houses of worship is justified because are they are "prone to crowding," "frequented by children," and "host constitutionally protected activity").

### C. Proper Characterization of the State's Interest Is Critical to Strict Scrutiny Review.

Broadly formulated interests, such as "protecting the public against gun violence," Appellants' Br. at 32, cannot satisfy strict scrutiny. "[A] more precise analysis" is required, focusing on "the asserted harm of granting specific exemptions to particular religious claimants." *Fulton*, 141 S. Ct. at 1881 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006)). The question therefore is not whether the State has a compelling interest in reducing gun violence, but whether it has a compelling interest in denying an exception to Pastor Spencer and the church. *Id.* If "the government can achieve its interests in a manner that does not burden religion, it *must* do so." *Id.* (emphasis added). Or to paraphrase *Tandon*, the State cannot "assume the worst when people go to church but assume the best when people go" shopping or to work. 141 S. Ct. at 1297. Absent compelling evidence that churches in New York pose a heightened risk of gun violence, the

8

CCIA's place-of-worship provision must fail strict scrutiny. Publicly available statistical data on the location of gun injuries and deaths nationwide shows that no such compelling evidence exists.

### D.  *Annual FBI Active Shooter Incidence Reports Show that, Generally Speaking, Houses of Worship Are at Low Risk of Gun Deaths.*

The FBI compiles annual reports about active shooter incidents in the United States,[4] defining an active shooter "as one or more individuals actively engaged in killing or attempting to kill people in a populated area."[5] For the past ten years, those reports show that houses of worship are one of the last places where gun deaths occur. In 2021, the latest year for which data has been published, there were sixty-one active shooter incidents.[6] Of those, thirty-two occurred in commercial establishments, nineteen in outdoor spaces, three in government offices, three in homes, and two in educational institutions—but only one in a house of worship.[7] In 2020, there were forty active shooter incidents[8]—none of which occurred in a house

---

[4] *Active Shooter Incidents in the United States in 2021*, Fed. Bureau of Investigation (May 2022), https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2021-052422.pdf/view.

[5] *Id. at 2.*

[6] *Id.*

[7] *Id*. at 21.

[8]*Active Shooter Incidents in the United States in 2020*,  Fed. Bureau of Investigation, 2 (July 2021), https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2020-070121.pdf/view.

of worship.[9] From 2000 to 2019, active shootings in houses of worship accounted for only 4.26% (13 of 305) of active shootings—and 5.19% (139 of 2,677) of casualties.[10] Similarly, a private organization distilling data from the FBI reports between 2000-2013 found that of the 163 active shooter incidents, over 80% occurred at work.[11] Of the 132 worksite shootings, 73 incidents (45.6%) took place at businesses, 39 (24.4%) at schools, 16 (10%) at government sites, and four at health care facilities (2.5%).[12] In short, as a general rule, the statistical data indicate that places of worship pose no heightened risk of gun violence.

_____

[9] *Id.* at 12 (reporting that 24 occurred in commercial establishments, 10 in open spaces, 3 in government offices, and 3 in homes).

[10] Numbers were compiled from FBI reports on active shooters that cover the years 2000 to 2019. J. Pete Blair & Katherine W. Schweit, *A Study of Active Shooter Incidents in the United States Between 2000 and 2013*, Tex. State Univ. & Fed. Bureau of Investigation 5, 13 (2014), https://www.fbi.gov/file-repository/active-shooter-study-2000-2013-1.pdf/view; Katherine W. Schweit, *Active Shooter Incidents in the United States in 2014 and 2015*, Fed. Bureau of Investigation 1, 4-5 (2016), https://www.fbi.gov/file-repository/activeshooterincidentsus_2014-2015.pdf/view; *Active Shooter Incidents in the United States in 2016 and 2017*, Fed. Bureau of Investigation 1, 6-7 (2018), https://www.fbi.gov/file-repository/active-shooter-incidents-us-2016-2017.pdf/view; *Active Shooter Incidents in the United States in 2018*, Fed. Bureau of Investigation 2, 6-7 (2018), https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2018-041019.pdf/view; *Active Shooter Incidents in the United States in 2019*, Fed. Bureau of Investigation 3, 8-9 (2020), https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2019-042820.pdf/view.

[11] Roy Maurer, *FBI: Over 80 Percent of Active Shooter Incidents Occur at Work*, Soc'y for Hum. Res. Mgmt. (Mar. 3, 2015), https://www.shrm.org/ResourcesAndTools/hr-topics/risk-management/Pages/FBI-Active-Shooter-Work.aspx.

[12] *Id.*

It is nonetheless true that Jewish Synagogues have recently experienced an increase in violent attacks, including with firearms.[13] The threat, however, is from outside the place of worship, not from within. Restricting a house of worship's constitutional right to protect itself against such attacks is an utterly irrational means of addressing such external threats.

---

[13] *See, e.g.*, Eric Berger, *Jewish Interest in Active Shooter Training Soared After Recent Attacks*, Jewish Telegraphic Agency (July 12, 2022, 3:26 PM), https://www.jta.org/2022/07/12/united-states/jewish-interest-in-active-shooter-trainings-soared-after-recent-attacks (discussing how New York synagogues have increasingly requested *active shooter training* in response to attacks across the country); Kiara Alfonseca, *Synagogue Attack Puts Jewish Community on Edge*, ABC News (Jan. 19, 2022, 5:15 AM), https://abcnews.go.com/US/synagogue-attack-puts-jewish-community-edge/story?id=82311539 (citing a note from the FBI and Department of Homeland Security stating that "[f]aith-based communities will 'likely' continue to be the target of violence"); Dakin Andone, *Jewish Communities Across the US on Heightened Alert After the Texas Standoff: 'Is Our Community Under Attack Again?'*, CNN (Jan. 17, 2022, 9:16 AM), https://www.cnn.com/2022/01/17/us/jewish-communities-security-colleyville/index.html (highlighting the Colleyville, Texas, synagogue hostage situation in 2022, the San Diego synagogue shooting in 2019, and the Pittsburgh synagogue shooting in 2018); Ben Sales, *Synagogues Are Now Conducting Active Shooter Drills During Services*, Jewish Telegraphic Agency (July 1, 2019, 2:26 PM), https://www.jta.org/2019/07/01/united-states/synagogues-are-now-conducting-active-shooter-drills-during-services; *see generally Audit of Antisemitic Incidents 2021*, Anti-Defamation League 23 (Apr. 2022), https://www.adl.org/sites/default/files/pdfs/2022-05/ADL_2021%20Audit_Report_042622_v11.pdf; Amir Vera, et al., *NYPD Investigates 6 Attacks at 4 Synagogues Over a Two-Day Span*, CNN (Apr. 25, 2021, 9:59 PM), https://www.cnn.com/2021/04/25/us/new-york-synagogue-vandalism-hate-crimes/index.html.

*Fulton* and *Tandon* make this a very easy case. Because the CCIA's place-of-worship provision is virtually certain to fail strict scrutiny, the district court correctly held that Pastor Spencer and the church are likely to succeed on the merits of their Free Exercise Claim. *See Tandon*, 141 S. Ct. at 1296 (rejecting state's unsubstantiated assertion that certain risk factors are "present in worship but absent from other secular activities").

## II. The Church Autonomy Principle Necessarily Includes Authority over Church Members' Exercise, Within the Organization, of Other Constitutional Rights.

From the founding, "religious bodies have been the preeminent example of private associations that have "'act[ed] as critical buffers between the individual and the power of the State.'" *Hosanna-Tabor*, 565 U.S. at 199 (2012) (Alito, J. concurring) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984)). Religion often "pervades and determines [church members'] … entire way of life." *Yoder*, 406 U.S. at 216 (1972). Church doctrine can therefore govern manifold aspects of daily life, including the exercise of constitutional rights. Religious doctrine may

touch on speech,[14] intimate association,[15] the right of assembly,[16] and the bearing of weapons.[17]

The earliest church autonomy doctrine cases involved a religious institution's control of its property. *See, e.g., Watson v. Jones,* 80 U.S. 679, 725-33 (1872) (property dispute between two Presbyterian churches)*; Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 109-10, 120-21 (1952) ("[W]hen the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls."); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 449-51 (1969) (property dispute between overlapping church entities); *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976) (same).

---

[14] *See, e.g., Ephesians* 5:4 ("Obscene stories, foolish talk, and coarse jokes—these are not for you. Instead, let there be thankfulness to God.").

[15] *See, e.g*., Kiddushin 68b (Talmudic provision forbidding intermarriage between Jew and Gentile).

[16] *See, e.g*., *Hebrews* 10:25 ("Let us not neglect meeting together, as some have made a habit, but let us encourage one another, and all the more as you see the Day approaching.").

[17] *Sikh Rehat Maryada* [Official Sikh Code of Conduct and Conventions] Sec. 6, Ch. XIII, Art. XXIV, *available at* http://gurunanakdarbar.net/sikhrehatmaryada.pdf (mandating that all Sikhs carry a kirpan [ceremonial sword]). The kirpan reminds the "bearer of a Sikh's solemn duty to protect the weak and promote justice for all." *Sikhism and the Sikh Kirpan Fact Sheet*, Sikh Coal., 1, https://www.sikhcoalition.org/wp-content/uploads/2016/12/kirpan-factsheet-aug2018.pdf (last visited Mar. 6, 2023).

These decisions establish Pastor Spencer's and the Church's right to determine whether church members can exercise a constitutionally guaranteed right to protect the Church's property and the lives of the Church's members. Control over the use of a church's property necessarily includes lawful means of protecting that property, whether with fences, door locks or a security system. If a church has control over how its property is secured, it surely has control over whether its members can engage in constitutionally protected conduct to protect the property and the church's members. *See Spencer*, 2022 U.S. Dist. LEXIS 233341, at *5 (holding that church autonomy doctrine encompasses control over "which personal items members and visitors may bring with them onto the Church's premises") (internal citations omitted).

In *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020), the Supreme Court reiterated the expansive scope of church autonomy and the critical importance of judges refraining from second-guessing church teaching on faith, doctrine, and religious law. The ministerial exception was but one "component" of a broader church autonomy doctrine, which gives religious entities "independence" to decide matters of church governance and internal management. *Id*. at 2060. Religious institutions have the right "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Id.* at 2055. Religious institutions are also free to make "internal

14

management decisions that are essential to the institution's central mission." *Id.* at

2060. Such internal management decisions include: 1) personnel decisions that are

the "very reason for the existence" of a particular institution, "essential to the

institution's central mission," or involving those who would lead others toward or

away from the faith, *id.* at 2055, 2060; 2) decisions "conveying the Church's

message and carrying out its mission," *id.* at 2062; 3) decisions "transmitting the ...

faith to the next generation," *id.* at 2063; and 4) elucidating or teaching the tenets of

the faith, *id.* at 2064.

> These accounts of church autonomy are broad on their face. They
> reference or encompass at least a religion's theological beliefs,
> authoritative doctrines, authority structures, decisions about the range
> of services an institution might offer, and to whom and how they will
> be delivered, as well as the theological foundations or motivations for,
> and the immanent and transcendent goals of, the entire institution.

Helen M. Alvare, *Church Autonomy After* Our Lady of Guadalupe School: *Too*

*Broad? Or Broad as it Needs to Be?*, 25 Tex. Rev. L. & Pol. 319, 323 (2021).

The church's internal management decision to allow church staff and

congregants to possess firearms on church grounds furthers the church's mission

because it protects the lives of those who will transmit the faith as well as the lives

of the next generation. *See* 140 S. Ct. at 2063. The district court correctly held that

Pastor Spencer and the Church are likely to succeed on their claim that the place-of-

worship provision violates the Religion Clauses' church autonomy doctrine.

# CONCLUSION

Amici respectfully request this Court to affirm the judgment below.

Respectfully submitted,

Dated: March 7, 2023

By: /s/Jay Alan Sekulow
Jay Alan Sekulow, Esq.
*Counsel for Amici Curiae,*
The American Center for Law &
Justice
201 Maryland Avenue
Washington. D.C. 20002
Tel: 202-546-8890
Fax: 202-546-9309
sekulow@aclj.org

## CERTIFICATE OF COMPLIANCE

This brief complies with type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rules 32.1(a)(4)(A) and 29.1(c) because this brief contains 3,572 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word processing software in 14-pt Times New Roman font.

Dated: March 7, 2023

/s/ Jay A. Sekulow
Jay A. Sekulow
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2023, I electronically filed a copy of the foregoing *Amicus Curiae* Brief using the ECF System which will send notification of that filing to all counsel of record in this litigation. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 7, 2023

/s/ Jay A. Sekulow
Jay A. Sekulow
*Counsel for Amici Curiae*