# 22-3237

## United States Court of Appeals
## for the Second Circuit

---

MICHAEL SPENCER, HIS TABERNACLE FAMILY CHURCH, INC.,

*Plaintiffs-Appellees,*

v.

STEVEN A. NIGRELLI, Acting Superintendent of the New York State Police,
in his official and individual capacities,

*Defendant-Appellant,*

WEEDEN A. WETMORE, District Attorney for the County of Chemung, New York,
in his official and individual capacities, MATTHEW VAN HOUTEN, District Attorney
for the County of Tompkins, New York, in his official and individual capacities,

*Defendants.*

---

On Appeal from the United States District Court
for the Western District of New York

---

**REPLY BRIEF FOR APPELLANT**

---

BARBARA D. UNDERWOOD
*Solicitor General*
ESTER MURDUKHAYEVA
*Deputy Solicitor General*
JONATHAN D. HITSOUS
*Assistant Solicitor General*
*of Counsel*

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellant
The Capitol
Albany, New York 12224
(518) 776-2044

Dated: March 10, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES....................................................................iii

PRELIMINARY STATEMENT..................................................... 1

ARGUMENT ................................................................................ 4

POINT I

PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON
THE MERITS OF THEIR FIRST AMENDMENT CHALLENGES TO THE
PLACE-OF-WORSHIP PROVISION ................................................ 4

    A.   The Place-of-Worship Provision Does Not Violate the
        Free Exercise Clause. ................................................ 4

        1.   The place-of-worship provision does not burden
            plaintiffs' religious beliefs or practices............................ 4

        2.   The place-of-worship provision is a neutral and
            generally applicable law. ..................................... 7

        3.   Alternatively, the place-of-worship provision
            survives strict scrutiny. ..................................... 13

    B.   The Place-of-Worship Provision Does Not Violate the
        Establishment Clause............................................ 16

POINT II

PLAINTIFFS FAILED TO SHOW A SUBSTANTIAL LIKELIHOOD
THAT THEY WOULD PREVAIL IN THEIR SECOND AMENDMENT
CHALLENGE TO THE PLACE-OF-WORSHIP PROVISION ........................... 21

    A.   The District Court Improperly Relieved Plaintiffs
        of Their Burden as to the Textual Element of the
        Second Amendment Inquiry. ................................... 21

i

**Page**

B.  The Place-of-Worship Provision Is a Constitutional
Sensitive-Place Regulation. .....................................................24

POINT III

THE EQUITABLE FACTORS FAILED TO SUPPORT A PRELIMINARY
INJUNCTION...............................................................................31

CONCLUSION ........................................................33

ii

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Altman v. Bedford Cent. Sch. Dist.*,
  245 F.3d 49 (2d Cir. 2001) ............................................................. 7

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ...................................................................... 22

*Bollard v. California Province of the Soc'y of Jesus*,
  196 F.3d 940 (9th Cir. 1999) ....................................................... 17

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ........................................................... 7, 11, 13

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985) ......................................................... 32

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ........................................................ 22, 24, 29

*Employment Div., Dep't of Hum. Res. of Or. v. Smith*,
  494 U.S. 872 (1990) ........................................................................ 8

*Espinoza v. Montana Department of Revenue*,
  140 S. Ct. 2246 (2020) ................................................................... 7

*Fisher v. University of Tex. at Austin*,
  570 U.S. 297 (2013) ...................................................................... 15

*Fratello v. Archdiocese of New York*,
  863 F.3d 190 (2d Cir. 2017) ......................................................... 16

*Holloway v. Attorney Gen. U.S.*,
  948 F.3d 164 (3d Cir. 2020) ......................................................... 22

*Kane v. De Blasio*,
  19 F.4th 152 (2d Cir. 2021) ........................................................... 9

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church
  in N. Am.*,
  344 U.S. 94 (1952) ........................................................................ 19

| Cases | Page(s) |
|---|---|

*Kelley v. Johnson*,
  425 U.S. 238 (1976) ............................................................... 19

*Kennedy v. Bremerton Sch. Dist.*,
  142 S. Ct. 2407 (2022) ...................................................... 4, 11

*Marianist Province of the U.S. v. City of Kirkwood*,
  944 F.3d 996 (8th Cir. 2019) ................................................. 6

*McDaniel v. Paty*,
  435 U.S. 618 (1978) ................................................................. 7

*McRaney v. North American Mission Bd. of the S. Baptist Convention, Inc.*,
  966 F.3d 346 (5th Cir. 2020) ............................................... 17

*National Rifle Ass'n v. Bondi*,
  No. 21-12314, 2023 WL 2416683 (11th Cir. Mar. 9, 2023) ............... 26

*New York State Rifle & Pistol Association v. Bruen*,
  142 S. Ct. 2111 (2022) ............................................... passim

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  140 S. Ct. 2049 (2020) ......................................................... 20

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) ............................................................. 10

*South Ridge Baptist Church v. Industrial Comm'n of Ohio*,
  911 F.2d 1203 (6th Cir. 1990) ............................................. 19

*Tandon v. Newsom*,
  141 S. Ct. 1294 (2021) ...................................................... 7, 11

*Turner Broad. Sys., Inc. v. FCC*,
  520 U.S. 180 (1997) ............................................................. 12

*United States Sec. & Exch. Comm'n v. Citigroup Global Mkts., Inc.*,
  752 F.3d 285 (2d Cir. 2014) ................................................. 32

| **Cases** | **Page(s)** |
|---|---|

*United States v. Class,*
930 F.3d 460 (D.C. Cir. 2019) ............................................................ 22

*United States v. Morrison,*
529 U.S. 598 (2000) .............................................................................. 19

## Laws & Rules

*New York*

Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Sys.) ............................ 32

Penal Law
§ 265.01-d ........................................................................................... 9
§ 265.01-e ..................................................................................... 1, 8-9

*English*

4 Hen. 4, c. 29 (1403) ............................................................................ 25

26 Hen. 8, c. 6 (1534) ............................................................................ 25

The Statute of Northampton of 1328, 82 Edw. 3, c. 3 (1328) ................. 25

*Rules*

Fed. R. Evid. 301 .................................................................................... 22

## Miscellaneous Authorities

Benjamin Boyd, *Take Your Guns to Church:*
*The Second Amendment and Church Autonomy,*
8 Liberty U. L. Rev. 653 (2014) ................................................... 18, 28

Joseph Blocher & Reva Seigel, *Second-Amendment Sensitive*
*Places: Protecting Democratic Community and Commerce*
(2023) (forthcoming N.Y.U. L. Rev.) .................................................. 30

**Miscellaneous Authorities**                                 **Page(s)**

United States Census Off., Dep't of the Interior,
*Statistics of the Population of the United States
at the Ninth Census (June 1, 1870)* (1872),
https://www2.census.gov/library/publications/decennial/
1870/population/1870a-04.pdf ........................................................... 26

## PRELIMINARY STATEMENT

New York prohibits an individual from carrying firearms in places of worship, along with 19 other categories of "sensitive location." N.Y. Penal Law § 265.01-e(2). The district court concluded that the place-of-worship provision offends the First Amendment because plaintiff Michael Spencer, a pastor at His Tabernacle Family Church, believes that he has a religious obligation to carry weapons into the church. The district court separately ruled that the place-of-worship provision violates the Second Amendment. As explained in the State's opening brief, these rulings misunderstand New York's statute, contort governing case law, and misapply the analogical reasoning envisioned in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).

Plaintiffs' defense of the First Amendment ruling is based on multiple evidentiary and doctrinal flaws. At the outset, Spencer's admissions at the preliminary-injunction hearing disprove plaintiffs' assertion that the place-of-worship provision burdens his religious practice. More fundamentally, plaintiffs' conception of the Free Exercise Clause guts the concept of neutrality and general applicability. The place-of-worship provision—like the remainder of New York's sensitive-place laws—prohibits carrying

a weapon into a particular location, whether a person does so with a religious motivation or not. And the law treats carrying firearms into places of worship in the same way it treats carrying firearms into other sensitive places. Plaintiffs cannot ascribe a lack of neutrality and general applicability based on their assertion that some people might engage in an activity for religious reasons when the law treats everyone engaging in that activity in the same way. Likewise, plaintiffs' assertion that congregant safety is exclusively a matter of church governance would render secular rules optional for religious organizations. The Supreme Court does not endorse such an expansive reading of the Establishment Clause, nor can an ordered society tolerate it.

Plaintiffs' defense of the district court's Second Amendment ruling fares no better. As an initial matter, plaintiffs define the scope of the Second Amendment right so broadly that virtually any firearm regulation necessarily interferes with that right, even those the Supreme Court has declared "presumptively lawful." Second, plaintiffs urge this Court to sweep aside the State's historical evidence by insisting that *Bruen* requires that the historical record include word-for-word historical twins for modern regulations, and that even historical twins would be insufficient if they

did not exist in enough States—excluding States plaintiffs deem disqualified from consideration. A faithful application of *Bruen* cannot categorically exclude historical precursors based on the arbitrary criteria used by plaintiffs and the district court.

Finally, plaintiffs fail to meaningfully rebut the State's arguments as to the remaining preliminary injunction factors. Instead, plaintiffs insist that the finding of a likelihood of success on the merits alone requires a preliminary injunction. To the contrary, plaintiffs have the burden of satisfying each of the factors independently, and they have failed to show a likelihood of success on the merits in any event.

# ARGUMENT

## POINT I

### PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR FIRST AMENDMENT CHALLENGES TO THE PLACE-OF-WORSHIP PROVISION

**A. The Place-of-Worship Provision Does Not Violate the Free Exercise Clause.**

The challenged provision does not burden plaintiffs' exercise of religion, much less single out religious exercise for unfavorable treatment. Plaintiffs therefore fail to demonstrate either element of a free exercise claim.

**1. The place-of-worship provision does not burden plaintiffs' religious beliefs or practices.**

To prevail on their free exercise claim, plaintiffs must first show that the place-of-worship provision burdens exercise of religion. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022). To this end, plaintiffs maintain that Spencer and the church's volunteer security team regard the protection of congregants as a religious obligation, that Spencer carries firearms to fulfill this obligation, and that members of the church's security team likewise carry firearms out of religious obliga-tion. (J.A. 74, 87, 214.) At the same time, Spencer admitted in sworn

4

testimony that he does not personally carry firearms to services because of a concern that doing so will distract from his work and that he does not inquire whether or when members of his security team are carrying firearms. (*See* J.A. 225, 231.) Spencer's statements contradict his legal assertion that the place-of-worship provision "coerces" him and his security team "to cease doing something that they believe God asks of them." *See* Br. for Pls.-Appellees ("Pls.' Br.") at 21. Plaintiffs accuse the State of "second-guessing" these beliefs (*id.* at 3, 17, 23-24), but it is not second-guessing to highlight Spencer's own statements about his own religious practice.

Moreover, plaintiffs could continue to carry firearms to fulfill a religious obligation to protect congregants by availing themselves of Penal Law § 265.01-e(3)'s exceptions. Plaintiffs do not explain on appeal why they never tried to recruit congregants who were active or retired law enforcement to serve on the security team. (*See* J.A. 229-230.) Nor do they deny that they could appoint their current volunteers as armed security guards under Penal Law § 265.01-e(3)(e). Instead, plaintiffs complain that to do so they would need to "navigate a lengthy process" to "receive a special armed registration card." Pls.' Br. at 24 (quotation

5

marks omitted). This bare assertion does not demonstrate that availing themselves of this alternative is impracticable or even meaningfully burdensome, especially when plaintiffs already expend resources to send their security-team members for multiple trainings. (*See* J.A. 73.) Regardless of whether plaintiffs *want* to avail themselves of this exception, the fact remains that they have meaningful options to fulfill their religious obligation to protect congregants and comply with the law at the same time. *See Marianist Province of the U.S. v. City of Kirkwood*, 944 F.3d 996, 1001 (8th Cir. 2019) (no First Amendment burden when plaintiffs could exercise their religious rights in compliance with the challenged ordinance).

Plaintiffs maintain that the exceptions or the place-of-worship provision more generally target religious exercise for disfavored treatment. Pls.' Br. at 22, 24. They put the cart before the horse. Absent "any infringement of their own religious freedoms," plaintiffs lack standing to challenge the place-of-worship provision as an unconstitutional burden

on hypothetical religious practices.[1] *See Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 71 (2d Cir. 2001) (quotation marks omitted).

## 2. The place-of-worship provision is a neutral and generally applicable law.

The parties agree that a law is not neutral or generally applicable if it treats any "comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). In arguing that the place-of-worship provision is not neutral and generally applicable, plaintiffs engage in a sleight-of-hand by treating the relevant comparator as place-based rather than activity-based. Specifically, plaintiffs believe

---

[1] Contrary to the assertions of plaintiffs and amici (Pls.' Br. at 22; *Amici Curiae* Br. of the Synagogue Sec. Council of N. Am., & the Am. Ctr. for L. & Just. ("Synagogue Sec. Council Br.") at 5-6 (Mar. 7, 2023), ECF No. 78), the Supreme Court has not departed from the long-settled rule that a burden on religious exercise is a necessary element of a free exercise claim. In *McDaniel v. Paty*, the Supreme Court expressly held that a law banning clergy from holding public office "encroached upon [petitioner's] right to the free exercise of religion." 435 U.S. 618, 626 (1978). In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, the Court observed that there was no dispute that the challenged ordinance burdened petitioners' ability to conduct animal sacrifices for religious reasons. *See* 508 U.S. 520, 531-38 (1993). And in *Espinoza v. Montana Department of Revenue*, the challenged prohibition burdened families from exercising their religious rights by sending their child to a religious school. 140 S. Ct. 2246, 2261 (2020).

that the inquiry must end because New York's list of sensitive places includes places of worship but does not include certain other "secular" establishments (notably shopping malls and retail establishments). *See* Pls.' Br. at 1-2, 27-29, 31-32, 35-38. Plaintiffs' theory misses the mark in several ways.

According to plaintiffs' own claim, the purportedly burdened religious activity at issue is carrying a firearm to fulfill the religious obligation to protect congregants. *See id.* at 21. Given plaintiffs' framing of the religious practice at issue, the relevant comparator for purposes of a free exercise claim is not carrying a firearm into a "secular establishment," but rather, carrying a firearm for a secular reason, such as personal self-defense.

With the comparison properly framed, the place-of-worship provision easily satisfies the test for neutrality and general applicability. The place-of-worship provision prohibits the act of carrying a firearm irrespective of a person's motivation for doing so. *See* Penal Law § 265.01-e(2). Whether a person wishes to bring a firearm into a place of worship due to a religious obligation to protect congregants or due to a secular desire to bring firearms into a place of worship, the statute requires the same outcome: they cannot do so. *See Employment Div., Dep't of Hum. Res. of Or. v.*

8

*Smith*, 494 U.S. 872, 882 (1990) (a law banning the use of a controlled substance did not violate Free Exercise Clause because the ban applied to everyone, regardless of their motivation for using that substance).

The place-of-worship provision is also neutral and generally applicable when compared with regulations governing comparable secular locations. Under New York law, Spencer may not carry a firearm to a museum, concert, or football game—even if to fulfill a religious obligation to protect a church youth group he accompanied there—because people cannot bring firearms into those sensitive locations for any reason. *See* Penal Law § 265.01-e(p). Conversely, if Spencer wanted to hold a Bible study group at his home, the New York Penal Law would leave the decision to him as to whether to permit firearms, as it does for all owners of private property that does not qualify as a sensitive place. *See id.* § 265.01-d. The same would be true if the church owned an off-site thrift store that it operated to fulfill a religious mission to help the needy, or if the church sent members door to door to conduct missionary work. If "[t]he analysis must focus on what a law treats better, not what it treats worse" (Pls.' Br. at 28), these examples demonstrate that New York's gun-control regime does not favor religion, but does not disfavor it, either, *see Kane v. De Blasio*,

9

19 F.4th 152, 165-66 (2d Cir. 2021) (vaccine mandate that applied to all covered employees did not need to include exception for religious objection).

Plaintiffs' extensive reliance (Pls.' Br. at 3, 17, 26) on the Supreme Court's per curiam stay order in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020), is misplaced. The challenged order in that case was deemed not neutral and generally applicable because it limited the size of assemblies "for a worship service" while permitting assemblies of similar sizes for secular activities. *Id.* at 67. And though the challenged order distinguished between gatherings occurring in places of worship and gatherings occurring in secular locations, the Court's finding of non-neutrality derived from its view that people necessarily gathered in places of worship for religious purposes like "worship services," whereas the activity of gathering in a secular location was not necessarily religious in nature. *See id.* Here, by contrast, even plaintiffs do not claim that the mere act of bringing a firearm into a place of worship is necessarily, predominantly, or even commonly a religious activity. While some people like Spencer may wish to carry a firearm due to a religious motivation to protect congregants, it is far from obvious that all persons wishing to carry firearms into a place of worship share this view or that the conduct

10

of carrying firearms for a religious obligation occurs exclusively in places of worship.

In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, the challenged ordinance also focused on activity: prohibiting the slaughter of animals in certain religious rituals but not animal slaughter under similar circumstances for secular reasons. 508 U.S. at 543-45. In *Tandon v. Newsom*, like *Roman Catholic Diocese*, the Court confronted a public-health order that restricted the size of assemblies for religious reasons while permitting assemblies of similar sizes for secular reasons. 141 S. Ct. at 1297. And in *Kennedy v. Bremerton School District*, the Court observed that a school district did not impose a post-game supervision requirement evenhandedly when it refused to rehire a football coach for failing to supervise due to religious activity but declined to penalize employees who may have failed to supervise students because of visits from friends or personal phone calls. 142 S. Ct. at 2423. All of these cases point to the relevant comparator as activity-based rather than place-based.

Plaintiffs, along with their amici, maintain that the relevant comparison is not between places of worship and secular establishments deemed sensitive, but between places of worship and secular establish-

11

ments *not* deemed sensitive, such as shopping malls, retail establishments, or fast-food restaurants. *See* Pls.' Br. at 28; Br. of Congregation Beth Aron D'Karlin as *Amicus Curiae* ("Congregation Br.") at 11-12, 15 (Mar. 7, 2023), ECF No. 79. As explained in the State's opening brief (at 24-25), the rationale for designating places of worship and 19 other categories of places as sensitive is decidedly secular and is based on the unique risks of violence posed in such locations. "Even in the realm of First Amendment questions," courts owe deference to legislative judgments. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 196 (1997). Whether or not the Legislature could have added shopping malls or other types of private property to its list of sensitive locations, their absence scarcely renders the existing list so "indisputably underinclusive" as to justify a conclusion that the place-of-worship provision unfairly targets religious activity over comparable secular activity. *See* Pls.' Br. at 28-29 (quotation marks omitted).

In the alternative, plaintiffs argue that the place-of-worship provision is not facially neutral because it uses the term "place of worship." *See id.* at 25-27. Plaintiffs question (*id.* at 27 n.1) the State's reliance on *Church of the Lukumi Babalu Aye* to support the statute's facial neutrality, overlooking the rule that decision establishes: "A law lacks facial neutral-

ity if it refers to *a religious practice* without a secular meaning discernable from the language or context," 508 U.S. at 533 (emphasis added). By alluding to a church-hosted March Madness viewing party (Pls.' Br. at 25), plaintiffs do not illustrate unfair differential treatment of religious activity as much as acknowledge that not all activity that occurs within a place of worship is inherently religious. Accepting that Spencer and some of his congregants carry firearms to their church to fulfill a religious obligation, plaintiffs fail to explain why it is reasonable to regard carrying firearms into places of worship as a religious practice generally, or that nobody could ascribe to that act a secular meaning. *Church of the Lukumi Babalu Aye*, 508 U.S. at 533-34 (ordinance's use of terms with a "religious origin" was nonetheless facially neutral because those terms could also have secular meanings).

### 3. Alternatively, the place-of-worship provision survives strict scrutiny.

Unable to demonstrate that the place-of-worship provision singles out religious activity facially or in effect, plaintiffs do not attempt to assert that the Legislature enacted the provision with discriminatory intent, or that the law would fail to survive rational basis review. Nor could they,

for the reasons stated in the State's opening brief (at 30-31). In any event, the provision would survive strict scrutiny review even if that standard applied.

Plaintiffs question whether the State can claim a compelling interest in preventing gun violence in places of worship without offering evidence that such violence occurs more frequently in places of worship than in non-sensitive secular locations. *See* Pls.' Br. at 31-32, 36. Yet plaintiffs themselves assert that they need to carry firearms because places of worship are especially susceptible to such violence. (J.A. 75-76; *see also* Pls.' Br. at 12.) The fact that plaintiffs would prefer a different response to the problem of gun violence in places of worship does not render the State's interest in that problem any less compelling.

Plaintiffs additionally dispute that the place-of-worship provision is narrowly tailored by pointing to laws from other States that permit congregational leaders to decide whether to permit firearms in places of worship (Pls.' Br. at 32-33) and to the New York Governor's proposed budget bill, which would permit congregational leadership to appoint their own armed security (*id.* at 38). But many of the jurisdictions whose laws plaintiffs highlight in fact support New York's place-of-worship

14

provision, because they show that gun violence presents a unique problem in each State that warrants a unique response: "Although states have taken slightly different approaches to address the particular needs of their community, all fall within the robust historical tradition of governments regulating the carry of firearms in places of worship." *See* Br. for D.C. et al. as *Amici Curiae* at 8-9, *Hardaway v. Nigrelli*, No. 22-2933 (2d Cir. Jan. 25, 2023), ECF No. 103. And the provision in the Governor's proposed budget bill may or may not ultimately be accepted by the Legislature as an appropriate response to the problem of gun violence in places of worship. "[N]arrow tailoring does not require exhaustion of every *conceivable* . . . alternative." *Fisher v. University of Tex. at Austin*, 570 U.S. 297, 312 (2013) (emphasis in original) (quotation marks omitted).

In response to the State's argument that requiring consideration of less restrictive alternatives would undermine its mission of reducing violence in all sensitive places, plaintiffs respond that only the place-of-worship provision targets religious exercise. *See* Pls.' Br. at 37. Assuming that plaintiffs are correct, the targeting of religion would explain why a court must consider whether the provision is narrowly tailored but would not on its own explain why the provision is insufficiently tailored. In any

event, plaintiffs' argument that strict scrutiny and the requirement of less restrictive alternatives applies only to the place-of-worship provision is undermined by their argument that a law targets religious activity whenever parties can show that it has served to burden their religious activity. If plaintiffs were right that the constitutionality of sensitive-place laws depended on whether a person's religion motivated them to carry firearms there, New York's ability to regulate in the interest of public safety would be severely imperiled.

## B. The Place-of-Worship Provision Does Not Violate the Establishment Clause.

Plaintiffs get no further defending the district court's conclusion that they were likely to succeed on their Establishment Clause claim. Plaintiffs stumble out of the gate by professing to refute the State's supposed argument that "churches possess autonomy only vis-à-vis the hiring and dismissal of church personnel." *See* Pls.' Br. at 45. The State never made that argument, of course, but relied on cases involving personnel decisions to illustrate the broader point that the Establishment Clause protects against government interference in "ecclesiastical decisions." *See Fratello v. Archdiocese of New York*, 863 F.3d 190, 201 (2d Cir.

16

2017) (quotation marks omitted); *see also Bollard v. California Province of the Soc'y of Jesus*, 196 F.3d 940, 946 (9th Cir. 1999) (equating internal church affairs to "ecclesiastical self-governance"). The carrying of firearms in plaintiffs' church can hardly be an ecclesiastical decision when Spencer himself bases his approval of congregants' carriage of firearms on secular considerations such as licensing: "[i]f they have a carry permit, they have a right to be there." (*See* J.A. 200-201.)

Spencer's admissions similarly refute plaintiffs' contention that "protecting congregants is a core matter of church government." *See* Pls.' Br. at 42 (quotation and alteration marks omitted). As discussed in the State's opening brief (at 38), Spencer declined to require staff to carry firearms or to discuss firearms with his congregation or even his security team. (*See* J.A. 200-201, 225.) In fact, Spencer declared with respect to firearms, "Each person, I believe, has their right to believe as they will. I don't dictate even to my staff." (J.A. 238.) Contrary to plaintiffs' suggestion, the State did not refer to Spencer's beliefs as "personal" to question their religious nature (Pls.' Br. at 43-44 (quotation marks omitted)), but to highlight that those beliefs are not coextensive with church policy, *see McRaney v. North American Mission Bd. of the S. Baptist Convention, Inc.*,

17

966 F.3d 346, 347-50 (5th Cir. 2020) (business practices at issue were not necessarily intertwined with church governance), *cert. denied*, 141 S. Ct. 2852 (2021).

Plaintiffs suggest that factual support is unnecessary because the protection of congregants' safety is categorically a matter of church governance (Pls.' Br. at 42-43), an argument that amici make explicit (Synagogue Sec. Council Br. at 15). The only authority that plaintiffs offer is a law review article that relies heavily on colonial laws requiring people to bring weapons to churches, Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 Liberty U. L. Rev. 653, 697-99 (2014)—laws that plaintiffs themselves disclaim as immaterial to their claimed Establishment Clause violation (Pls.' Br. at 46). And the authority offered by amici for the proposition that government may not interfere with *any* issues concerning a church's use of its property pertained to a property dispute that necessarily required a court to weigh into what was "strictly a matter of ecclesiastical government, the power of the Supreme Church Authority of the Russian Orthodox Church to appoint the ruling hierarch of the archdiocese of North America."

18

*See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 115 (1952).

In all events, "[t]he promotion of safety of persons and property is unquestionably at the core of the State's police power." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976); *see United States v. Morrison*, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). Thus, plaintiffs are undeniably subject to fire and building codes, *see South Ridge Baptist Church v. Industrial Comm'n of Ohio*, 911 F.2d 1203, 1211 (6th Cir. 1990), which equally pertain to the protection of congregants "while conducting worship in the sanctuary" (Pls.' Br. at 41 (emphasis omitted)).

Plaintiffs counter that the place-of-worship provision, unlike fire and building codes, targets religion for harsh treatment. *Id.* at 43. As noted above, New York's law prohibits the secular activity of carrying firearms for any reason in any sensitive location, rather than the assertedly religious activity of carrying firearms to protect congregants in places of worship. More fundamentally, plaintiffs fail to explain how the

19

purported "targeting" of religious activity has any significance to the question of whether protecting congregant safety is a matter of church governance in the first place. The absence of logical consistency in plaintiffs' position suggests that what they seek to invoke is nothing less than the right to disregard any law with which they disagree as an interference with church governance. *See id.* at 43-44. This is a stretch too far for the Establishment Clause, which does not confer "a general immunity from secular laws." *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020).

Finally, in response to the historical evidence that supports government regulation of congregant safety, plaintiffs argue that laws enacted both after and before the Founding are of no probative value. Pls.' Br. at 45-46. What remains undisputed, however, is that the record reflects *no* point in history where a government's authority to enact laws that would affect congregant safety has been uncertain. Consequently, with or without history, plaintiffs are unlikely to succeed on their Establishment Clause claim.

20

## POINT II

**PLAINTIFFS FAILED TO SHOW A SUBSTANTIAL LIKELIHOOD THAT THEY WOULD PREVAIL IN THEIR SECOND AMENDMENT CHALLENGE TO THE PLACE-OF-WORSHIP PROVISION**

### A. The District Court Improperly Relieved Plaintiffs of Their Burden as to the Textual Element of the Second Amendment Inquiry.

*Bruen* envisions a two-step inquiry: first, courts should inquire whether "the Second Amendment's plain text covers an individual's conduct," and second, if it does, courts should inquire whether the government seeking to regulate that conduct "demonstrate[d] that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. Plaintiffs appear to agree that the party challenging a law on Second Amendment grounds must carry the burden on the first step of the test, but incorrectly insist that they can satisfy this requirement by defining the Second Amendment right at the highest level of generality. *See* Pls.' Br. at 47.

Plaintiffs' suggested approach is unsupported by law and would entitle anyone who assigns the "Second Amendment" label to a claim challenging a firearm regulation to force the government to "sift the historical materials," *Bruen*, 142 S. Ct. at 2150, to support virtually any

21

law that regulates firearms, including those that the Supreme Court has recognized as "presumptively lawful"—such as sensitive-place regulations, *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring); *id.* at 2157 (Alito, J., concurring) (noting that *Bruen* does not "disturb[] anything that [the Supreme Court] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns").

A presumption serves to "allocat[e] the burdens of proof between parties." *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988); *see* Fed. R. Evid. 301 ("the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption"). It is thus no surprise that the lower courts have taken the Supreme Court's use of the term "presumptively lawful" in this context at face value. *See, e.g.*, *Holloway v. Attorney Gen. U.S.*, 948 F.3d 164, 169 (3d Cir. 2020) (a challenger to presumptively lawful firearm restriction had burden to rebut presumption), *cert. denied*, 141 S. Ct. 2511 (2021); *United States v. Class*, 930 F.3d 460, 463 (D.C. Cir. 2019) (same, as to sensitive-place regulation), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2127 n.4.

Plaintiffs are wrong to argue that *Bruen* used sensitive places as a "prime example of how the burden-shifting regime works" to immediately place the burden of proof on the government. *See* Pls.' Br. at 48. *Bruen* held that the government cannot condition the exercise of the right to bear arms on a showing of special need, which is how it construed New York's proper-cause requirement. 142 S. Ct. at 2156. When the Court cautioned that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place,'" it was rejecting the suggestion that the proper-cause requirement, strictly applied in densely populated places, could be understood as a sensitive-place regulation. *Id*. at 2134. Moreover, the Court expressly declared that it had "no occasion to comprehensively define 'sensitive places.'" *Id.* at 2133. The Court did not purport to establish the analytical standard applicable to sensitive-place regulations that are indisputably place-based, nor to alter the general rule that a party challenging a law on Second Amendment grounds must first show that its intended conduct falls within the scope of the Second Amendment's text.

**B.    The Place-of-Worship Provision Is a Constitutional Sensitive-Place Regulation.**

In any event, the validity of the place-of-worship provision is amply established by the historical record, which shows numerous historical examples of statutes treating places of worship as sensitive places, and additional historical examples of statutes that treat closely analogous places as sensitive places within the meaning of Second Amendment jurisprudence. Plaintiffs' efforts to distinguish these precedents are unpersuasive.

As explained in the State's opening brief (at 47-50), New York's place-of-worship provision has over a dozen nineteenth-century predecessors. Plaintiffs attempt to manufacture a conflict between those laws and colonial laws that purported to mandate firearms in places of worship, which they claim support "the exact opposite of the tradition the state must establish." Pls.' Br. at 50. But government mandates are especially weak evidence of a right against government regulation. After all, the Second Amendment protects the *choice* to carry firearms for self-defense. *Heller*, 554 U.S. at 628-29. Plaintiffs themselves desire the right to "choose" whether to permit firearms at their church. Pls.' Br. at 28. Given that laws mandating that people carry firearms directly impact that choice,

24

they underscore only that the presence of firearms at places of worship has long been understood as a legitimate subject of government regulation.

Plaintiffs reach back still further, contending that an English court in 1686 placed conditions on when firearms in church could be prohibited. *Id.* at 49-50. They neglect to mention that by that point, English society had regarded the presence of firearms in places of worship to be a legitimate field of government regulation for over three centuries. *See* The Statute of Northampton of 1328, 82 Edw. 3, c. 3 (1328); 4 Hen. 4, c. 29 (1403); 26 Hen. 8, c. 6, § 3 (1534). Consequently, the historical laws plaintiffs invoke do not reflect a public understanding of the limitations imposed on a government's police powers by the Second Amendment or any precursor in English law.

Whatever meaning plaintiffs might derive from laws that long predate the Founding, the State nonetheless met its burden with extensive evidence from the nineteenth century that governments can and did prohibit the presence of firearms in places of worship. As the Eleventh Circuit recently confirmed, "historical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era" because the Reconstruction Era is when the States

25

adopted the Second Amendment through the Fourteenth Amendment. *National Rifle Ass'n v. Bondi*, No. 21-12314, 2023 WL 2416683, at *3 (11th Cir. Mar. 9, 2023). In that case, the Court held that a prohibition on the purchase of firearms by persons under 21 years old was supported by Reconstruction-era laws, notwithstanding eighteenth-century laws requiring people younger than 21 to muster for the militia. *Id.* at *8-13.

Here, and as explained in the State's opening brief (at 47-50), the State identified historical place-of-worship prohibitions from four States and two territories that became States, broader laws in two additional States that would have covered places of worship, local laws that affected places of worship in three additional States, and judicial decisions in at least two more States. Engaging with the State's reliance on each set of laws individually (Pls.' Br. at 50-53), plaintiffs exalt the parts over the whole, ignoring that the State's evidence collectively represented laws in over a dozen States that represented approximately 10,905,000 people or 28% of the U.S. population as of 1870.[2]

---

[2] U.S. Census Off., Dep't of the Interior, *Statistics of the Population of the United States at the Ninth Census (June 1, 1870)* tbl. 1 (1872). (For sources available online, full URLs appear in the Table of Authorities. All URLs were last visited on March 10, 2023.)

Plaintiffs' piecemeal quibbles with the State's evidence are unavailing. Plaintiffs seek to disqualify laws from southern States, suggesting that they might have racist origins notwithstanding the absence of any racial distinctions or classifications in the text of the statutes. *Id.* at 50-51. In any event, the unfortunate reality is that the eighteenth- and nineteenth-century laws to which *Bruen* directs the Second Amendment inquiry often codified prejudices that existed at the time. The State does not endorse any racist motivations behind certain historical gun regulations; it merely cites these laws to show the public has not historically understood the Second Amendment's right to bear arms to limit a government's ability to regulate firearms in places of worship in the interests of public safety.

Plaintiffs alternatively attempt to distinguish the State's historical precursors as not relevantly similar to the place-of-worship provision by pointing to self-defense exceptions in three such laws. *Id.* at 51-52. Plaintiffs' quibbling calls on the State to supply the very "historical twins" the Supreme Court has declared are unnecessary. *Bruen*, 142 S. Ct. at 2133. Plaintiffs also assert that Georgia's historical prohibition "later evolved to allow church leaders to decide the issue themselves." Pls.' Br. at 52.

27

Plaintiffs do not reveal what they mean by "later evolved," but the materials on which they rely make clear that they are referring to a *2012* Eleventh Circuit interpretation of a *2010* statute. *See* Boyd, *supra*, at 658-59 & nn.31-33 (quoting *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1261 & n.36, 1264 (11th Cir. 2012)). *Bruen* directed courts to use history to inform the validity of modern regulations, not the other way around.

Plaintiffs also resort to attacking the State's historical expert for "derid[ing]" *Bruen* in academic writing. Pls.' Br. at 49. But a historical expert's critiques of legal rulings have no bearing on the reliability of his or her historical analysis. To the extent that plaintiffs maintain that unspecified "other scholars" have "repudiated" the State's expert (*id.* (quotation marks omitted))—presumably not on the subject of sensitive places, since otherwise they would have said so—they only beg the question why they did not offer a conflicting opinion from their own expert and let the district court decide whose opinion was more persuasive. Having declined to do so, plaintiffs left the court with an undisputed historical record that was entirely one-sided in supporting the conclusion that places of worship are historically recognized sensitive places.

Moreover, the State explained in its opening brief (at 54-60) that places of worship are independently analogous to other historically recognized sensitive places, which is all that *Bruen* demands that it demonstrate, 142 S. Ct. at 2133. Plaintiffs offer in response that *Bruen*'s analogical approach is limited to "new" sensitive places, and places of worship are not "new." Pls.' Br. at 54. To be sure, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation" suggests its inconsistency with the Second Amendment. *Bruen*, 142 S. Ct. at 2131. But no such inference is compelled from the simple fact that places of worship and firearms predate the Founding.

Firearms have changed over the past several centuries. *See Heller*, 554 U.S. at 582. The threat to certain locations posed by semiautomatic weapons is quite different from the threat posed by muskets. Thus, the Supreme Court's reference to "new sensitive places" logically includes locations that have *become* sensitive because they developed the same characteristics as sensitive places recognized throughout history. Plaintiffs' cramped reading of *Bruen*, by contrast, would preclude common-sense firearm prohibitions inside places like libraries, hospitals, and psy-

chiatric institutions, regardless of how closely they resemble places where firearms have long been restricted.

Plaintiffs do not dispute that places of worship, like the sensitive places *Bruen* identified, are centers of constitutionally protected activity, but instead assert that there is no "historical tradition whatsoever for the notion that [a State] may choose to suppress constitutional rights it disfavors in service of promoting rights it favors." Pls.' Br. at 55. Plaintiffs' argument misunderstands sensitive-place regulations, which are based on the common understanding that the Second Amendment permits restrictions on guns in locations where the presence of firearms is sufficiently threatening to core public interests. *See, e.g.*, Joseph Blocher & Reva Seigel, *Second-Amendment Sensitive Places: Protecting Democratic Community and Commerce* (2023) (forthcoming N.Y.U. L. Rev.). If plaintiffs were correct that the place-of-worship provision "suppress[es]" the Second Amendment right to bear arms in order to promote religious rights (Pls.' Br. at 55), then by the same logic, a prohibition of firearms in courts "suppresses" the Second Amendment right in order to promote the First Amendment right to petition for redress. But neither argument is correct. Instead of offering this Court a coherent constitutional framework, plain-

30

tiffs simply seek to elevate an unbridled Second Amendment right over all others.

## POINT III

### THE EQUITABLE FACTORS FAILED TO SUPPORT A PRELIMINARY INJUNCTION

The State's opening brief (at 61-67) explained how the district court misapplied the remaining preliminary-injunction elements: namely, that there was likelihood of irreparable harm to plaintiffs in the absence of an injunction, that a preliminary injunction serves the public interest, and that the balance of other equities weighs in favor of a preliminary injunction. In response, plaintiffs have done little but reiterate their Second Amendment arguments, insisting that the purported showing of a constitutional violation necessarily satisfies the equitable factors as well. Pls.' Br. at 56. To the contrary, plaintiffs bear the burden of separately satisfying each of the preliminary-injunction factors, which they have failed to do here.

Independently of the merits, plaintiffs take issue with the State's assertion that their delay refutes irreparable harm. Although plaintiffs insist that the "the modest two months" it took them to file suit "bears no

resemblance to [the decisions] the state invokes" (*id.* at 57), delays of ten weeks can undercut the sense of urgency necessary to justify an injunction, *see Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276-77 (2d Cir. 1985). When measured from the enactment of the legislation that included the place-of-worship provision on July 1, 2022, the delay here was nearly 18 weeks. *See* Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Sys.).

According to plaintiffs and their amici, the State's public-interest argument actually works to support an injunction because the fact that places of worship are uniquely susceptible to gun violence "underscores the harm Pastor Spencer and the church stand to suffer from being disarmed by the state." *See* Pls.' Br. at 58; *see also* Congregation Br. at 8, 15-16. Plaintiffs might believe that the answer to gun violence is to give guns to more people. But neither they—nor the district court—can impose that policy choice on the people of New York State. *See United States Sec. & Exch. Comm'n v. Citigroup Global Mkts., Inc.*, 752 F.3d 285, 296-97 (2d Cir. 2014) (district court improperly defined "the public interest"). And plaintiffs do not dispute that, by remarking that the public has an interest in the "strong sense of the safety" that guns provide

(J.A. 38 (quotation marks omitted)), this is precisely what the district court did. Such a policy determination was beyond the court's authority.

## CONCLUSION

This Court should reverse the district court's order granting a preliminary injunction against enforcement of the place-of-worship provision.

Dated:  Albany, New York
         March 10, 2023

                                        Respectfully submitted,

                                        LETITIA JAMES
                                          *Attorney General*
                                          *State of New York*
                                        Attorney for Appellant


                                 By:  */s/ Jonathan D. Hitsous*
                                        JONATHAN D. HITSOUS
                                        Assistant Solicitor General

BARBARA D. UNDERWOOD                    The Capitol
  *Solicitor General*                   Albany, New York 12224
ESTER MURDUKHAYEVA                      (518) 776-2044
  *Deputy Solicitor General*
JONATHAN D. HITSOUS
  *Assistant Solicitor General*
     *of Counsel*

33

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,358 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Kelly Cheung*